# Exhibit B

# [NYSCEF No. 1]

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| JOHN DOE,<br><br>Plaintiff,<br><br>vs.<br><br>MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN, COINBASE, INC.; and COINBASE GLOBAL, INC.<br><br>Defendants. | Index No.:<br>Date purchased:<br><br>**SUMMONS WITH NOTICE**<br><br>Plaintiff designates New York County as the place of trial.<br><br>The basis for the venue is CPLR § 503(a) |

**TO THE ABOVE-NAMED DEFENDANTS:**

***YOU ARE HEREBY SUMMONED*** to appear in this action by serving a notice of appearance or demand for the complaint upon Plaintiff's attorney at the address stated below within the time provided by the law as set forth at the end of this summons. In case of your failure to appear or answer, judgment will be taken against you by default for the sum and relief demanded herein.

Plaintiff designates New York County as the place of trial.

Venue is proper in this Court pursuant to CPLR § 503(a) because a substantial part of the events giving rise to the claim occurred in New York County.

Plaintiff brings this action to hold defendants accountable for their actions taken to promote and operate an illegal offshore gambling platform, Stake.com, to target and acquire minor users,

including Plaintiff. The Stake Defendants, permitted underage users, including Plaintiff, to wager on their platforms, while the Coinbase Defendants, knowingly supplied routing and payment infrastructure that made such wagering possible. The actions of the Defendants caused the Plaintiff to develop a gambling addiction as a minor, which has impacted his ability to be a productive member of society as an adult.

This conduct violated state laws enacted to protect minors and to prevent the exploitation of vulnerable users through unlawful gambling activity. (See, e.g., N.Y. Rac. Pari-Mut. Wag. & Breed. Law §§ 1332, 1362, 1367(4), 1404; N.Y. Comp. Codes R. & Regs. Tit. 9., §§ 5329.19(a), 5313.2, 5325, 5327.)

Plaintiff seeks judgment against Defendants, as follows:

**A. Declaratory Judgment**

1. A declaration that no agreement to arbitrate was formed with Coinbase Defendants due to the express eligibility condition, and that any purported arbitration, delegation, and/or forum-selection provisions asserted by any Defendant are unenforceable as to Plaintiff based on infancy and disaffirmance for conduct occurring while Plaintiff was a minor.

**B. Compensatory Damages (Economic)**

1. An award of damages in an amount to be determined at trial, but no less than the total funds misappropriated from Plaintiff.
2. An award for the costs of Plaintiff's past and future medical care, psychological therapy, and vocational rehabilitation necessary to restore his economic capacity.

**C. Compensatory Damages (Non-Economic)**

1. An award for Plaintiff's pain and suffering, emotional distress, loss of enjoyment of life, and loss of youth caused by the Defendants' willful exploitation and grooming.

**D. Punitive Damages**

1. An award of Punitive Damages against all Defendants in an amount sufficient to punish their willful, wanton, and reckless misconduct, and to deter similar corporate malfeasance. Plaintiff requests an award of Punitive Damages in an amount commensurate with Defendants' revenue to ensure meaningful deterrence.

**E. Statutory Damages**

1. An award of statutory treble damages and reasonable attorney's fees pursuant to N.Y. Gen. Bus. Law § 349(h).

**F. Injunctive Relief**

1. An Order enjoining the Operator Defendants (as defined in the Complaint) from accepting wagers from New York users unless, before any deposit or wagering, the user completes robust age and identity verification, including document verification plus liveness/selfie verification, and prohibiting acceptance of wagers where geolocation controls indicate VPN/proxy use or location inconsistency.

**G. Interest & Costs**

1. Pre-judgment and post-judgment interest on all amounts awarded, as allowed by law.

In the event of your default, judgment may be taken against you for the relief described above.

**YOU ARE ADVISED TO APPEAR AND ANSWER.**

If served within the State of New York, the time to appear is 20 days after service, exclusive of the day of service, 30 days if served pursuant to CPLR § 308(4) or CPLR § 308(5). If served outside the State of New York, the time to appear is 30 days after service, exclusive of the day of service.

Dated: April 10, 2026

David R. Buchanan
Nigel P. Halliday (*pro hac vice to be filed*)
**SEEGER WEISS LLP**
55 Challenger Road, Sixth Floor
Ridgefield Park, NJ 07660
Telephone: (973) 639-9100
Facsimile: (973) 639-8656
dbuchanan@seegerweiss.com
nhalliday@seegerweiss.com

Troy Rafferty (*pro hac vice to be filed*)
Madeline Pendley (*pro hac vice to be filed*)
**RAFFERTY DOMNICK CUNNINGHAM & YAFFA**
815 South Palafox Street, 3rd Floor
Pensacola, FL 32502
Telephone: (850) 208-0830
troy@pbglaw.com
madeline@pbglaw.com

Frederick Schenk (*pro hac vice to be filed*)
Benjamin S. Schenk (*pro hac vice to be filed*)
**THE SCHENK LAW FIRM, LLP**
600 West Broadway, Suite 700
San Diego, California 92101
Telephone: (858) 424-4444
Facsimile: (858) 206- 9008
fred@schenklawfirm.com
ben@schenklawfirm.com

***Counsel for Plaintiff***

**TO: (continued on next page)**
**MEDIUM RARE N.V. D/B/A STAKE.COM**
Seru Loraweg 17B, Curaçao

**SWEEPSTEAKS LTD. d/b/a STAKE.US**

28 Oktovrio, 313 Omrania BLD, Limassol, CY-3105, Cyprus

**SWEEPSTEAKS LTD. d/b/a STAKE.US**
13101 Preston Road, Suite 110-5027 Dallas, TX 75240

**EASYGO GROUP HOLDINGS PTY LTD.**
Level 2, 287-293 Collins Street, Melbourne VIC 3000, Australia

**EASYGO ENTERTAINMENT PTY LTD.**
Level 2, 287-293 Collins Street, Melbourne VIC 3000, Australia

**MEDIUM RARE LTD.**
7-9 Riga Feraiou, Lizantia Court, Office 310, Agioi Omologites, 1087 Nicosia, Cyprus

**SLICEMEDIA B.V.**
Fransche Bloemweg 4, Willemstad, Curaçao

**BIJAN TEHRANI**
7 Riverside Quay, Unit 8401, Melbourne VIC 2006, Australia

**EDWARD CRAVEN**
35 Queens Bridge Street, Unit 6301, Southbank VIC 3006, Australia

**CHRISTOPHER FREEMAN**
788 NE 23rd ST, Unit 3602, Miami, FL 33137- 5913

**COINBASE GLOBAL, INC.**
c/o Registered Agent - CT Corporation System, 1999 Bryan St. #900, Dallas, Texas 75201

**COINBASE, INC.**
c/o Registered Agent - CT Corporation System, 1999 Bryan St. #900, Dallas, Texas 75201

[NYSCEF No. 2]

At the Ex Parte Motion Office of the Supreme Court of the State of New York, held in and for the County of New York, at the Courthouse located at 60 Centre Street, New York, NY on the ______ day of ________, 20__

PRESENT:

Hon.________________________

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

JOHN DOE,

Plaintiff,

-against-

MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN COINBASE, INC.; and COINBASE GLOBAL, INC.,

Defendants.

---

Index No.:

ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER

Upon reading the Summons with Notice and Complaint in this action, dated April 10, 2026, the Affidavit/Affirmation in support of their motion to assign an index number to this matter with the above caption to the parties and their respective counsel,

Let the plaintiff John Doe, SHOW CAUSE at an IAS Part ____, Room _____ of this Court, to be held before The Hon. ________________________________ in an ______, at the County of New York Courthouse, located at 60 Centre Street, New York, New York, on the ____________ day of ___________, 20__, at _______ in the ____ or as soon as the parties to this proceeding may

be heard, why an order should not be issued, directing that the County Clerk enter the caption of the above-entitled proceeding in the current minute books and indices of actions and proceedings maintained in his office under the title of JOHN DOE, vs. MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN COINBASE, INC.; and COINBASE GLOBAL, INC., and it is

HON. JAMES G. CLYNES J.S.C.
APR 10 2026

**ORDERED** that, pending the hearing of this matter BEFORE THE JUSTICE TO BE ASSIGNED, the Clerk of this Court, upon payment of the proper fees, is hereby directed to assign an index number to this proceeding, and to accept for filing a Request for Judicial Intervention ("RJI") bearing the following caption, namely:

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

JOHN DOE,

Plaintiff,

-against-

MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN COINBASE, INC.; and COINBASE GLOBAL, INC.,

Defendants.

---

and it is further

JSC

**ORDERED** that, personal service of a copy of this Order to Show Cause together with the papers upon which it is based and the Summons with Notice/Summons and Complaint be served upon Defendants, on or before the _____ day of ___________, 20__.

**ENTER~~ED~~:** ____________________________________
JSC

[NYSCEF No. 3]

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

JOHN DOE,

Index No.:

Plaintiff,

-against-

MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN COINBASE, INC.; and COINBASE GLOBAL, INC.,

Defendants.

---

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR AN ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER**

## PRELIMINARY STATEMENT

Plaintiff respectfully submits this Memorandum of Law in support of his application for an Order to Show Cause with Temporary Restraining Order, permitting this action to proceed under the pseudonym "JOHN DOE," and keeping the identity of the Plaintiff confidential throughout the course of this litigation.

This is a case about an online crypto casino which maintained and maintains a deliberately ineffective age verification system, allowing children in New York to gamble freely, all while marketing itself through means, like partnerships with popular celebrities associated with videogames played by children, that would induce children to seek out the online crypto casino. As a result of this scheme, Plaintiff—at the age of twelve years old—began gambling in Defendants' online crypto casino. Plaintiff has now developed a serious gambling addiction, which has, among other consequences, destroyed his college career, placed him a position where his family must manage his finances for him, and required him to seek specialized medical treatment. This matter is thus highly sensitive and will cause embarrassment, stigma, and humiliation to the Plaintiff and his family if Plaintiff's identity is not anonymized. Moreover, Plaintiff has a genuine fear of the unwanted, negative publicity and attention that he will undoubtedly receive from filing the complaint in this action, along with a along with a genuine fear of mental harm if his identity is publicized. As demonstrated below, Plaintiff meets the requirements of New York law to proceed with this action while keeping his identity confidential. Accordingly, Plaintiff respectfully requests that this Honorable Court permit him to proceed in this action using a pseudonym and direct all parties to maintain the identity of the Plaintiff in confidence.

## STATEMENT OF FACTS

When Plaintiff was ten, he created an account on a website which hosts livestreamed commentary about video games, including video games that Plaintiff enjoyed. Many of the commentators who Plaintiff watched were secretly being paid by Defendants to promote an online crypto casino operated by Defendants, Stake.com. When Plaintiff was twelve, he began gambling on Stake as a result of this targeted recruitment. Gambling is addictive, particularly for minor children whose developing brains are particularly sensitive to this kind of stimuli. Despite knowing this, and knowing that their marketing strategy of hiring popular videogame commentators as secret promoters would inevitably induce children to access their online crypto casino, Defendants had no meaningful age verification system at the time Plaintiff created his account.

Plaintiff quickly developed a gambling addiction, with devastating consequences. Plaintiff stole thousands of dollars from his family to feed his addiction. In high school, Plaintiff felt unable to study or concentrate because gambling was "the only thing that felt fun." Shortly after enrolling in college, Plaintiff had to drop out and return home because he immediately gambled away the money he had for living expenses. Plaintiff has been forced to seek specialized medical care in order to treat his gambling addiction. Today, he is unable to independently manage his finances and relies on his family to control his spending as a result of the serious mental health harms he suffered as a direct result of Defendants' conduct.

## ARGUMENT

In deciding whether to allow a plaintiff to proceed anonymously in litigation, courts must weigh the merits of competing interests. "When determining whether to allow plaintiff to proceed anonymously, the court must use its discretion in balancing plaintiffs' privacy interest against the presumption in favor of open trials and against any potential prejudice to defendant." *Stevens v.*

*Brown,* 2012 N.Y. Slip Op. 31823 [U], 2012 WL 2951181 (Sup. Ct., N.Y. County 2012) (citations omitted). As laid out by the First Department, a party will be permitted to proceed anonymously upon alleging that a matter implicates "a privacy right so substantial as to outweigh the customary and constitutionally embedded presumption of openness in judicial proceedings." *J. Doe No. 1 v. CBS Broadcasting Inc.*, 24 A.D.3d 215, 215 (1st Dept. 2005). Further, a plaintiff's anonymity should be permitted "where a substantial privacy interest is involved." *Doe v. New York Univ.*, 786 N.Y.S.2d 892, 879 (Sup. Ct., N. Y. County 2004) (quoting Milani, *Doe v. Roe: An Argument for Defendant Anonymity When a Pseudonymous Plaintiff Alleges a Stigmatizing Intentional Tort*, 41 Wayne L. Rev. 1659, 1684 (1995)). The factors that a court must consider in making this determination include:

> [1] Whether the justification asserted ... is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of a sensitive and highly personal nature; [2] whether the party seeking anonymity has an illegitimate ulterior motive; [3] the extent to which the identity of the litigant has been kept confidential; [4] whether identification poses a risk of mental or physical harm, harassment, ridicule, or personal embarrassment; [5] whether the case involves information of the utmost intimacy; [6] whether the action is against a governmental or private entity; [7] the magnitude of the public interest in maintaining confidentiality or knowing the party's identity; [8] whether revealing the identity of the party will dissuade the party from bringing the lawsuit; [9] whether the opposition to anonymity has an illegitimate basis; [and] [10] whether the other side will be prejudiced by use of the pseudonym.

*Stevens v. Brown*, 2012 WL 2951181 at *1.

Plaintiff meets this standard. Plaintiff seeks anonymity here not for any improper purpose, but to preserve privacy in a matter that is sensitive and highly personal—a suit about his childhood gambling and struggles with gambling addiction. Should Plaintiff's identity be disclosed, he risks social stigmatization, embarrassment, and humiliation. Thus, it is clear that in considering the

factors enumerated in *Stevens v. Brown*, none weigh against permitting Plaintiff to file a complaint under a pseudonym and remain anonymous in this action. Plaintiff does not seek to seal court records or proceedings. The public's right to free and open access to court records and proceedings is not abridged by permitting the anonymity requested, and no public interest would be served by revealing the identity of the Plaintiff. "Though ordinarily trials and judicial proceedings are open to the public view and the public has an interest in the disclosure of court records, the public's right to inspect and copy judicial records is not absolute nor unrestricted and is a matter of judicial discretion." *Doe v. Bellmore-Merrick Central High School District*, 770 N.Y.S.2d 847, 848 (Sup. Ct., Nassau County 2003) (internal citations omitted). Significantly, there will be no prejudice whatsoever to the Defendants if Plaintiff's application for anonymity is granted. Plaintiff can reveal his identity to the Defendants in confidence shortly after the commencement of this action so that discovery can proceed unimpeded.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Honorable Court grant the application for an Order to Show Cause with Temporary Restraining Order, thereby permitting Plaintiff to file his complaint using the pseudonym "JOHN DOE," permitting the Plaintiff, to remain anonymous in all court filings, and directing the parties to maintain the Plaintiff's identity in confidence.

Dated: April 10, 2026

David R. Buchanan
Nigel Halliday (pro hac vice pending)
SEEGER WEISS LLP
55 Challenger Road, Sixth Floor
Ridgefield Park, NJ 07660
Phone: (973) 639-9100
Facsimile: (973) 639-8656
Dbuchanan@seegerweiss.com
nhalliday@seegerweiss.com

Frederick Schenk (pro hac vice to be filed)
Benjamin S. Schenk (pro hac vice to be filed)
**THE SCHENK LAW FIRM, LLP**
600 West Broadway, Suite 700
San Diego, California 92101
Telephone: (858) 424-4444
Facsimile: (858) 206- 9008
*fred@schenklawfirm.com*
*ben@schenklawfirm.com*

Troy Rafferty (*pro hac vice pending*)
Madeline Pendley (*pro hac vice pending*)
**RAFFERTY DOMNICK CUNNINGHAM & YAFFA**
815 South Palafox Street, 3rd Floor
Pensacola, FL 32502
Telephone: (850) 208-0830
*troy@pbglaw.com*
*madeline@pbglaw.com*

***Counsel for Plaintiff***

# [NYSCEF No. 4]

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

JOHN DOE,

Plaintiff,

-against-

MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN COINBASE, INC.; and COINBASE GLOBAL, INC.,

Defendants.

Index No.:

AFFIRMATION IN SUPPORT OF ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER

---

David R. Buchanan, an attorney admitted to practice in the courts of the State of New York, affirms under penalty of perjury that:

1. I am a member of Seeger Weiss LLP, counsel for the Plaintiff in "JOHN DOE v. MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARDS CRAVEN, CHRISTOPHER FREEMAN COINBASE, INC.; and COINBASE GLOBAL, INC.," filed in the Supreme Court of the State of New York, County of New York. I submit this affirmation in support of an Order to Show Cause with Temporary Restraining Order allowing Plaintiff to proceed anonymously and permitting the use of the pseudonyms "JOHN DOE" for the name of the Plaintiff in all papers filed herein.

2. This is a tort case brought against an online casino by a person who, when a minor child, developed a gambling addiction and other serious harms as a result of the online casino's conduct.

As such, these allegations concern matters that are highly sensitive in nature, profoundly private, and potentially embarrassing, stigmatizing and humiliating to the Plaintiff.

3. The details of the harm suffered by the victim are set forth in the Memorandum of Law filed herewith in support of this application for an Order to Show Cause with Temporary Restraining Order. Plaintiff seeks to proceed in this litigation without revealing his identity to the public, in order to maintain his privacy and avoid the attendant publicity and media scrutiny that would accompany the disclosure of the identity of a child victim, as well as to avoid undue embarrassment, shame, ridicule, and potential retaliation Plaintiff and his family face.

4. As set forth in the Plaintiff's Memorandum of Law, submitted herewith in support of this application for an Order to Show Cause with Temporary Restraining Order, the law of the State of New York permits plaintiffs to proceed anonymously and permit actions to be brought under a pseudonym where the plaintiff has a substantial privacy interest in proceeding anonymously. *Doe v. New York Univ.*, 786 N.Y.S.2d 892 (Sup. Ct., N.Y. County 2004).

5. The relief requested in Plaintiff's application for an Order to Show Cause with Temporary Restraining Order will neither prejudice the Defendants nor curtail the rights of the public and the media to access judicial records. The Plaintiff's identity will be revealed confidentially to Defendants' counsel. Thus, the anonymity sought will in no way impede discovery or thwart the defense mounted by the Defendants. In addition, the public and the media will have unfettered access to the filings in this case because Plaintiff does not seek an order sealing the records herein.

6. A prior application has not been made for the relief now requested.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter an order granting the following relief:

(a) Permitting Plaintiff to use the pseudonym "JOHN DOE" and deeming the filing of the Plaintiff's complaint under the caption "JOHN DOE v. MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARDS CRAVEN, CHRISTOPHER FREEMAN COINBASE, INC.; and COINBASE GLOBAL, INC" to be proper;

(b) Ordering all parties to the aforesaid action to maintain the confidentiality of the Plaintiff's true identity;

(c) Ordering all parties to the aforesaid action to use the pseudonym "JOHN DOE" to identify Plaintiff when filing pleadings, motions or other documents with the Court, and for all pleadings, motions, or other filings to bear the caption "JOHN DOE v. MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARDS CRAVEN, CHRISTOPHER FREEMAN COINBASE, INC.; and COINBASE GLOBAL, INC.,"

Dated: April 10, 2026

David R. Buchanan
SEEGER WEISS LLP
55 Challenger Road, Sixth Floor
Ridgefield Park, NJ 07660
Phone: (973) 639-9100
Facsimile: (973) 639-8656
Dbuchanan@seegerweiss.com

# [NYSCEF No. 5]

UCS-840
(rev. 12/16/2024)

# REQUEST FOR JUDICIAL INTERVENTION

SUPREME COURT, COUNTY OF NEW YORK

Index No: ________________ Date Index Issued: ________________

For Court Use Only:
IAS Entry Date
Judge Assigned
RJI Filed Date

**CAPTION** Enter the complete case caption. Do not use et al or et ano. If more space is needed, attach a caption rider sheet.

JOHN DOE,

Plaintiff(s)/Petitioner(s)

-against-

MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN, COINBASE, INC.; AND COINBASE GLOBAL, INC.

Defendant(s)/Respondent(s)

**NATURE OF ACTION OR PROCEEDING** Check only one box and specify where indicated.

**COMMERCIAL**
- ○ Business Entity (includes corporations, partnerships, LLCs, LLPs, etc.)
- ○ Contract
- ○ Insurance (where insurance company is a party, except arbitration)
- ○ UCC (includes sales and negotiable instruments)
- ○ Other Commercial (*specify*): ____________

***NOTE:*** *For Commercial Division assignment requests pursuant to 22 NYCRR 202.70(d), complete and attach the* ***COMMERCIAL DIVISION RJI ADDENDUM (UCS-840C)****.*

**TORTS**
- ○ Asbestos
- ○ Environmental (*specify*): ____________
- ○ Medical, Dental or Podiatric Malpractice
- ○ Motor Vehicle
- ○ Products Liability (*specify*): ____________
- ◉ Other Negligence (*specify*): child gambling
- ○ Other Professional Malpractice (specify): ____________
- ○ Other Tort (specify): ____________

**SPECIAL PROCEEDINGS**
- ○ Child-Parent Security Act (*specify*): ○ Assisted Reproduction ○ Surrogacy Agreement
- ○ CPLR Article 75 – Arbitration [see ***NOTE*** in **COMMERCIAL** section]
- ○ CPLR Article 78 – Proceeding against a Body or Officer
- ○ Election Law
- ○ Extreme Risk Protection Order
- ○ MHL Article 9.60 – Kendra's Law
- ○ MHL Article 10 – Sex Offender Confinement (*specify*): ○ Initial ○ Review
- ○ MHL Article 81 (Guardianship)
- ○ Other Mental Hygiene (*specify*): ____________
- ○ Other Special Proceeding (*specify*): ____________

**MATRIMONIAL**
- ○ Contested

***NOTE:*** *If there are children under the age of 18, complete and attach the* ***MATRIMONIAL RJI ADDENDUM (UCS-840M)****.*
*For Uncontested Matrimonial actions, use the Uncontested Divorce RJI (****UD-13****).*

**REAL PROPERTY** Specify how many properties the application includes: _______
- ○ Condemnation
- ○ Mortgage Foreclosure (*specify*): ○ Residential ○ Commercial

Property Address: ____________

***NOTE:*** *For Mortgage Foreclosure actions involving a one to four-family, owner-occupied residential property or owner-occupied condominium, complete and attach the* ***FORECLOSURE RJI ADDENDUM (UCS-840F)****.*
- ○ Partition

***NOTE:*** *Complete and attach the* ***PARTITION RJI ADDENDUM (UCS-840P)****.*
- ○ Tax Certiorari (*specify*): Section:________ Block:________ Lot:________
- ○ Tax Foreclosure
- ○ Other Real Property (*specify*): ____________

**OTHER MATTERS**
- ○ Certificate of Incorporation/Dissolution [see ***NOTE*** in **COMMERCIAL** section]
- ○ Emergency Medical Treatment
- ○ Habeas Corpus
- ○ Local Court Appeal
- ○ Mechanic's Lien
- ○ Name Change/Sex Designation Change
- ○ Pistol Permit Revocation Hearing
- ○ Sale or Finance of Religious/Not-for-Profit Property
- ○ Other (*specify*): ____________

**STATUS OF ACTION OR PROCEEDING** Answer YES or NO for every question and enter additional information where indicated.

| | YES | NO | |
|---|---|---|---|
| Has a summons and complaint or summons with notice been filed? | ◉ | ○ | If yes, date filed: 04/07/2026 |
| Has a summons and complaint or summons with notice been served? | ○ | ◉ | If yes, date served: ____________ |
| Is this action/proceeding being filed post-judgment? | ○ | ◉ | If yes, judgment date: ____________ |

**NATURE OF JUDICIAL INTERVENTION** Check one box only and enter additional information where indicated.
- ○ Infant's Compromise
- ○ Extreme Risk Protection Order Application
- ○ Note of Issue/Certificate of Readiness
- ○ Notice of Medical, Dental or Podiatric Malpractice — Date Issue Joined: ____________
- ○ Notice of Motion — Relief Requested: ____________ Return Date: ____________
- ○ Notice of Petition — Relief Requested: ____________ Return Date: ____________
- ◉ Order to Show Cause — Relief Requested: Permitting Plaintiff to use the pseudonym "JOHN DOE," Return Date: ____________
- ○ Other Ex Parte Application — Relief Requested: ____________
- ○ Partition Settlement Conference
- ○ Request for Preliminary Conference
- ○ Residential Mortgage Foreclosure Settlement Conference
- ○ Waiver of Court Costs, Fees, and Expenses
- ○ Writ of Habeas Corpus
- ○ Other (specify): ____________

**RELATED CASES** List any related actions. For Matrimonial cases, list any related criminal or Family Court cases. If none, leave blank. If additional space is required, complete and attach the **RJI ADDENDUM (UCS-840A)**.

| Case Title | Index/Case Number | Court | Judge (if assigned) | Relationship to instant case |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**PARTIES** For parties without an attorney, check the "Un-Rep" box and enter the party's address, phone number and email in the space provided. If additional space is required, complete and attach the **RJI ADDENDUM (UCS-840A)**.

| Un-Rep | Parties<br>List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant, 3rd party plaintiff, etc.) | Attorneys and Unrepresented Litigants<br>For represented parties, provide attorney's name, firm name, address, phone and email. For unrepresented parties, provide party's address, phone and email. | Issue Joined<br>For each defendant, indicate if issue has been joined. | Insurance Carriers<br>For each defendant, indicate insurance carrier, if applicable. |
|---|---|---|---|---|
| ☐ | Name: JOHN DOE<br>Role(s): Plaintiff | David R. Buchanan, Nigel P. Halliday, SEEGER WEISS LLP, 55 Challenger Road, Sixth Floor, Ridgefield Park, NJ 07660 TEL: (973)639-9100 Email: dbuchanan@seegerweiss.com, nhalliday@seegerweiss.com | ○ YES ○ NO | |
| ☐ | Name: JOHN DOE<br>Role(s): Plaintiff | Frederick Schenk, Benjamin S. Schenk, THE SCHENK LAW FIRM, LLP, 600 West Broadway, Suite 700, San Diego, California 92101 TEL: (858) 424-444 Email: fred@schenklawfirm.com, ben@schenklawfirm.com | ○ YES ○ NO | |
| ☐ | Name: JOHN DOE<br>Role(s): Plaintiff | Troy Rafferty, Madeline Pendley, RAFFERTY DOMNICK CUNNINGHAM & YAFFA, 815 South Palafox Street, 3rd Floor, Pensacola, FL 32502 TEL: (850)208-0830 Email: troy@pbglaw.com, madeline@ pbglaw.com | ○ YES ○ NO | |
| ☒ | Name: MEDIUM RARE N.V. D/B/A STAKE.COM<br>Role(s): Defendant | Seru Loraweg 17B, Curaçao | ○ YES ● NO | |
| ☒ | Name: SWEEPSTEAKS LTD. d/b/a STAKE.US<br>Role(s): Defendant | 28 Oktovrio, 313 Omrania BLD, Limassol, CY-3105, Cyprus // 13101 Preston Road, Suite 110-5027 Dallas, TX 75240 | ○ YES ● NO | |
| ☒ | Name: EASYGO GROUP HOLDINGS PTY LTD.<br>Role(s): Defendant | Level 2, 287-293 Collins Street, Melbourne VIC 3000, Australia | ○ YES ● NO | |
| ☒ | Name: EASYGO ENTERTAINMENT PTY LTD.<br>Role(s): Defendant | Level 2, 287-293 Collins Street, Melbourne VIC 3000, Australia | ○ YES ● NO | |
| ☒ | Name: MEDIUM RARE LTD.<br>Role(s): Defendant | 7-9 Riga Feraiou, Lizantia Court, Office 310, Agioi Omologites, 1087 Nicosia, Cyprus | ○ YES ● NO | |
| ☒ | Name: SLICEMEDIA B.V.<br>Role(s): Defendant | Fransche Bloemweg 4, Willemstad, Curaçao | ○ YES ● NO | |
| ☒ | Name: BIJAN TEHRANI<br>Role(s): Defendant | 7 Riverside Quay, Unit 8401, Melbourne VIC 2006, Australia | ○ YES ● NO | |
| ☒ | Name: EDWARD CRAVEN<br>Role(s): Defendant | 35 Queens Bridge Street, Unit 6301, Southbank VIC 3006, Australia | ○ YES ● NO | |
| ☒ | Name: CHRISTOPHER FREEMAN<br>Role(s): Defendant | 788 NE 23rd ST, Unit 3602, Miami, FL 33137- 5913 | ○ YES ● NO | |
| ☒ | Name: COINBASE GLOBAL, INC.<br>Role(s): Defendant | c/o Registered Agent - CT Corporation System, 1999 Bryan St. #900, Dallas, Texas 75201 | ○ YES ● NO | |
| ☒ | Name: COINBASE, INC.<br>Role(s): Defendant | c/o Registered Agent - CT Corporation System, 1999 Bryan St. #900, Dallas, Texas 75201 | ○ YES ● NO | |
| ☐ | Name:<br>Role(s): | | ○ YES ○ NO | |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, UPON INFORMATION AND BELIEF, THERE ARE NO OTHER RELATED ACTIONS OR PROCEEDINGS, EXCEPT AS NOTED ABOVE, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION BEEN PREVIOUSLY FILED IN THIS ACTION OR PROCEEDING.**

Dated: **04/07/2026** *_/s/ David R. Buchanan_*
Signature

**2636819** **David R. Buchanan**
Attorney Registration Number Print Name

# [NYSCEF No. 6]

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| JOHN DOE,<br><br>Plaintiff,<br><br>vs.<br><br>MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN, COINBASE, INC.; and COINBASE GLOBAL, INC.<br><br>Defendants. | Index No.:<br><br>**COMPLAINT FOR DAMAGES**<br><br>Jury Trial Demanded |

Plaintiff John Doe brings this Complaint against Defendants Medium Rare N.V. d/b/a Stake.com, Sweepsteaks Ltd. d/b/a Stake.us, Easygo Group Holdings Pty Ltd., Easygo Entertainment Pty Ltd., Medium Rare Ltd., Slicemedia B.V., Bijan Tehrani, Edward Craven, Christopher Freeman, Coinbase, Inc.; and Coinbase Global, Inc., ("Defendants") and alleges, upon personal knowledge as to his own actions and his counsel's investigations, and upon information and belief as to all other matters, as follows:

## I. INTRODUCTION

1. This case is about the promotion and operation of an illegal offshore gambling platform, Stake.com, to target and acquire minor users, including Plaintiff.

2. As a minor in New York, Plaintiff was recruited to participate in underage gambling through gambling livestreams and platform endorsement deals (via the Stake Defendants), and

then routed to a U.S.-facing crypto onramp that enabled repeated deposits to offshore casino wallets (via the Coinbase Defendants).

3. The Stake Defendants, as described below, permitted underage users, including Plaintiff, to wager on their platforms, while Defendant Coinbase knowingly supplied routing and payment infrastructure that made such wagering possible.

4. In the case of Coinbase, Defendants facilitated the conversion and transfer of funds used for illegal gambling by a minor, notwithstanding Coinbase's own 18-and-over eligibility requirements and public representations regarding restricted uses.

5. This conduct violated state laws enacted to protect minors and to prevent the exploitation of vulnerable users through unlawful gambling activity. (See, e.g., N.Y. Rac. Pari-Mut. Wag. & Breed. Law §§ 1332, 1362, 1367(4), 1404; N.Y. Comp. Codes R. & Regs. Tit. 9., §§ 5329.19(a), 5313.2, 5325, 5327.)

6. The predictable result of Defendants' operation was a devastating impact on Plaintiff, including years of financial losses and a severe addiction-related injury, all incurred before Plaintiff was legally allowed to gamble.

7. Although he has made progress through recovery programs, Plaintiff's injuries endure and will require lifelong care and management.

8. The prevalence of online gambling by underage users is rapidly increasing, and has become the next addiction crisis; following on the heels of the opioid epidemic and the now infamous tobacco litigation.

9. The Defendants that prey on our youth must be held accountable for the destruction they have, and are continuing to cause.

## II. PARTIES AND CITIZENSHIP

### *A. __Plaintiff:__*

10. Plaintiff John Doe is a citizen of New York, residing in Westchester County, NY.

11. Plaintiff was a minor when he began gambling on Defendants' platforms, Stake.com and Primedice.

12. Between the ages of 13 and 19, Plaintiff engaged in frequent online gambling activity, which he concealed from his parents.

13. During his teenage years, Plaintiff incurred substantial online gambling losses, depleting his personal savings and, when his own funds were exhausted, charging his father's credit card without authorization.

14. The financial impact extended beyond those direct losses. Plaintiff's gambling impaired his ability to maintain a bank account or manage personal finances without relapse concerns, and created ongoing financial strain within his family, which assumed responsibility for addressing the resulting debts.

15. Plaintiff's gambling addiction derailed his education and early adulthood.

16. Plaintiff was unable to study or concentrate through high school because gambling was "the only thing that felt fun."

17. While his peers were preparing for college, Plaintiff compulsively stayed awake through the night placing online bets, sleeping little, and hiding his activities.

18. After graduating high school, he enrolled at Indiana University, but withdrew within one week of arriving, telling his family he could not remain on campus.

19. The true reason, later revealed, was that he had already lost all available funds and was unable to pay for food or necessities.

20. The illicit gambling operation, as described in this Complaint, robbed Plaintiff of his opportunity to attend college and the formative social experiences that accompany it.

21. Instead of attending college, Plaintiff moved back to his childhood home and began intensive therapy at Columbia University's specialized addiction counseling program to treat his compulsive gambling.

22. Plaintiff has been formally diagnosed with compulsive gambling disorder and panic disorder, suffers from anxiety, depression, and recurring panic attacks—episodes in which he feels he "is going to die" and cannot control his breathing, among other psychological and emotional injuries all caused by Defendants' harm.

23. When the Columbia University program failed to treat Plaintiff's addiction, he turned to Gambler's Anonymous (GA).

24. Plaintiff currently attends four GA meetings per week, spends about ten (10) hours weekly in therapy, and works with a sponsor daily.

25. Plaintiff's addiction severely and permanently strained his familial relationships.

26. To conceal his gambling losses, he repeatedly lied and manipulated his parents to access money; the addiction preyed upon, exploited, and fractured the most sacred bond: the trust between parent and child.

27. To prevent relapse, and in a fragile attempt at rebuilding trust, Plaintiff's father now acts as his personal financial controller.

28. Plaintiff maintains de minimis sums of money in his bank account, and requests small amounts of money from his father for daily expenses.

29. His father reviews receipts to account for every expense to ensure that Plaintiff did not use the money on gambling.

30. Plaintiff damaged his credibility with his siblings and must watch as they progress and flourish through their lives.

31. The cumulative effect of Plaintiff's addiction has eroded Plaintiff's self-esteem, confidence, and the ability to enjoy the pleasures of ordinary life.

32. The addiction has permanently altered his life's trajectory, forcing Plaintiff to live under financial guardianship, jeopardizing his career options, and leaving permanent emotional scars.

33. Through this Complaint, Plaintiff brings claims for damages and injunctive relief under New York common law, New York's Gen. Bus. Law § 349, and similar state consumer protection statutes.

***B. Stake Defendants:***

34. The following Defendants operate as a single engaged enterprise, hereinafter referred to collectively as the "**Stake Defendants**":

a. Defendant Medium Rare N.V. d/b/a Stake.com ("Medium Rare");

b. Defendant Sweepsteaks Ltd. d/b/a Stake.us ("Sweepsteaks");

c. Defendant Easygo Group Holdings Pty Ltd. ("Easygo Holdings");

d. Defendant Easygo Entertainment Pty Ltd. ("Easygo Entertainment");

e. Defendant Medium Rare LTD.;

f. Defendant Slicemedia B.V. ("Slicemedia");

g. Defendant Bijan Tehrani ("Tehrani"); and

h. Defendant Edward Craven ("Craven").

35. There is a complete unity of ownership and interest across these entities: Defendants Tehrani and Craven founded, wholly own, and direct the operations of every entity

within this enterprise.

36. They do not operate these companies as arm's-length partners, but as mere departments of a single global gambling syndicate. Each defendant is explained in more detail in the following paragraphs:

37. Defendant Edward Craven ("Craven") is a resident of Melbourne, Victoria, Australia.

38. Craven is the CEO of Defendant Easygo Holdings.

39. Defendant Bijan Tehrani ("Tehrani") is an individual who was born in the United States and maintains a residence in New York, NY.

40. Defendants Tehrani and Craven founded, wholly own, and run Defendants Medium Rare, Sweepstakes, Slidemedia, Easygo Group Holdings Pty. Ltd. ("Easygo Holdings"), and Easygo Entertainment Party Ltd. ("Easygo Entertainment").

41. Defendant Easygo Entertainment is an Australian Proprietary Company with its principal place of business at Level 2, 287-293 Collins Street, Melbourne, Victoria, 3000 Australia.

42. Defendant Easygo Holdings is an Australian Proprietary Company with its principal place of business at Level 2, 287-293 Collins Street, Melbourne, Victoria, 3000 Australia.

43. Defendant Easygo Holdings has an interest in Defendant Medium Rare and its operation of the Stake.com casino.

44. Defendant Medium Rare N.V. d/b/a Stake.com ("Medium Rare") is a Curaçao Limited Liability Company with its principal place of business at Seru Loraweg 17 B, Curaçao.

45. Through the Stake.com website, brand, promotions, advertisements, and affiliated marketing agreements, Medium Rare intentionally conducts business in New York.

46. Defendant Medium Rare Ltd. is a Cyprus Limited Liability Company with its

principal place of business at 7-9 Riga Feraiou, Lizantia Court, Office 310, Agioi Omologites, 1087 Nicosia, Cyprus.

47. Medium Rare Ltd. handles payment processing for Medium Rare N.V.

48. Defendant Sweepsteaks Ltd. d/b/a Stake.us ("Sweepsteaks") is a Cyprus Limited Company with its principal place of business located at 28 Oktovrio, 313 Omrania BLD, Limassol, CY-3105, Cyprus.

49. Sweepsteaks conducts business in New York through its website and brand, including but not limited to its ".us" domain, promotions, advertisements, and affiliated marketing agreements.

50. It operates a United States office located at 13101 Preston Road, Suite 110-5027, Dallas, TX 75240.

51. While nominally a "social" gaming platform, Sweepsteaks functions as the essential compliance shield for the illegal Stake.com enterprise.

52. Upon information and belief, Defendants launched Sweepsteaks in 2022.

53. This was done to establish a veneer of domestic legality, utilizing its corporate existence to sanitize the "Stake" brand and market it to American audiences without triggering immediate regulatory enforcement.

54. By presenting Sweepsteaks as the United States operation's public face, the Stake Defendants created deliberate regulatory confusion that obscured the illegal nature of their primary business, Stake.com, thereby maintaining the open access channels that allowed Plaintiff to continue gambling on Stake.com during the most critical years of his addiction.

55. Defendant Slicemedia is a part of the Stake.com corporate family. It operates a predecessor gambling site to Stake.com, Primedice, which was a crypto casino focused on dice

games specifically. It is a Curaçao Limited Liability Company with its principal place of business at Seru Loraweg 17 B, Curaçao. Primedice was created, designed, and founded by Tehrani, Craven, and Freeman. Plaintiff used Primedice as a minor to gamble.

56. Defendant Freeman is a resident of Florida. He was integrally involved in the design and operation of Primedice, as well as the Stake Defendants' early corporate decisions regarding the operation of the enterprise. Following a dispute between Tehrani, Craven, and Freeman, Freeman was pushed out of ownership of the business.

**1. Alter Ego Allegations as to the Stake Defendants:**

57. As previously stated, there is a complete unity of ownership and interest across the Stake Defendants.

58. The unity of interest extends beyond the individual founders to the corporate structure itself.

59. Defendant Easygo Group Holdings Pty Ltd. serves as the central holding company and operational hub for the entire enterprise.

60. Public corporate profiles and industry reports confirm that Easygo Holdings is the "parent company" of both Medium Rare entities and Sweepsteaks (also known as Stake.us).

61. Medium Rare owns and operates the online casino Stake.com.

62. Stake.com and Stake.us are Easygo Holding's wholly owned or controlled subsidiaries, subject to the direct oversight and financial dominance of the Australian headquarters.

63. On information and belief, Tehrani and Craven structured these entities deliberately to shield themselves from liability while continuing to operate and profit from an illegal online gambling enterprise in New York and across the United States.

64. Defendant Freeman has publicly admitted precisely this in a lawsuit he filed against

Tehrani and Craven, explaining that he, Craven, and Tehrani were advised by their counsel that they should "establish a web of offshore entities to keep their identities and 'fingerprints' off the operating entities due to the legal risks flowing from such offshore, unlicensed, crypto-based gambling online ventures." Notably, this advice came from the third set of lawyers Freeman, Craven, and Tehrani consulted. Freeman has publicly admitted in a parallel lawsuit that the first set of lawyers the group consulted advised them to immediately shut down their online crypto casino.

65. This complex web of shell companies serves no legitimate business purpose other than to obfuscate the flow of funds from American minors to offshore casinos.

66. As noted in an enforcement action by the City of Los Angeles against Stake, "separating their liability and allowing shareholders to dodge personal liability... would be inequitable" given the unity of their unlawful purpose. *People of the State of California v. Sweepsteaks Ltd.* [hereinafter "*The LA Enforcement Action*"], Super. Ct. Cal., Los Angeles Cty., filed Aug. 28, 2025, No. 25STCV25304) at ¶ 27. Thus, it would be inequitable to permit Defendants to escape responsibility for the harm caused by their unified and unlawful conduct.

***C. Coinbase Defendants:***

67. Defendant Coinbase Global, Inc. is a corporation operating in the cryptocurrency field and is incorporated in the State of Texas.

68. According to Coinbase Global, Inc.'s Form 10-K for the fiscal year ended December 31, 2024, its principal executive offices are located at One Madison Avenue, Suite 2400, New York, NY.

69. Coinbase Global, Inc. is one of the world's largest crypto exchanges and custodians of digital assets, with $404 billion in digital assets under management at the end of 2024.

70. Coinbase, Inc. is the operating entity that provides the Coinbase consumer platform, including: account onboarding; identity verification; linking of funding instruments; and fiat-to-cryptocurrency conversion services.

71. On information and belief, Coinbase, Inc. transacts business in New York, provides services to New York residents including Plaintiff, and derived fees and other revenue from the transactions described *infra*.

72. Coinbase, Inc. is the subject of the NYDFS Consent Order described below, pleaded for notice, foreseeability, and standard-of-care purposes.

73. On information and belief, Defendant Coinbase Global, Inc. directly or indirectly controls Coinbase, Inc., including through ownership, common management, and the power to direct Coinbase, Inc.'s policies and practices concerning customer onboarding, "Know Your Customer" (KYC)/AML compliance, risk classification, and transaction monitoring.

74. On information and belief, Coinbase, Inc. operated the "Coinbase" branded exchange and custodial wallet services offered to Plaintiff and other New York residents.

75. Coinbase Global, Inc. held these services out to the public as "Coinbase," authorized and ratified Coinbase, Inc.'s conduct, and is liable for it.

76. Coinbase Global, Inc. and Coinbase, Inc. are referred to collectively as the **"Coinbase Defendants**."

77. On information and belief, the Coinbase Defendants derived substantial revenue and other benefits from transaction fees, spreads, account growth, and asset-custody related revenues associated with the transactions and flows of funds alleged herein.

78. On information and belief, Coinbase makes its consumer platform available to and routinely serves New York residents through contracts formed via its New York-directed

clickwrap onboarding flow, including identity verification, linking of New York-based or New York-used funding instruments, and execution of cryptocurrency purchase and transfer transactions initiated from within New York.

79. Coinbase's New York-directed operations include servicing New York users, including Plaintiff, and earning transaction fees from New York-based gambling activity of the kind alleged herein.

***D. The Combined Operation - All Defendants***

80. While each Defendant performed a distinct function, they collectively operated as an integrated machine that facilitated repeated offshore gambling activity.

81. For ease of reference, this integrated machine is referred to herein as **"The Operation."** The Operation functioned through two interdependent components that together enabled the flow of funds from United States consumers to offshore gambling services.

82. The "**Operator Defendants**" consist of Medium Rare N.V., Sweepsteaks Ltd., Easygo Group Holdings Pty Ltd., Easygo Entertainment Pty Ltd., Medium Rare LTD., and founders Bijan Tehrani and Edward Craven.

83. The Operator Defendants functioned as the architects of the gambling scheme; designing, coding, and deploying proprietary gambling software, the prohibited gambling products (including, but not limited to, the 'Stake Originals' suite of games), the deceptive "sweepstakes" facade (discussed *infra*), and the unregulated streaming platform, Kick.com, intended to retain users banned from legitimate platforms.

84. The "**Facilitator Defendant**" (Coinbase) functioned as the Operation's financial engine.

85. New York Department of Financial Services found that Coinbase's compliance

program suffered serious deficiencies, including a 'check-the-box' approach in key areas.

86. As part of a settlement to avoid punishment for these serious violations of law, Coinbase agreed to a Consent Order imposing remediation, monitorship, and penalties.[1]

87. In this case, Coinbase's onboarding and transaction controls failed to prevent or interrupt a foreseeable, high-risk conversion-and-transfer pattern consistent with prohibited use, while Coinbase collected fees from the same transaction cycle. (*In the Matter of Coinbase, Inc.*, N.Y. State Dep't of Fin. Servs. Consent Order, ¶ 39 (Jan. 4, 2023) (hereinafter, the "**NYDFS Consent Order**" or "**Consent Order**").)

88. Coinbase provided the compliance evasion mechanism necessary for the Operator Defendants to bypass New York State anti-gambling restrictions, thereby enabling the illicit extraction of funds from United States residents, including Plaintiff.

Jurisdiction and Venue

89. This Court has general subject matter jurisdiction over this action pursuant to Article VI, § 7 of the New York State Constitution, which grants the Supreme Court jurisdiction in law and equity.

90. This Court has personal jurisdiction over Defendants Coinbase Global, Inc. and Coinbase, Inc. pursuant to CPLR § 302(a)(1) because they transact business within New York and contract to supply services in New York, and Plaintiff's claims arise from those New York-directed transactions.

91. Plaintiff opened and used the Coinbase consumer account in New York.

92. Plaintiff was presented in New York with Coinbase's clickwrap User Agreement

[1] Plaintiff pleads the Consent Order solely for notice, foreseeability, and standard-of-care context—not to privately enforce AML/BSA requirements.

as part of onboarding (any purported acceptance was not a knowing, voluntary assent and, in any event, occurred when he was a minor and is voidable and unenforceable).

93. Plaintiff linked and used a payment instrument issued in Plaintiff's name from New York.

94. Plaintiff used Coinbase's app/website from New York to purchase cryptocurrency.

95. Plaintiff used Coinbase's transfer functionality from New York to send cryptocurrency to offshore gambling deposit addresses, generating fees and spreads for Coinbase from New York-based transactions.

96. Coinbase's services (including onboarding, identity verification, funding-instrument linking, fiat-to-crypto conversion, and outbound transfer services) were provided to Plaintiff in New York and constitute purposeful New York business activity that is the direct "articulable nexus" for the claims plead here.

97. These jurisdictional allegations are based on Coinbase's New York-directed provision of services and course of dealing with Plaintiff, and are not a concession that any Coinbase terms—including any arbitration provision—were validly formed, knowing and voluntary, or enforceable against Plaintiff.

98. The NYDFS Consent Order further confirms that Coinbase's consumer platform operations were conducted under New York regulatory supervision.

99. Further, the Consent Order confirms that Coinbase had specific notice of compliance and risk-control failures that are relevant to the foreseeable misuse alleged here.

100. Additionally, Defendant Coinbase Global, Inc. is subject to general jurisdiction in New York based on its continuous and systematic New York presence, including maintaining an office within New York County at One Madison Avenue, Suite 2400, New York, New York

10010, identified in Coinbase's securities filings as being its principal place of business, and directing substantial corporate operations connected to the Coinbase consumer platform through New York.

101. This Court has personal jurisdiction over the non-domiciliary Defendants (Medium Rare N.V. d/b/a Stake.com, Sweepsteaks Ltd. d/b/a Stake.us, Easygo Group Holdings Pty Ltd., Easygo Entertainment Pty Ltd., Medium Rare Ltd., Slicemedia B.V., Bijan Tehrani,[2] Edward Craven, and Christopher Freeman) pursuant to CPLR § 302(a)(1) because they transact business within the state and contract to supply goods or services in the state.

102. As alleged *infra*, these Defendants purposefully targeted New York residents by promoting its gambling platforms in the state of New York, entering into "Terms of Service" contracts with New York users (including Plaintiff), and deriving substantial revenue from interstate commerce that had a direct foreseeable effect in New York.

103. This Court further has jurisdiction pursuant to CPLR § 302(a)(3) because the non-domiciliary Defendants committed tortious acts throughout the state that caused injury to person and property within the state, and Defendants expected or should have expected their acts to have consequences in the state.

104. The State of New York has personal jurisdiction over the Defendants because they purposefully avail themselves of the privilege of conducting business in the State by directly targeting New York residents with advertisements, sponsorships, and interactive gambling platforms.

105. As an example, in the video excerpted below, a Stake affiliate provides step-by-step instructions to New York citizens on how to create an account with Stake using the affiliate's

[2] As noted above, Tehrani maintains a residence in New York City.

unique promotional code and registration link. Stake uses this kind of affiliate promotion to target New York citizens.




106. The Stake Defendants and Freeman further purposefully availed themselves of this forum by designing and operating Primedice in New York. Between 2015 and 2021, Primedice was designed and operated out of New York by Tehrani and Freeman during the time each was a resident of New York. Tehrani was a resident of New York from 2015 until approximately 2017 (and to this day maintains a residence in New York) and Freeman was a resident of New York from 2017 to 2021. Defendant Freeman has publicly admitted that during this period, Freeman, Tehrani, and Craven developed a number of features for Primedice that would come to be used by Stake.com, including certain games, technologies, and functionalities shared by both sites. Plaintiff gambled on both Stake.com and Primedice.

107. Under New York law, illegal gambling is deemed to occur where the player is

located. (*See People v. World Interactive Gaming Corp.*, 185 Misc. 2d 852 (Sup. Ct. N.Y. Cty. 1999); *see also* Penal Law § 225.00(2).)

108. Because Plaintiff was located in New York when he was solicited, onboarded, and exploited by the Operation, the injury occurred within this Court's jurisdiction.

109. Venue is properly designated in New York County pursuant to CPLR §§ 503(a) and 503(c) because Plaintiff is a New York resident the wrongful conduct and injuries occurred in New York; and the Coinbase Defendants contract to supply services in New York and transact business in New York, including through the Coinbase consumer platform used by Plaintiff from New York.

110. Venue is further proper because Coinbase Global, Inc. maintains its principal executive office within New York County at One Madison Avenue, Suite 2400, New York, New York 10010.

111. To the extent any Defendant contends provisions contained in any Terms of Service or similar online agreement govern this dispute—including any clause requiring litigation or arbitration outside New York or in a foreign jurisdiction—such provisions are unenforceable as to Plaintiff.

112. Plaintiff was a minor lacking legal capacity at the time of any purported assent, and any such agreement is voidable and has been expressly disaffirmed by Plaintiff through the filing of this Complaint.

113. Plaintiff did not knowingly and voluntarily assent to any arbitration or forum-selection term, and no enforceable delegation clause binds Plaintiff in the absence of a valid agreement.

114. Accordingly, venue is governed by the CPLR and applicable New York law, not

by any purported adhesion contract.

## III. FACTUAL ALLEGATIONS

115. Gambling in New York is tightly regulated.

116. Defendants' coordinated conduct operated outside New York's tightly limited gambling framework and predictably enabled minors—including Plaintiff—to engage in unlawful online gambling.

117. NY CLS Const Art I, § 9, provides that "except as hereinafter provided, no lottery or the sale of lottery tickets, pool-selling, book-making, or any other kind of gambling … shall hereafter be authorized or allowed within this state…"

118. The exceptions are "lotteries operated by the state and the sale of lottery tickets in connection therewith," "pari-mutuel betting on horse races," and "casino gambling at no more than seven facilities as authorized and prescribed by the legislature[.]"

119. All forms of gambling not expressly allowed by the above section are still illegal in New York. *See* NY CLS Penal § 225.00, *et seq*. N.Y. Gen. Oblig. Law § 5-401 prohibits "all wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever….".

120. In particular, New York prohibits all gambling by minors, even for the types of gambling that are legal in New York.

121. The minimum age for wagering in New York on social games, fantasy sports, traditional lottery (other than Quick Draw) and pari-mutuel racing is 18.

122. The legal minimum age is 21 for Quick Draw, video lottery terminals, commercial casinos and sports wagering.

123. Furthermore, New York prohibits any advertisements that "[d]epict any person under the age of twenty-one engaging in gaming and related activities[.]" N.Y. Rac. Pari-Mut. Wag. & Breed. Law §§ 1363(2)(c).

124. Nevertheless, online real money gambling games operated or facilitated by Defendants herein, are widely available in New York over the internet on mobile devices and personal computers, including to minors.

125. These products evade consumer protection, responsible gaming, and anti-money laundering requirements to which gambling in New York is otherwise subject. These products and operations are untaxed and unregulated.

126. Defendants'online gambling platforms evade state prohibitions of the use of U.S.-based financial institutions for gambling by accepting payment in cryptocurrency.

127. Defendant Coinbase Global, Inc. provides widely used cryptocurrency services that, as alleged below, functioned here as a substitute payment pathway for offshore gambling when traditional card and bank rails were restricted.

### A. ***The Stake Defendants' Three-Prong Strategy to Operate an Illegal Gambling Platform Without New York Authorization***

128. The Stake Defendants operate one of the largest offshore online gambling platforms in the world, publicly reporting approximately $4.7 billion in gross gaming revenue in 2024.[3]

129. Upon information and belief, approximately $219 billion in Bitcoin wagers flow through the platform annually.

[3] Mark Whittaker, *Ed Craven & the untold story of Stake: Inside the $5.6 billion rise of crypto's biggest high rollers*, *Forbes* (Feb. 24, 2025), available at https://www.forbes.com.au/covers/magazine/how-ed-craven-and-bijan-tehrani-built-their-5-6-billion-fortune/ [last accessed April 3, 2026].

130. To place that scale in context, Stake Defendants publicly claim that their platform handles nearly 4% of all annual Bitcoin transactions worldwide.[4]

131. Leveraging these billions, the Stake Defendants secure endorsements from global superstars.

132. According to public reports, Stake pays the rapper Drake an estimated $100 million per year to livestream himself gambling on their platform to his millions of young followers.[5]

133. Beyond individual influencers, the marketing budget funds title sponsorships of major global sports entities, including the Stake F1 Team (formerly Alfa Romeo), Everton FC, and various UFC athletes.

134. While Stake is prohibited from advertising within the United States, these sponsorship deals allow Defendant to bypass domestic restrictions.

135. Through these sponsorships, athletes and celebrities promote Stake directly to millions of U.S. followers on social media, wearing branded apparel and creating content consumed by American fans.

136. This conduct effectively overrides broadcast blackouts designed to protect U.S. consumers from unregulated offshore casinos, creating a false veneer of legitimacy that misleads consumers into believing Stake is a lawful, regulated operator.

137. Upon information and belief, the Stake Defendants executed a calculated, three-prong strategy to capture the U.S. market, prioritizing rapid growth over legal compliance.

**1. Prong One: Unregulated Direct Access to Stake.com.**

[4] *Id.*
[5] Alphonse Pierre, *On Drake's Gambling Streams, Everybody Loses*, Pitchfork (April 16, 2025), available at https://pitchfork.com/thepitch/on-drakes-gambling-streams-everybody-loses/ [last accessed April 3, 2026].

138. In the initial phase, aimed at obtaining a dominant market share, the Stake Defendants intentionally operated Stake.com with virtually no KYC controls.

139. Operator Defendants understand that identity verification creates "friction" that reduces sign-ups and imposes burdensome regulatory overhead.

140. As a result, Defendants permitted U.S. users—including Plaintiff, and other minors similarly situated—to access Stake.com via a virtual private network ("VPN"), a tool that disguises a user's geographic location, without any meaningful age or identity checks, and gamble instantly.

141. This calculated non-compliance with various state gambling prohibitions, including New York's, allowed Defendants to onboard millions of unverified users and establish a substantial and rapidly expanding foothold in the U.S. market.

142. The weaknesses of this verification system were deliberate. In a prior business venture operated by Tehrani, Craven, and Freeman, Primedice, the first time any effort was made to block US players from accessing Primedice, the site lost half its daily revenue, as Freeman publicly admitted in a lawsuit against Tehrani and Craven. Freeman further admitted that he was told by Primedice's CEO (who currently serves as the CEO of most Stake corporate entities) that "stake has lots of usa players that can't play on pd [referring to Primedice]" and that "most of the [customer support] chat is usa, and support to most of it is from USA and on pd we barely get any."

143. The Stake Defendants maintained records of which users were using VPNs, which they chose to use for business purposes, but not to comply with the law. For example, in an argument with an unhappy customer of Stake on the online forum Bitcoin Talk, Tehrani, using the screenname Stunna, revealed that Stake tracks what users are using VPNs—writing to a disgruntled gambler that a purported error with payment was because "[l]ogs are indicating that

you are using a popular VPN, which is causing wrong cashout value and before successful cashout, the page must be refreshed/updated to show the right value at the moment."

**2. Prong Two: The "Sweepstakes Casino" Trojan Horse Structure**.

144. As regulatory scrutiny of offshore online gambling increased in or around 2022, the Stake Defendants implemented a second component of their U.S. strategy with the launch of Stake.us.

145. To obtain and maintain banking relationships, Stake Defendants marketed Stake.us as a U.S.-compliant "sweepstakes casino," structured around a dual-currency system using so-called "Gold Coins" and "Stake Cash."

146. These sites, operated or facilitated by Defendants herein, make it easy for minors to set up the credentials necessary to gamble.

147. Most of them look like familiar gaming sites, and many platforms don't require proof of age or this proof requirement is easily by-passed.

148. In substance, this sweepstakes format operated as a Trojan Horse—presenting itself as a compliant promotional model while preserving the same wagering mechanics, user experience, and economic incentives as Stake.com.

149. Stake.us is essentially a clone of Stake.com:




Stake.com




Stake.us

150. Unlike Stake.com, at launch, Stake.us incorporated a "Level 2" identity-verification process requiring government-issued identification.

151. However, Stake Defendants knowingly designed and implemented this verification mechanism as a one-way gate.

152. On information and belief, the Stake.us's architecture required identity verification only when the user attempts to withdraw money earned on the platform - not when the user creates an account

153. This permitted unverified users to deposit funds and place wagers immediately without completing identity checks.

154. As a result, users were allowed to gamble without verification, at least until the point of withdrawing winnings.

155. This design predictably maximizes deposits—including deposits from underage or otherwise ineligible users - by deferring compliance to the point until after the platform had captured funds.

156. This asymmetric verification structure allowed Defendants to present an appearance of compliance while continuing to accept wagers from minors and other unverified users who could deposit funds but were unable to withdraw winnings.[6]

[6] This strategic pivot, however, has only exposed the Stake Defendants to greater legal peril. In jurisdictions including **Illinois** [*Urdan v. Sweepsteaks Limited*, No. 1:25-cv-03736 (N.D. Ill.)], **Alabama** [*Hall v. Sweepsteaks Limited*, No. 3:25-cv-00345 (M.D. Ala.)], and **Missouri** [*Killham v. Sweepsteaks Limited*, No. 2516-CV35089 (Cir. Ct. Jackson Cty.)], plaintiffs have filed suit alleging that Stake.us is not a lawful sweepstakes, but a thinly disguised illegal casino. Furthermore, the **Los Angeles City Attorney** has filed an enforcement action in **California**, alleging that Stake.us constitutes an illegal gambling operation targeting California consumers [*The LA Enforcement Action.*, *supra*]. These complaints allege that the "free" entry methods are illusory and that the platform's true purpose is to facilitate illegal gambling transactions in violation of state consumer protection and anti-gambling statutes.

**3. Prong Three: The Covert Credential Distribution Network**.

157. As regulatory scrutiny increased, the Stake Defendants transitioned from passive non-compliance to an affirmative system designed to distribute access credentials to individuals who could not lawfully complete identity verification.

158. This third phase operated through a parallel, invitation-only infrastructure designed to distribute pre-verified accounts while minimizing traceability and audit risk.

159. In or around September 2024, the Stake Defendants sent mass email notifications to their Stake.com user base, announcing that 'Level 2' identity verification would become mandatory for all accounts by 2025.

160. This notice confirmed that unverified play—previously the platform's standard operating model—would no longer be tolerated on the main platform.





Hi [redacted]

Please submit Level 2 verification by January 1st to unlock more rewards on your account.

In order for you to continue enjoying Stake.com in 2025, we will require you to submit Level 2 verification. This will need to be done by January 1st.
Until then, you can continue to use Stake.com without completing this level of verification.

**What does this mean for you?**

- Submitting Level 2 verification allows for us to gift you extra rewards in the form of bonuses and competitions.
- It ensures your account exists with ultimate safety and security.
- It means you will be able to continue enjoying Stake.com from 2025.

**What is required from you?**

- Level 2 verification requires basic personal information as well as proof of identification, via Drivers License or National ID Card.

Keeping your account secure allows us to reward your account further, whilst offering you unmatched service.

Please verify your account further by the 1st of January 2025 to continue enjoying Stake.com.

**Complete Profile**

161. However, this purported crackdown remains fatally flawed by design.

162. Stake’s 'Level 2' verification process still did not require a 'liveness check' or dynamic selfie.

163. These are industry-standard biometric tools used by legitimate financial institutions and technology companies to ensure the person holding the device matches the ID being uploaded.

164. By consciously omitting this, and other standard safeguards, Operator Defendants knowingly permit the use of static, stolen, or purchased identity documents.

165. This deliberate technical gap is what allows the 'black market' for pre-verified accounts (described *infra*) to thrive, as it permits agents to verify accounts using nothing more than a file upload, without ever exposing a human face to the camera.

166. Upon information and belief, in parallel with their public-facing verification requirements, the Stake Defendants now operate a separate distribution channel through a network of "special partner" Streamers to facilitate access to pre-verified accounts for high-value users who cannot complete identity verification themselves.

167. Through private Discord servers managed by these Streamers, login credentials are provided for "Level 2" accounts (accounts that have already completed verification using identities of someone other than the end user).




Direct Messages
Find or start a conversation
Friends
Nitro
Shop
Quests
Direct Messages
sonyvaio
Mod/Admin For Syztmz https://www.kic...
SyztmzAffiliateTeam
sonyvaio
sonyvaio
This is the beginning of your direct message history with sonyvaio.
1 Mutual Server
Add Friend
Block
Report Spam
November 21, 2025
Jacob 11/21/25, 9:52 PM
yo
i need a stake account but i cant id verify
how can i get one
November 22, 2025
sonyvaio 11/22/25, 9:04 PM
where r u playing from ? give me 2 usernames ill get one setup for u
November 23, 2025
@sonyvaio where r u playing from ? give me 2 usernames ill get one setup for u
Jacob Yesterday at 5:53 AM
canada
a stake username?
j4c0b07 jacob07
Jacob Yesterday at 9:44 AM
yo
you there
sonyvaio Yesterday at 9:54 AM
Yes
Its sent to create
Jacob Yesterday at 9:58 AM
oh alright thanks
how long does it take usually? and is it safe to play on for a long time?
NEW
sonyvaio Yesterday at 3:58 PM
Email Address : j4c0b0711@outlook.com
Password : Stake123
Stake username : j4c0b07
Stake Password : jacob0723
Change passwords. Add 2fa to stake before playing. No deposit/withdraw from exchanges use a middle wallet like exodus or trust
Don't lose 2fa I cannot help u recover
Message @sonyvaio
Jacob
Do Not Disturb
Mod/Admin For Syztmz https://www.kick.com/s...
sonyvaio
sonyvaio
Member Since
Sep 13, 2020
Mutual Servers — 1
Mutual Friends — 1
View Full Profile


Keithlocks
Keithlocks
ticket-3670
Search Keithlocks
SERVER RULES
WELCOME-AND-RULES
WELCOME CHANNEL
JOINED
LEAVE
VERIFICATION CHANNEL
VERIFY
IMPORTANT
announcements
dont-get-scammed
verifaction-help
done-with-dice
giveaways
STAKE
stake-free-5
level-up-rewards
25k-weekly-stake
GENERAL
general
sports-bets
big-wins
memes
clips
NEW MENTIONS
November 25, 2025
Fargo 3:59 AM
Hey @Cole let me know if you are around tn and we can get this done, takes about 5 mins
Cole 7:04 AM
yes
Fargo 7:15 AM
Can i have you pull up gmail for me @Cole gonna give you an email to log into first
Cole 7:15 AM
done
Fargo 7:15 AM
juanlocks05@gmail.com
Kudaterbang1!
once you have logged into the email lmk
@Cole
Cole 7:17 AM
in
Fargo 7:18 AM
ok you are gonna get an email from stake, with a 2fa code can you please send that to me
code should be there
Cole 7:18 AM
yes
978385
Fargo 7:20 AM
ok this acct is ready to go for you @Cole
NEW
lets have you log into the stake acct now
you can use same email and pw to log in
Owner — 1
keithlocks
god — 4
bardal
Dustin
Fargo
Scapegoatie
Verified — 2
Cole
Double Counter APP
BOT — 4
BetSync Bot APP
22 servers on BetSync.app
GiveawayBot APP
MEE6 APP
/mee6-games
Ticket Tool APP




168. The operational hub for this clandestine distribution network is Discord, a messaging platform organized into invitation-only communities known as "servers."

169. Within these gated servers, the "special partner" influencers utilize a mechanism known as "support tickets," which are temporary, private chat channels visible only to the user and the distributor.

170. Once a prohibited user requests an account inside this private channel, moderators provide the pre-verified login credentials directly.

171. Unlike conventional customer-support systems, after the transaction on Discord is completed, the moderator closes and deletes the ticket, permanently destroying the evidence of the transfer.

172. By design, Discord's architecture permanently erases data from deleted channels immediately, with no native option for recovery.

173. Because the Stake Defendants deliberately choose *not* to configure optional transcription features, every illicit transaction is effectively "shredded" the moment a moderator

completes it, leaving no digital footprint for regulators to audit.

174. This system allows the Stake Defendants to distribute thousands of fraudulent accounts while maintaining total deniability, and is designed to minimize retention and auditability of credential transfers.

175. Upon information and belief, the Stake Defendants compensate Streamers who encourage users to access Stake.com through the illicit Discord channel at higher affiliate rates than standard Streamers.

176. This compensation structure rewards the recruitment of users who require pre-verified accounts in order to access the platform.

177. Accounts distributed through this process are frequently registered using disposable or "burner" email addresses, further separating account access from verifiable user identities.

178. By funding and managing this distribution network, the Operator Defendants have transformed their operation from one of passive non-compliance into an active, fraudulent operation designed to deceive regulators while continuing to prey on minors.

***B. The Result: Widespread Access by New York Consumers***

179. The success of the Stake Defendants' evasion strategy is quantifiable. According to public traffic analytics from SEMrush (November 2025), the United States remains the third-largest source of traffic to Stake.com globally, generating approximately **5.22 million visits to the illegal platform in a single month**.[7]

180. This volume places the United States ahead of nearly every jurisdiction where Stake is actually licensed.

[7] *Stake.com Website Traffic, Ranking, Analytics*, Semrush, https://www.semrush.com/website/stake.com/overview/ [last accessed Dec. 29, 2025].

181. This confirms that the platform's "geoblocking" is little more than a digital turnstile that Defendants knowingly allow millions of Americans to bypass.

182. Upon information and belief, a substantial portion of this traffic originates from New York.

183. Given that New York is the largest sports betting market in the United States by revenue—regularly exceeding $2 billion in monthly handle—the scale of that activity supports a reasonable inference that the 5.22 million monthly U.S. visits to Stake.com include tens of thousands of New York residents.[8]

184. Consequently, Plaintiff's access followed as a foreseeable and predictable result of the Stake Defendant's business model.

185. Operator Defendants engineered this mass infiltration through the "open door" policy described in Prong One and the "credential distribution" network described in Prong Three.

186. By knowingly servicing this volume of New York traffic without enforcing effective blocks, Defendants have engaged and, indeed, continue engaging in consumer-oriented conduct that affects the public interest of the State at large.

***C. <u>The Twitch and Kick Pipeline</u>***

187. To promote their gambling platforms Stake.us and Stake.com, the Operator Defendants utilized live-streaming platforms–primarily Twitch.tv ("Twitch") and Kick.com ("Kick").

188. Twitch initially functioned as the Operation's recruitment engine.

[8] *New York Sets New U.S. Record with $2.64 Billion in Mobile Sports Wagers*, iGamingToday (Nov. 10, 2025), https://www.igamingtoday.com/new-york-sets-new-u-s-record-with-2-64-billion-in-mobile-sports-wagers/ [confirming New York is the "country's most lucrative online betting market" and has exceeded $2 billion in handle for three consecutive months]

189. Distinct from a neutral hosting platform, Twitch entered into commercial contracts with the gambling-focused livestreamers (“**Streamers**”).

190. Twitch is an Amazon-owned live-streaming platform with an audience of around 31 million visitors *per day* (Amazon acquired Twitch in 2014 for $970 million).

191. As of 2022, Twitch said nearly 75 percent of its viewers were between the ages of 16 and 34.

192. On July 13, 2021, *WIRED.com* published a report titled, “Twitch Streamers Rake in Millions With a Shady Crypto Gambling Boom.”[9]

193. At the time of the *WIRED* report, the saturation of crypto gambling on Twitch was undeniable: 64 of the platform’s top 1,000 most-trafficked Streamers broadcasted crypto slots or promoted offshore casinos.

194. This content was not niche; at the peak of the platform’s gambling craze, the ‘Slots’ category surged to become the #7 most-watched category on the entire site.[10]

195. Eclipsing global gaming franchises like *Fortnite* and *Call of Duty*, these streams regularly attracted over 100,000 concurrent viewers, effectively transforming a video game platform into a broadcast hub for unregulated gambling.

196. Industry reporting during the relevant period made clear that offshore crypto gambling platforms’ reliance on VPN-based “geo-blocking” did not meaningfully prevent access by U.S. users.

197. The *WIRED* report further explained that, although such off-shore platforms

[9] Cecilia D'Anastasio, Twitch Streamers Rake in Millions With a Shady Crypto Gambling Boom, Wired (July 13, 2021), available at https://www.wired.com/story/twitch-streamers-crypto-gambling-boom/ [last accessed April 3, 2026].

[10] Cecilia D'Anastasio, Twitch’s Gambling Boom Is Luring Gamers Into Crypto Casinos, Bloomberg (Aug. 5, 2022), available at https://www.bloomberg.com/news/articles/2022-08-04/twitch-s-gambling-boom-is-luring-gamers-into-crypto-casinos [last accessed Dec. 10, 2025].

claimed to block U.S. access, those measures were easily circumvented, and functioned primarily as superficial compliance mechanisms rather than effective technical barriers.

198. Further, Twitch algorithmically promoted streams that showcased and encouraged participation in offshore gambling platforms prohibited under New York law, including Stake.com and Stake.us.

199. On September 20, 2022, Twitch issued a public statement titled *"An Update on Gambling on Twitch,"* stating Twitch will "prohibit any streaming of sites that contain slots, roulette, and dice games and are unlicensed in the U.S. or other jurisdictions that offer consumer protections like deposit limits, waiting periods, and age verification systems" after October of 2022.

200. This statement also acknowledged that streamers had been "circumvent[ing]" prior platform rules regarding gambling-related links and that such conduct could "expose the community to potential harm."

201. Twitch's banning of gambling Streamers broadcasting their playing on Stake's website represented a critical disruption to the Stake Defendants' primary marketing and distribution channel.

202. In response to this ban by Twitch.com, Defendants Tehrani and Craven launched Kick.com, via the creation and incorporation of Kick Streaming Pty Ltd., and Kick Streaming Ltd, a Delaware Limited Liability Company and designated a Washington, D.C. address as its registered office.

203. Unlike Twitch.com, Kick permits streaming gambling content, including content featuring Stake.com.

204. Easygo Holdings wholly owns both Kick Streaming Pty Ltd. and Kick Streaming

Ltd., and Defendants Craven and Tehrani exercise ultimate control over both the Stake and Kick businesses simultaneously.

205. Kick is "wholly owned and controlled by Defendant Easygo" and run from the "same office in Melbourne, Australia" as are the Stake gambling operations. (*The LA Enforcement Action* at ¶ 29.)

206. Defendants structured Kick to operate with an immediate U.S. legal presence while continuing to service a predominantly U.S. audience.

207. Immediately following its launch in December 2022, the Stake Defendants began migrating their most valuable Streamers from Twitch, to the new platform, Kick, to reconstruct their shattered marketing funnel.

208. For example, Tyler "Trainwreckstv" Niknam, who had previously served as one of Stake's most prolific recruiters on Twitch, immediately joined Kick as a non-exclusive advisor and broadcaster.

209. He was soon followed by Adin Ross, who signed a widely publicized deal—reportedly worth significantly more than standard streaming contracts—to effectively move his large and highly engaged audience–including minors–from Twitch's regulated environment to Kick's unregulated one.

210. Kick.com continues to stream gambling content and as a result, direct traffic to Stake.com.

***D. The Coinbase Financial Engine***

211. While Kick and Twitch served as part of the Operation's "recruitment arm"—broadcasting to millions of minors to drive traffic—Defendant Coinbase acts as its essential

"cashier's cage."[11]

212. Coinbase is the largest publicly traded cryptocurrency exchange in the United States.

213. Offshore casinos like Stake are routinely blocked by banks and card issuers using Merchant Category Codes (7995). Therefore, users seeking to gamble must first convert U.S. dollars into crypto through a U.S.-based exchange.

214. Just as a physical casino requires a secure window where players exchange legal tender for gaming chips, the Stake Defendants rely on Coinbase to serve as the critical gateway between the regulated U.S. banking system and the unregulated crypto-economy.

215. Coinbase supplied that gateway by providing currency-to-crypto (also called "fiat-to-crypto") services:

(i) converting user's U.S. dollars into cryptocurrency and

(ii) enabling outbound transfers to addresses designated by the offshore casino.

216. Coinbase's fiat-to-crypto services served as a primary and foreseeable onramp for New York users—including minors—to fund Stake's unlawful gambling.[12]

217. Coinbase was not a passive financial intermediary.

---

[11] Plaintiff does not assert any claim to privately enforce the Bank Secrecy Act, AML regulations, UIGEA, 23 N.Y.C.R.R. Part 200, or the NYDFS Consent Order. Those authorities are cited only as evidence of (i) Coinbase's notice of foreseeable misuse of its platform as a fiat-to-crypto conversion rail for unlawful offshore gambling, (ii) the risk controls Coinbase publicly represented it employed, and (iii) the standard of reasonable care and consumer-facing representations relevant to Plaintiff's negligence and consumer-deception theories.

[12] Coinbase filled this role, serving as the primary financial bridge that allowed the Stake Defendants to monetize the audience they recruited through Twitch and, later, Kick. (Coinbase Global, Inc., *Annual Report* (Form 10-K), at 8 (filed Feb. 25, 2022).)

218. Coinbase designed and controlled onboarding, funding-instrument linking, conversion, and outbound transfers—and it profited from repeated conversion cycles associated with foreseeable high-risk use, including offshore gambling funding.

219. Coinbase failed to apply reasonable safeguards consistent with foreseeable, repeated, and high-risk misuse of its platform from which it profited.

***1. Motive: "High-Velocity" Retail Revenue Engine***

220. Coinbase's participation in the Operation was driven by its dependence on transaction fees from "Retail Transaction Revenues."

221. Retail Transaction Revenues are transaction fees earned from customers that are primarily individuals. (Coinbase Global, Inc., *Annual Report* (Form 10-K), at 142 (filed Feb. 25, 2022).)

222. Unlike "buy-and-hold" investors who generate a single fee upon purchase, gambling users function as "high-velocity" revenue engines.

223. This is due to the mandatory "fiat-to-crypto" conversion required for offshore gambling:

a. Gamblers frequently deplete their balances and must purchase new cryptocurrency to continue playing, a psychological phenomenon in the context of gambling addiction known as "chasing losses."[13]

[13] Michael Auer & Mark D. Griffiths, *An Empirical Attempt to Operationalize Chasing Losses in Gambling Utilizing Account-Based Player Tracking Data*, 39 J. Gambling Stud. 1 (2023); Sally M. Gainsbury et al., *Chasing Losses in Online Poker and Casino Games*, 217 Psychiatry Rsch. 220 (2014).

b. Each time a gambling user reloads through Coinbase, it triggers a "Trading Fee" (historically up to 3.99% for debit cards) plus a "Spread" markup.[14]

c. To spend any winnings or remaining funds in the real economy, users must convert the cryptocurrency back to U.S. dollars, triggering a second Trading Fee and a second Spread.

224. Coinbase profits directly from these transaction fees.

225. By facilitating these high-velocity, "round-trip" conversions, Coinbase captured, and continues to capture fees on the same capital repeatedly.

226. Coinbase's own Terms and Conditions prohibit use of its services for gambling.

227. However, Coinbase chose not to enforce its own rules due to its financial motivation; blocking these gambling-related transactions would have severed a lucrative revenue stream.

228. Because Coinbase's revenues increase with transaction volume and repeated conversions, it had a financial incentive to maintain frictionless conversion and transfer functionality—even when the pattern of use made the foreseeable destination and purpose of the funds high-risk.

229. Coinbase's revenue model made Plaintiff's gambling-driven conversion cycle predictably profitable: each reload to continue gambling generated fees and spreads, and each cash-out generated additional fees and spreads.

230. Coinbase's negligent onboarding and failure to apply reasonable safeguards were a

[14] *See User Agreement* §§ 3.2–3.3, Coinbase [last accessed April 3, 2026], https://www.coinbase.com/legal/user_agreement; *see also Pricing and Fees*, Coinbase [last accessed April 3, 2026], https://help.coinbase.com/en/coinbase/trading-and-funding/pricing-and-fees/fees

substantial factor in enabling Plaintiff's access to offshore gambling and prolonging the loss cycle.

***2. The Conversion Rail: How Coinbase Enabled Offshore Gambling Funding***

231. Coinbase served as that conversion rail, enabling Plaintiff to move funds from the regulated banking system into cryptocurrency that could be transferred to offshore gambling endpoints.

232. Here, Coinbase approved Plaintiff's account despite obvious mismatches and red flags (including identity-and-funding inconsistencies and gambling-pattern transfers), and continued to process the same conversion-and-transfer sequence that foreseeably funded Plaintiff's offshore gambling deposits via Stake.com.

233. Coinbase served as the primary and most accessible fiat-to-crypto onramp through which Plaintiff funded his offshore gambling deposits. Coinbase's frictionless onboarding, widespread availability, and failure to apply reasonable safeguards made it the dominant conversion rail enabling Plaintiff's repeated deposits to Stake.com.

234. Coinbase's services were neither incidental nor passive.

235. The conversion and outbound transfer functionality is what made it practical for a New York user to fund an offshore casino account repeatedly, quickly, and at scale.

236. Coinbase profited from this cycle through transaction fees, spreads, and increased trading volume each time Plaintiff converted funds and transmitted them outward, and again when he converted back.

237. Coinbase's own policies and public-facing representations describe a platform designed to detect and interrupt high-risk and prohibited use, including representations directed at retail users regarding safety, compliance, and responsible platform use.

238. And yet, Coinbase allowed users to open accounts and use them for the same high-risk conversion-and-transfer pattern that predictably funds unlawful offshore gambling.

239. NYDFS determined Coinbase conducted business in an "unsafe and unsound" manner. (*NYDFS Consent Order* at ¶ 69.)

240. Those findings track the conduct alleged here: Coinbase's deficient onboarding and monitoring permitted Plaintiff's funds to be converted into cryptocurrency and transferred through pathways commonly used to fund unlawful offshore casinos, while Coinbase collected fees and spreads on each transaction.

***3. A Compliance Program Destined to Fail***

241. The transaction pattern alleged here—rapid fiat-to-crypto purchases followed by outbound transfers to offshore gambling endpoints—is recognized in the payments industry as a high-risk misuse pattern commonly associated with prohibited or restricted transaction destinations. (Coinbase, Prohibited & Conditional Use Policy [listing "Unlawful Gambling" as prohibited use], at https://www.coinbase.com/legal/prohibited_use [last accessed April 3, 2026].)

242. Coinbase publicly represents that it employs risk-based onboarding and monitoring designed to identify and interrupt prohibited uses of its platform, and that it retains contractual and operational discretion to pause, restrict, or require additional verification when risk indicators appear.[15]

243. In the payments and compliance industry, rapid, high-volume transfers to offshore gambling operators are classified as "higher risk" because they present elevated fraud, chargeback,

[15] (Coinbase, United States User Agreement § 1.2 (Registration of Coinbase Account) & § 6.10 (Suspension, Termination, and Cancellation), at https://www.coinbase.com/legal/user_agreement/united_states [last accessed April 3, 2026]; see also Coinbase, Prohibited & Conditional Use Policy, supra.)

and unlawful-use indicators and are frequently associated with prohibited transaction destinations (including offshore gambling).[16]

244. To capture this high-risk traffic, Coinbase failed to apply reasonable onboarding and identity-verification safeguards consistent with the risk profile of the account, including obvious discrepancies between the identity presented and the funding instrument used.

245. In 2017, the New York State Department of Financial Services (NYDFS) licensed Coinbase to engage in virtual currency business as a money transmitter, conditioning that license on strict adherence to AML laws. (*In the Matter of Coinbase, Inc.*, N.Y. State Dep't of Fin. Servs. Consent Order, p. 2 (Jan. 4, 2023) (hereinafter, the "**NYDFS Consent Order**" or "**Consent Order**").

246. NYDFS has explained that New York's virtual currency regulatory framework treats transaction monitoring as a core component of a risk-based compliance program, including monitoring for transactions associated with unlawful or high-risk activity. (*NYDFS Consent Order* at ¶ 29.)[17]

247. Coinbase, Inc. operated as a registered money services business (MSBs) and a virtual currency business (VCBs) and publicly represented that its compliance program included policies and procedures designed to verify customer identity and assess transaction risk.

---

[16] Fed. Fin. Insts. Examination Council, *Electronic Banking - Overview*, *in* Bank Secrecy Act/Anti-Money Laundering Examination Manual [last accessed Dec. 27, 2025], https://bsaaml.ffiec.gov/manual/RisksAssociatedWithMoneyLaunderingAndTerroristFinancing/06

[17] Plaintiff pleads this regulatory context solely to show notice, foreseeability, and the reasonable safeguards a regulated exchange holds itself out as maintaining—not to privately enforce any statute or regulation.

248. State regulations governing MSBs and VCBs describe identity verification as a core component of an effective compliance program. (23 N.Y.C.R.R § 200.15) These standards are pleaded to illustrate the reasonable safeguards Coinbase held itself out as maintaining and the foreseeability of harm when such safeguards are not meaningfully applied.

249. Coinbase held itself out as maintaining robust KYC and Customer Due Dilligence ("CDD") controls sufficient to understand customer identity, transaction purpose, and risk. NYDFS has found that such controls are intended to prevent platforms from being used as conduits for unlawful or high-risk activity. (*NYDFS Consent Order* at ¶ 37.)

250. Coinbase's failure to apply reasonable safeguards consistent with those representations supports an inference of foreseeability and reckless indifference to misuse of its platform.

251. Consistent with industry-standard compliance frameworks and NYDFS supervisory guidance, virtual currency businesses assess customer risk at onboarding and reassess that risk as customer activity changes over time.

252. NYDFS has explained that changes in transaction patterns, counterparties, or velocity are indicators that warrant heightened scrutiny. (23 N.Y.C.R.R § 200.15(b).)[18]

253. The risk assessment informs the level of scrutiny applied to that user's account. (*NYDFS Consent Order* at ¶ 38.)

254. Under industry-standard protocols and New York regulations, customers exhibiting higher-risk behaviors, such as high-velocity transfers to offshore gambling entities, must be subjected to Enhanced Due Diligence. (23 N.Y.C.R.R § 200.15(h)(1)-(2).)

---

[18] These principles are pleaded to show the foreseeable need for ongoing monitoring and reasonable safeguards—not to privately enforce any regulatory provision.

255. Coinbase's failure to meaningfully apply escalation tools (including holds, enhanced verification, restrictions, or suspensions) to this known high-risk conversion-and-transfer pattern was not an isolated operational lapse, but rather a conscious business choice ratified at the management level.

256. Coinbase possessed both the technical capability and contractual discretion to stop participating in this pattern, yet continued to process and profit from it.

257. These facts support the inference that Coinbase's response reflected a conscious business choice ratified at the management level, demonstrating a knowing disregard of the high probability of harm to consumers, including ineligible minor users, such as the Plaintiff.

258. New York law explicitly dictates that virtual currency licensees like Coinbase "must establish enhanced due diligence policies, procedures, and controls" for accounts involving foreign entities to detect money laundering. (23 N.Y.C.R.R § 200.15(h)2).)

259. New York's virtual currency regulatory framework reflects that a regulated exchange is expected to maintain and apply risk-based policies and procedures to identify and respond to impermissible or high-risk activity, including by restricting, pausing, or rejecting certain transactions when warranted. (23 N.Y.C.R.R § 200.15(j).)[19]

260. Coinbase nevertheless failed to apply reasonable safeguards to detect and interrupt the predictable, high-risk conversion-and-transfer pattern used to fund offshore gambling, supporting Plaintiff's negligence and gross negligence theories.

261. Beginning in May 2020, NYDFS audited Coinbase's compliance for the above requirements for the time period July 1, 2018, through December 31, 2019 (the "**Examination**").

[19] Plaintiff pleads this regulatory context, together with NYDFS's findings, solely as evidence of notice, foreseeability, and the reasonable safeguards a New York–regulated virtual currency business holds itself out as maintaining—not to privately enforce any statute or regulation.

(*NYDFS Consent Order* at ¶ 4.) The Examination and resulting Consent Order are pleaded to show that Coinbase was on notice that its onboarding and monitoring controls were deficient, yet continued operating materially the same systems as Plaintiff continued using the account before, during, and after the Examination period.

262. NYDFS provided Coinbase's management with detailed results of its Examination ("**Report of Examination**") in September 2020. (*NYDFS Consent Order* at ¶ 4.)

263. NYDFS determined in its Report of Examination that Coinbase treated its compliance obligations as a "simple check-the-box exercise," explicitly failing to build and maintain a functional compliance program that could "keep pace" with its growth. (*NYDFS Consent Order* at ¶¶ 39, 47.)

264. NYDFS found that Coinbase's compliance program was deficient in ways that created foreseeable risk of unlawful and high-risk activity being facilitated through its platform.

265. In the same Consent Order, NYDFS explicitly found that Coinbase's compliance failures constituted a violation of New York Banking Law § 44, determining that "Coinbase conducted business in an unsafe and unsound manner." (Id. at ¶ 69.)

266. NYDFS found that by late 2021, Coinbase's accumulated transaction-monitoring backlog swelled to a "significant and growing backlog of over 100,000 unreviewed transaction monitoring alerts… and the backlog of customers requiring enhanced due diligence ("EDD") exceeded 14,000." (*NYDFS Consent Order* at ¶¶ 9, 47.)

267. In late 2021, Coinbase attempted to "burn through" its compliance failures by hiring over 1,000 poorly trained third-party contractors, over which, NYDFS found that Coinbase "provided insufficient oversight" in the form of training that "was not scalable for the size of the

contractor force" and inadequately tracking "attendance at the training sessions" it held. (*NYDFS Consent Order* at ¶¶ 50.)

268. Further, NYDFS found that Coinbase initially "did not have a quality control system in place to audit the quality control" performed by the contractors. Id.

269. The results of this "burn through" strategy were catastrophic.

270. One third-party contractor hired to clear the backlog posted a failure rate of 96%, meaning nearly every alert was mishandled. (*NYDFS Consent Order* at ¶ 52.)

271. Despite operating under active regulatory audit by NYDFS during this period, NYDFS found that Coinbase did not inform the Department of these quality-control failures until July 2022.

272. Furthermore, NYDFS found Coinbase failed to maintain an effective transaction monitoring program in violation of 23 NYCRR § 504.3. (Id. at ¶ 71.)

273. NYDFS determined Coinbase operated in an "unsafe and unsound" manner. (Id. at ¶ 69.)

274. That regulatory determination supports the inference that Coinbase's onboarding and monitoring controls were foreseeably inadequate and that Coinbase failed to apply reasonable safeguards consistent with the risks it publicly acknowledged.

275. Coinbase processed and profited from the conversion and transmission of Plaintiff's funds to offshore gambling services despite obvious indicators of high-risk and unlawful use, and failed to apply reasonable safeguards or intervene consistent with the foreseeable risks of the activity

***4. Actual Knowledge: The 'Blinking Red Lights' of Illegal Gambling***

276. Under Second Circuit jurisprudence, a defendant cannot escape liability for fraud by deliberately closing its eyes to the obvious.

277. As held in *United States v. Ferguson* 676 F.3d 260 (2d Cir. 2011), a defendant's conscious disregard of "red flags" regarding fraudulent activity constitutes "willful blindness" sufficient to prove fraudulent intent under federal law (*United States v. Ferguson* 676 F.3d 260, 278 (2d Cir. 2011); see also *United States v. Nektalov*, 461 F.3d 309, 312, 317 (2d Cir .2006) [upholding conscious avoidance instruction where defendant consummated transactions despite obvious "red flags," including cash payments in small bills and references to moving "product" to Colombia, which provided the factual predicate for knowledge of money laundering].)

278. On information and belief, Coinbase's awareness of these illegal gambling transfers was systematically generated by the blockchain analytics software it utilizes for daily compliance.

279. Specifically, Coinbase utilizes "wallet clustering" heuristics—automated algorithms that analyze transaction behavior to link millions of individual deposit addresses to a single controlling entity.

280. The transaction pattern Stake users engaged in is distinct and consistent with well-known offshore gambling typologies.

281. When a user sends cryptocurrency to Stake.com, the funds are transmitted to a deposit address assigned to that user's Stake account.

282. Stake's automated systems then sweep those funds into centralized, pooled "hot wallets," where the platform assumes custody and control of the assets and tracks user balances through an internal ledger.

283. This deposit-and-sweep structure—characterized by repeated inflows from numerous retail users followed by rapid consolidation into centralized wallets—creates a

recognizable on-chain pattern that payment platforms and exchanges, including Coinbase, use to identify centralized gambling operators and high-risk counterparties.

284. The mechanism of this financial consolidation is standard casino architecture adapted for the blockchain.

285. Just as a pit boss at a physical casino periodically moves cash from table “drop boxes” to a central secure vault after players have exchanged it for chips, Stake’s automated software continuously “sweeps” the cryptocurrency proceeds from thousands of individual deposit addresses into centralized, aggregated “hot wallets.”

286. Once swept, these funds are commingled with the enterprise’s operating capital, confirming that the user has surrendered control of their assets to the House.

287. Stake’s consolidation, in turn, creates a distinct, recognizable, and permanent on-chain link between the user's specific deposit address and the central Stake enterprise—a digital fingerprint that sophisticated exchanges like Coinbase use to identify the central operator.

288. Industry-standard blockchain analytics tools can cluster deposit addresses and identify associated counterparties, including gambling-related services.

289. Specifically, Coinbase publicly represents that it employs transaction monitoring and risk assessment tools designed to identify prohibited and high-risk activity, including activity associated with unlawful gambling

290. As a major U.S. exchange that publicly emphasizes compliance and monitoring, Coinbase either detected—or exercising reasonable care should have detected—that repeated conversions followed by outbound transfers associated with offshore gambling funding presented a prohibited, high-risk use pattern.

291. Additionally, given the repeated pattern of fiat-to-cryptocurrency conversion

followed by outbound transfers associated with offshore gambling funding, Coinbase either detected—or, exercising reasonable care, should have detected—that Plaintiff's specific account activity posed a high-risk and prohibited use case under its own policies.

292. Moreover, NYDFS found that Coinbase knew that its users, including Plaintiff, utilized evasion technologies to bypass geographic restrictions.

293. The NYDFS Consent Order found that "Coinbase knows there is technology widely available to circumvent geographic restrictions [and] knows that some of its customers use that technology." (*NYDFS Consent Order* at ¶ 65.)

294. Despite this actual knowledge of evasion, Coinbase "never promulgated a risk-based policy" to flag VPN usage as "High Risk." (*NYDFS Consent Order* at ¶ 64.)

295. Coinbase failed to apply reasonable monitoring, escalation, or intervention safeguards consistent with the risk profile of Plaintiff's account activity.

296. Whether due to deficient system design, inadequate resourcing, or failure to enforce its own policies, Coinbase continued to process the same high-risk conversion-and-transfer pattern without interruption.

297. Coinbase manages customer funds through large-scale, pooled digital vaults known as "omnibus wallets," which pool funds from thousands of customers to facilitate liquidity.

298. Instead of keeping each customer's funds in isolated wallets, Coinbase tracks ownership via an internal ledger.

299. While this setup saves Coinbase transaction fees, it grants them complete visibility and control over every transfer entering or leaving these wallets.[20]

[20] In the cryptocurrency world, every transaction recorded on the public blockchain incurs a "gas fee" paid to the network. By using an omnibus wallet, Coinbase can simply update its own private

300. Coinbase's compliance system approved Plaintiff's account despite a glaring facial inaccuracy: the name on the verified identity document (Plaintiff's father) did not match the name on the funding source (Plaintiff's personal debit card).

301. A functional compliance system would have flagged this account mismatch immediately as a fraud indicator.

302. This failure was compounded when Plaintiff immediately began engaging in high-volume depositing and withdrawals with a known offshore gambling operator, a specific pattern of "High Risk" activity that, when combined with the identity mismatch, would have prompted reasonable safeguards—such as a hold, additional verification, or escalation for review—before permitting continued conversion and outbound transfers associated with an offshore gambling counterpart.

***5. The Legal Consequence: Gross Negligence and Systemic Recklessness***

303. NYDFS found that Coinbase treated its compliance obligations as a "simple check-the-box exercise." (*NYDFS Consent Order* at ¶ 39.)

304. Coinbase consented to entry of the Consent Order and, to resolve the matter, stipulated and agreed to its settlement provisions, including a civil monetary penalty and compliance-investment and monitorship commitments.

305. These NYDFS findings are pleaded to show that the risks at issue were foreseeable and known, and that Coinbase's failure to implement reasonable safeguards plausibly reflects reckless indifference, as well as consumer deception—not to privately enforce the BSA/AML regime.

internal spreadsheet to reflect transfers between users—a process that costs nothing—rather than paying these mandatory fees to broadcast each individual move to the public blockchain.

306. Further, Coinbase's failure to act on these red flags satisfies the rigorous standard for gross negligence under New York law.

307. Longstanding precedent defines gross negligence as conduct that evinces a "reckless indifference to the rights of others." (*See Gentile v. Garden City Alarm Co.*, 147 A.D.2d 124, 131 (2d Dept. 1989); *see also Food Pageant, Inc. v. Consolidated Edison Co.*, 54 N.Y.2d 167 (1981).)

308. This bar is met where a defendant systematically ignores its own safety warnings or employs incompetent staff to manage critical tasks. (*See Food Pageant, Inc. v. Consolidated Edison Co.*, 54 N.Y.2d 167 (1981) [upholding gross negligence verdict where defendant utility company "failed to properly maintain and inspect" critical systems and was "grossly negligent in placing an unqualified employee in such a critical position"]; *Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540 (1992) [holding that a fire alarm company's failure to report a signal created a triable issue of gross negligence].)

309. Here, Coinbase's conduct mirrors the specific liability found in *Sommer* and *Food Pageant*.

310. By allowing a backlog of 100,000 unreviewed transaction alerts to accumulate, Coinbase effectively ignored the "fire alarm" of money laundering just as the defendant ignored the alarm in *Sommer*.

311. Furthermore, Coinbase's subsequent hiring of 1,000 poorly trained contractors to "burn through" the backlog—agents who had a 96% failure rate—constitutes the precise "placement of unqualified employees in a critical position" condemned in *Food Pageant*.

312. Because the specific disposition of Plaintiff's transaction alerts remains in Defendant's exclusive control, Defendant's liability follows from two plausible inferences, either of which supports gross negligence under New York law:

- (a) Reckless Disregard of Obvious Risk Indicators (*Sommer*): Coinbase's compliance system flagged the obvious identity mismatch (Father vs. Son), but the alert languished in the 100,000-alert backlog due to the company's reckless "check-the-box" resource allocation; OR
- (b) Unsafe Design (*Food Pageant*) Coinbase's system was so fundamentally "unsafe and unsound," as NYDFS found in the Consent Order, that it failed to generate an alert for a facially obvious identity mismatch, constituting a complete abandonment of "slight care" and a failure to maintain critical systems. (*NYDFS Consent Order* at ¶ 69; *Food Pageant*, supra, at 172.)

313. Coinbase cannot claim its compliance failures were harmless errors.

314. As the NYDFS concluded, "the risks to the financial system due to this weakness…have already resulted in suspicious or unlawful conduct being facilitated through Coinbase's platform." (*NYDFS Consent Order* at ¶ 42.)

315. NYDFS found that Coinbase's controls were inadequate to detect and prevent high-risk and unlawful activity on its platform, and that those deficiencies facilitated suspicious and unlawful conduct. (*NYDFS Consent Order* at ¶ 42).

316. These findings are pleaded to show notice and foreseeability: Coinbase knew its monitoring and risk controls were insufficient to identify and interrupt high-risk transaction patterns, yet continued to process the conversion-and-transfer flows that predictably enable unlawful offshore wagering.

317. By knowingly deploying a compliance system it knew was functionally useless against high-velocity gambling transfers, Coinbase acted with reckless disregard for obvious indicators of high-risk and unlawful use, by continuing to process the same conversion-and-transfer pattern without applying reasonable safeguards.

318. Indeed, having paid a $100 million penalty to the New York Department of Financial Services in 2023 for historical failures in this exact area, Coinbase possesses actual knowledge that its automated compliance tools must detect such activity.[21]

### *6. The Operation in Action: How Defendants Collectively Recruited, Onboarded, and Exploited Plaintiff*

319. Plaintiff John Doe is a 20-year-old resident of Westchester County, New York.

320. Plaintiff began his descent into the Defendants' gambling ecosystem at 12 years of age.

321. On or about November 29, 2015, Plaintiff, age ten (10) at the time, created an account on Twitch.

322. Like millions of other adolescents, he was initially drawn to the platform for competitive video gaming content including *Counter-Strike: Global Offensive* ("CSGO"), where Twitch's "Partner Program" Streamers such as PhantomL0rd, Syndicate, m0E, and FaZe Banks mixed gaming with the use of in-game "skins."

323. However, Twitch's recommendation algorithms—designed to maximize

[21] Press Release, NY St Dept of Fin Servs, *Superintendent Adrienne A. Harris Announces $100 Million Settlement with Coinbase, Inc. after DFS Investigation Finds Significant Failings in the Company's Compliance Program* (Jan. 4, 2023), available at https://www.dfs.ny.gov/reports_and_publications/press_releases/pr202301041 [last accessed April 3, 2025]

engagement—soon began serving him high-stakes gambling streams alongside his gaming feed.[22]

324. Plaintiff watched "Verified" Twitch partners–influencers such as Trainwrecks, Adin Ross, Roshtein, ClassyBeef, and others–win large and rapidly fluctuating sums of money on Stake.com. Many of these streamers also streamed content related to videogames popular with children like Plaintiff.

325. These streams normalized the use of cryptocurrency for gambling and explicitly instructed viewers on how to bypass geographic restrictions.

326. As Twitch's recommendation algorithms transitioned Plaintiff from competitive gaming content to high-stakes gambling streams, Plaintiff was unaware that these "Verified" influencers were paid promoters under contract with Defendant Stake.

327. Despite FTC guidelines requiring clear disclosures for paid endorsements, these streams—featuring extreme sums of money on Stake.com—frequently lacked mandatory indicators such as '#ad' tags or responsible gambling banners.

328. Because Twitch actively served these streams via its 'Recommended' pages, Plaintiff reasonably believed the activities—including the use of cryptocurrency and the bypassing of geographic restrictions—were lawful and safe platform-approved content, rather than undisclosed paid advertisements.

329. After being recruited through gambling-content marketing on Twitch and instructed on how to access Stake.com, Plaintiff began taking the steps promoted by the streamers he watched.

330. Stake.com purported to restrict U.S.-based users through rudimentary geoblocking.

---

[22] Many of these CSGO skins streamers were later exposed for owning or promoting unregulated jackpot-style gambling websites without disclosing their affiliations. *In re CSGO Lotto, Inc., Trevor Martin, and Thomas Cassell*, FTC File No. 162 3184 (Dec. 8, 2017) (final order).

331. On or about September 27, 2018, following the instructions he learned from Twitch gambling-content, Plaintiff downloaded a VPN to mask his New York-based IP address—an easy workaround well-known to users and foreseeable to Defendants.

332. By simply selecting a permitted jurisdiction from a dropdown menu, Plaintiff was able to bypass this barrier instantly.

333. This is a trivial workaround well-known to the Operator Defendants. Indeed, as noted above, Defendant Tehrani has publicly admitted that Stake's systems can and do track VPN use, which Stake uses for business purposes but not to comply with the law.

334. Plaintiff, like countless other viewers, understood VPN use as a routine and accepted part of accessing Stake.com's platform and encountered no barriers when he followed the same steps.

335. Plaintiff also needed a mechanism to convert U.S. dollars into the cryptocurrency required to fund wagers on Stake.com.

336. On or about October 20, 2018, Plaintiff created a Coinbase account for that purpose.

337. Plaintiff was born on April 26, 2005. Accordingly, on October 20, 2018, Plaintiff was 13 years of age at the time he opened the Coinbase account.

338. Upon information and belief, the Coinbase account-opening process in or about October 2018 required a user to complete an online registration flow (via Coinbase's website and/or mobile application) and to take one or more steps indicating assent to a "User Agreement" and/or "Terms" as a condition of proceeding.

339. At the time Plaintiff opened the account, Coinbase did not display the full contractual terms on the registration screen; instead, the terms were presented, at most, through one or more hyperlinks within the registration interface, without requiring the user to open the

terms, scroll through them, or separately acknowledge any dispute-resolution terms before proceeding.

340. Plaintiff clicked assent while still a minor.

341. The click was a general step to proceed with account creation and did not constitute knowing assent to arbitration or to any waiver of litigation rights, and, in any event, Plaintiff was a minor at the time of account creation.

342. Plaintiff did not view, open, or read any arbitration provision during account creation.

343. The registration interface did not require Plaintiff to scroll through arbitration terms, click any arbitration-specific disclosure, or separately acknowledge an arbitration clause or class-action waiver as a condition of creating the account.

344. Coinbase's current onboarding flow requires a user to (i) certify that the user is eighteen or older and agree to hyperlinked terms during registration, and (ii) complete additional identity verification steps, including document upload, as part of account setup.

345. Even with those steps, Coinbase does not display any arbitration provision on the registration screen itself or require any arbitration-specific disclosure or separate acknowledgment at the point where the user is required to indicate assent to the User Agreement.

346. Plaintiff alleges on information and belief that Coinbase's 2018 onboarding flow used the same basic structure—hyperlinked clickwrap terms and age attestation followed by identity-verification steps—though Coinbase's acceptance logs and archived terms versions will confirm the precise flow and operative agreement.

347. On information and belief, Coinbase maintains business records reflecting the specific terms presented to a user at the time of account creation, including the date/time of any

purported assent, the version of the User Agreement then in effect, and the manner by which Coinbase recorded that assent (e.g., clickwrap acceptance event logs and associated user-interface flow records).

348. Those records are in Coinbase's exclusive possession and will be obtained through discovery.

349. After turning eighteen, Plaintiff did not knowingly or voluntarily reaffirm any Coinbase contract or any arbitration agreement.

350. Any brief post-majority account access occurred during a continuing period of gambling-related impairment, was not accompanied by any updated-terms clickwrap or other renewed manifestation of assent tied to arbitration or dispute-resolution terms, and ended when Plaintiff became sober and stopped using Coinbase for any gambling-related activity on or about December 17, 2024, when Plaintiff was younger than 21 years old.

351. Plaintiff seeks damages from Defendants only for injuries incurred as a result of Defendants' conduct while Plaintiff was under eighteen.

352. Plaintiff registered the Coinbase account using his adult father's identification to bypass age restrictions.

353. However, Plaintiff funded the digital wallet by linking and transferring funds from a debit card issued in his own name.

354. Coinbase linked Plaintiff's Coinbase account to a Chase debit card and associated checking account labeled **"High School Checking"** (ending ****9351), and repeatedly processed withdrawals from Plaintiff's Coinbase account to that same "High School Checking" account.

355. Chase markets and labels "Chase High School Checking" as a teen checking

product for students ages 13–17 opened with a parent/guardian as co-owner.[23]

356. The Coinbase interface identified Plaintiff's linked payment method and withdrawal destination as "Chase – HIGH SCHOOL CHECKING," which—at minimum—flagged the account as youth-associated and presented a need for heightened onboarding scrutiny and age/identity verification before Coinbase processed additional purchases or withdrawals.

357. The "High School Checking" designation did not reflect a user-selected nickname.

358. On information and belief, Chase assigns that label as the product name for its teen checking accounts.

359. The label therefore identified the linked funding and withdrawal account as a teen-branded product associated with minors (ages 13–17 at opening) and parent/guardian co-ownership.

360. That designation—combined with Coinbase's ability to require additional verification or restrict use—created an objectively foreseeable risk that a minor or minor-associated account funded and controlled the cryptocurrency purchases and withdrawals at issue.

361. Plaintiff also funded Coinbase cryptocurrency purchases using the same Chase debit card and checking account identified in Coinbase's interface as "Chase – HIGH SCHOOL CHECKING" (ending ****9351).

362. For example, on or about June 1, 2020, Coinbase processed a purchase of cryptocurrency funded by that "High School Checking" payment method and charged a transaction fee on the purchase.

363. Coinbase thus processed repeated transactions while its own interface displayed a

---

[23] Chase High School Checking, JPMorgan Chase & Co., https://www.chase.com/personal/checking/high-school-checking [last accessed Jan. 3, 2026]

teen-branded checking label for the linked payment method, despite Coinbase's own policy limiting its services to users aged eighteen and older.




(*Above: Screenshot of Plaintiff's Coinbase transaction dated June 1, 2020, displaying "Chase - HIGH SCHOOL..." as the Payment Method, confirming Coinbase processed cryptocurrency purchases funded by a teen-branded checking account.*)

364. The combination of (i) a mismatch between the identity used to open the Coinbase account and the name on the linked funding instrument, and (ii) Coinbase's repeated processing of purchases and withdrawals through a payment method labeled "High School Checking," presented obvious indicators warranting heightened verification and review.

365. Coinbase nevertheless continued to process the conversion-and-transfer cycle without interruption–collecting fees on each such transaction–thereby providing the liquidity that

enabled Plaintiff's gambling activity.

366. Using the combined workflow—VPN-based access and cryptocurrency funding—Plaintiff accessed Stake.com and registered an account on or about November 26, 2018. Plaintiff also used Defendants' Primedice online casino.

367. Stake.com knew or should have known VPN evasion was widespread because its systems routinely record indicators such as physically impossible travel patterns and repeated logins inconsistent with true location.

368. At no point during this sign-up process did the Stake Defendants require Plaintiff to verify his age or identity.

369. The Stake Defendants' security systems knowingly accepted his connection despite obvious indicators of "impossible travel"—a standard cybersecurity alert triggered when a user's geolocation shifts between physically incompatible locations (e.g., New York to Singapore) in a timeframe that defies the laws of physics.

370. By permitting play despite these high-fidelity fraud signals, Defendants demonstrated willful blindness to the obvious use of illicit tools to bypass their own geo-blocking protocols.

371. Once inside, Plaintiff transferred the cryptocurrency he had acquired via Coinbase directly to his unique Stake deposit address.

372. These transactions were validated by the blockchain and, upon information and belief, swept into the Stake Defendants' central hot wallet, thereby surrendering exclusive custody and control of Plaintiffs assets to Stake.

373. Plaintiff often gambled on Stake.com by playing proprietary 'Stake Originals' including Blackjack, Roulette, Crash, Mines, Plinko, Limbo, and Hilo.

374. Additionally, he heavily utilized third-party live and slot games hosted on the platform, including Monopoly, CrazyTime, Gates of Olympus, Fruit Party, Floating Dragon, Sugar Rush, Chaos Crew, Dog House, Gems Bonanza, and the candy-themed slot game, 'Sweet Bonanza.'




*(Above: 'Sweet Bonanza', a candy-themed slot game hosted on Stake.com)*

375. The visual design of 'Sweet Bonanza' employs a 'gamification' strategy that deliberately blurs the line between adult gambling and juvenile entertainment. The interface utilizes a hyper-saturated, neon color palette and cartoonish typography, mirroring the aesthetic of popular mobile puzzle games marketed to children, such as *Candy Crush Saga*.

376. By replacing traditional gambling iconography with symbols like swirly lollipops, fruits, and heart-shaped candies, the game lowers the psychological barrier to entry and creates a visual lure that is uniquely attractive to a minor demographic. These design choices augmented

the Stake Defendants' choice to promote their addictive gambling product through videogame streamers popular with children, making the Stake online casino more attractive to children.

377. When Twitch finally restricted gambling streams in late 2022 following public outcry, the Stake and Kick Defendants executed their migration strategy to ensure Plaintiff remained hooked.

378. On or about December 14, 2022, following his favorite Streamers who had announced their move to the new platform, Plaintiff created an account on Kick.com.


STAKE
DRAKE

Hi [redacted]

Drake returns for another action-packed stream on Dec 16. 9pm EDT.

Make sure you tune in, as **over $2,000,000 in giveaways** will be blessed to lucky Stakers, and you've got to be in it to win it! 💰

Be on the lookout for some exciting Roulette rolls as Drake employs his strategy with aims to win big! He'll also explore some slot games.

Find Drake live on kick.com/drake. And If the last few Stake vs Drake streams have taught us anything, it's that this is not one to miss! 👀

- Drake 🤝 Stake
- @champagnepapi
- @stake

Where can you watch the stream live on Dec 16? kick.com/drake. Save December 16th on your calendar, the party starts 9pm EDT 🥳

Stake x Drake

*(Above: Email from Stake.com to Plaintiff dated December 14, 2022, announcing Drake's migration to Kick.com as part of the Stake and Kick Defendant's user conversion strategy)*

379. Kick served as the Stake Defendant's "retention valve."

380. By offering a nearly identical user interface to Twitch but with zero restrictions on gambling content, Kick allowed the Stake Defendants to continue broadcasting to Plaintiff without interruption.

381. Plaintiff continued consuming gambling content on Kick and gambling on Stake.com until treatment for his gambling addiction, sustaining the financial losses and psychological injuries detailed *infra*.

382. While watching gambling streams on Twitch and Kick, Plaintiff frequently observed prominent Streamers appearing to win large sums of money on the Stake.com platform.

383. These broadcasts portrayed gambling as easy, exciting, and lucrative, often showing continuous wins and lavish rewards.

384. Plaintiff reasonably believed that the Streamers were gambling with their own funds and that their results reflected genuine outcomes.

385. In reality, many of these Streamers were under undisclosed promotional contracts with Stake.com, funded by the company itself to gamble with house money and to promote the platform to their audiences.

386. Plaintiff was unaware of these financial relationships or that the outcomes were manipulated for marketing purposes, leading him to believe that similar success was attainable through his own play.

## IV. CHOICE OF LAW

387. Coinbase is headquartered in New York and all decisions related to the maintenance and operations of its ecommerce websites emanate from New York.

388. The remaining Defendants all purposefully direct their business and advertisements at New York residents and target those residents for their online gambling sites and platforms.

389. Plaintiff is, and at all relevant times has been, a resident of New York and all of his gambling was done on a computer and phone located in New York.

## V. TOLLING OF STATUTE OF LIMITATIONS

390. During a significant portion of the events alleged herein, Plaintiff was a minor under the age of 18.

391. At the time of the filing of this Complaint, Plaintiff has not yet turned 21. Pursuant to N.Y. CPLR § 208, all claims alleged herein are timely.

## VI. VOIDING OF CONTRACTUAL PROVISIONS

### *A. No Enforceable Arbitration / Forum-Selection / Choice-of-Law Provisions With the Coinbase Defendants*

392. No valid arbitration agreement was formed with Plaintiff as to the Coinbase Defendants.

393. Coinbase's User Agreement expressly conditions eligibility on the user being at least eighteen years old.

394. Plaintiff was under eighteen at the time of the clickwrap. Because that express eligibility condition was not satisfied, no agreement was formed between Plaintiff and Coinbase, including any agreement to arbitrate or to delegate questions of arbitrability. (Coinbase User Agreement § 1.1 (Eligibility).)

395. Alternatively, even if a contract could be deemed formed, New York law treats contracts entered into by minors as voidable at the minor's election under the common-law Infancy Doctrine and N.Y. Gen. Oblig. Law § 3-101.

396. Plaintiff has exercised that right by disaffirming any purported agreement entered into while he was a minor, including any arbitration, delegation, forum-selection, or choice-of-law provision, through the filing of this Complaint.

397. Plaintiff does not seek to enforce any contractual benefit under the purported agreement and limits his claims to conduct occurring while he was a minor.

398. Plaintiff specifically disaffirms any delegation clause separate and apart from any other contractual terms.

399. Because Plaintiff lacked capacity to contract, no agreement to delegate authority to an arbitrator was ever formed.

400. Coinbase Defendants may contend that an arbitrator must decide these issues under a delegation clause. Absent a valid agreement formed with Plaintiff—or in light of Plaintiff's disaffirmance—no enforceable delegation clause binds Plaintiff.

401. The Court therefore retains authority to determine whether any agreement to arbitrate exists.

402. Accordingly, Plaintiff cannot be compelled to arbitrate or litigate in any contractual forum based on a purported agreement that was never formed or, alternatively, is unenforceable as to Plaintiff due to infancy and disaffirmance.

***B. No Enforceable Arbitration / Forum-Selection / Choice-of-Law Provisions With the Non-Coinbase Defendants***

403. Plaintiff is informed and believes that the non-Coinbase Defendants will contend that Plaintiff is bound by one or more online "Terms of Service," "User Agreements," "Community Guidelines," "Arbitration Agreements," "Forum Selection" clauses, "Choice of Law" clauses, "Class Action Waiver" provisions, "Limitation of Liability" provisions, or similar purported contracts.

404. No such provisions are enforceable against Plaintiff for at least the following independent reasons.

405. First, Plaintiff was a minor and lacked legal capacity at the time of any purported assent to any such terms, and any such agreement is voidable at Plaintiff's election under New York's common-law Infancy Doctrine and N.Y. Gen. Oblig. Law § 3-101.

406. Plaintiff has exercised that right by expressly disaffirming any purported agreement entered into while he was a minor through the filing of this Complaint.

407. Second, Plaintiff did not knowingly and voluntarily assent to any arbitration agreement, delegation clause, forum selection clause, choice-of-law clause, class-action waiver, or limitation-of-liability provision. To the extent any non-Coinbase Defendant relies on browsewrap or hyperlink-only terms, or contends that mere use of a website, app, or stream constitutes assent, such purported assent is ineffective as a matter of contract formation—particularly as to a minor.

408. Third, to the extent any non-Coinbase Defendant invokes a delegation clause requiring an arbitrator to decide arbitrability, no enforceable delegation agreement exists because Plaintiff lacked capacity to contract and has disaffirmed any purported agreement; accordingly, the Court must decide whether any agreement to arbitrate exists.

409. Plaintiff does not seek to enforce or accept any benefits under any purported Terms of Service or similar agreement, and Plaintiff's claims are based on Defendants' unlawful and tortious conduct directed at Plaintiff while he was a minor.

## VII. CAUSES OF ACTION

### <u>COUNT I</u>
### Violation Of New York GBL § 349
### (Against All Defendants)

410. Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

411. New York's General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

412. In their provision of online services throughout the State of New York, Defendants conduct business and trade within the meaning and intendment of New York's General Business Law § 349.

413. Plaintiff is a consumer who conducted transactions with Defendants for his personal use.

414. As set forth above, Defendants engaged in deceptive acts and practices in the conduct of their businesses and in the furnishing of their services, including unlawfully advertising and promoting online gambling to minors, failing to develop or implement any functional means of determining a users' age or location, and thus the laws applicable to that user, failing to provide various statutorily-required notices and disclaimers, and failing to prevent their assets from being used in unlawful ways, including online gambling by minors.

415. **As to Coinbase,** Plaintiff's §349 claim is based on Coinbase's consumer-facing representations that its platform is limited to users 18 and over, that it restricts prohibited activity (including unlawful gambling-related use), and that it employs risk-based onboarding and monitoring with the ability to place holds, require additional verification, restrict transfers, or suspend accounts. These representations and omissions were materially misleading because Coinbase nonetheless onboarded and serviced Plaintiff while he was a minor and continued to process and profit from a repeated conversion-and-outbound-transfer pattern consistent with prohibited gambling funding, without meaningfully applying the safeguards it represented it used. Plaintiff was injured as a result, including through Coinbase fees and spreads charged on these transactions and through the continuation and escalation of the funding cycle while Plaintiff was under eighteen.

416. By the acts and conduct alleged herein, Defendants have engaged in deceptive, unfair, and misleading acts and practices.

417. The foregoing deceptive acts and practices were directed at consumers and, thus, constituted "consumer-oriented conduct" under § 349.

418. Defendants' conduct was not unique to the Plaintiff but was part of a broad, standardized scheme affecting consumers at large. Upon information and belief, Defendants' failure to implement effective age and location verification was a systemic design choice intended to onboard thousands of similarly situated New York residents. By allowing the "VPN workaround" to remain widely known and functional, and by promoting their platforms through influencers who normalized these evasion techniques to a mass audience, Defendants engaged in a pattern of deceptive conduct that had a broad impact on the public interest of the State of New York.

419. Furthermore, the deception was material to the public. Defendants created a false "veneer of legitimacy" by securing sponsorships with prominent celebrities (e.g., Drake, Adin Ross, etc.) and obtaining "Verified" status on Twitch. This branding misled reasonable consumers, including Plaintiff and the public at large, into believing that the Stake gambling ecosystem was a safe, regulated, and lawful marketplace, when in reality it was an illegal offshore operation targeting users who could not legally play elsewhere.

420. The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the legality of Defendants' activities and promote and facilitate the unlawful participation in those illegal activities.

421. By reason of this conduct, Defendant engaged in deceptive conduct in violation of GBL § 349.

422. Defendant's actions are the direct, foreseeable, and proximate cause of the damages that Plaintiff has sustained.

423. Defendants' violations of GBL § 349, set out above, have directly and proximately injured Plaintiff, including but not limited to: (i) actual damages and economic losses; and (ii) noneconomic damages to be determined.

424. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

425. Plaintiff is entitled to damages in an amount to be proven at trial, and to equitable relief, including injunctive relief.

**COUNT II**
**Gross Negligence**
**(As to Defendant Coinbase only)**

426. Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

427. At all times relevant, Defendant Coinbase owed Plaintiff a duty to exercise reasonable care in providing its consumer exchange and custodial-wallet services, including in implementing and applying the safeguards and restrictions it publicly represented it used to prevent prohibited and high-risk uses—where the foreseeable misuse of its platform included repeat fiat-to-crypto conversions followed by outbound transfers to offshore gambling endpoints.

428. Coinbase held itself out to consumers as operating a risk-based onboarding and monitoring system, and reserved discretion to restrict or suspend accounts engaging in prohibited use. Having undertaken to operate an 18+ consumer exchange with stated anti-gambling restrictions, Coinbase owed a duty to apply reasonable safeguards consistent with foreseeable,

repeated use of its platform as a gambling-funding rail—especially where Coinbase's own interface displayed youth-associated indicators tied to the funding source.

429. Defendant Coinbase breached that duty by processing and profiting from a predictable, repeated conversion-and-transfer sequence—fiat-to-cryptocurrency purchases followed by outbound transfers—despite red flags indicating the account was being used to fund offshore gambling.

430. Plaintiff alleges on information and belief that at all times relevant, Defendant Coinbase knew or should have known that the cryptocurrency transactions facilitated by its platform were being used to fund illegal online gambling.

431. Defendant Coinbase controls the onboarding, funding-instrument linking, conversion, and outbound transfer functions on its platform and, consistent with its public policies and risk-based controls, can place holds, request additional verification, restrict transfers, or suspend accounts when activity presents prohibited or high-risk indicators.

432. Despite knowing that its platform serves as the primary workaround for these prohibited transactions, Coinbase failed to apply reasonable safeguards consistent with the risks it publicly acknowledged and the controls it represented it used, despite the foreseeable misuse of its platform as a gambling-funding rail.

433. Despite this actual and constructive knowledge, Defendant Coinbase negligently made no effort to stem the flow of cryptocurrency from New York residents, such as Plaintiff, to the remaining Defendants herein.

434. This failure began at onboarding—where the verified identity and funding instrument did not match—and continued as the account engaged in the same repeated gambling-funding pattern.

435. Coinbase ignored multiple, converging indicators of minor involvement—including a teen-branded payment method displayed in its own interface—and continued to process and profit from the same conversion-and-transfer cycle.

436. The involvement of third-party criminal conduct does not sever proximate cause where the intervening act was a foreseeable consequence of the risk created by Defendant's negligence. Here, Coinbase's negligent onboarding and continued processing of the same high-risk conversion-and-transfer pattern foreseeably enabled the offshore gambling deposits that caused Plaintiff's losses. Defendant cannot rely on the illegality of the transaction as a defense when its own profit model relies on processing those illicit funds.

437. The resulting harm was foreseeable. Coinbase represents that it employs risk-based monitoring and safeguards to detect and interrupt prohibited and high-risk uses. Given the repeated conversion-and-transfer sequence alleged here—together with onboarding red flags—Coinbase either detected, or in the exercise of reasonable care should have detected, that the account activity posed a prohibited/high-risk use case under its own policies and public-facing representations.

438. Defendant Coinbase's breach of its duty set out above has directly and proximately injured Plaintiff, including but not limited to: (i) actual damages and economic losses; and (2) noneconomic damages to be determined.

439. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

440. Defendant Coinbase's conduct was willful, wanton, and reckless because it prioritized transaction volume and fee generation over applying the reasonable safeguards it publicly represented it used to restrict prohibited and high-risk activity, despite the foreseeable

harm to consumers. This conscious and reckless disregard for known risks supports an award of punitive damages.

441. Coinbase's misconduct was not an isolated error affecting only Plaintiff. It reflects a profit-driven policy and systemic failure to apply meaningful safeguards to a foreseeable, repeatable "conversion-and-transfer" misuse pattern, while collecting fees and spreads on the same cycle. Coinbase's conduct therefore implicates the public interest and warrants punitive damages to punish and deter a business model that externalizes predictable consumer harm—particularly harm to minors ineligible to use the platform at all.

442. Plaintiff is entitled to damages in an amount to be proven at trial, and to equitable relief, including injunctive relief. As to Coinbase, Plaintiff seeks damages only for losses incurred while Plaintiff was under eighteen.

**COUNT III**
**Negligence**
**(As to Defendant Coinbase only)**

443. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

444. At all times relevant, Coinbase operated a consumer-facing cryptocurrency exchange and custodial-wallet platform and invited consumers, including New York residents, to use its services through a New York-directed onboarding flow and ongoing platform access.

445. Coinbase held itself out as operating an 18-and-over consumer platform with policies restricting prohibited activity, and as employing risk-based onboarding and monitoring safeguards, including the ability to request additional verification, place holds, restrict transfers, or suspend accounts when activity presents prohibited or high-risk indicators.

446. By undertaking to provide those consumer services in New York while reserving and advertising the ability to apply risk-based safeguards and restrictions, Coinbase owed Plaintiff a duty to exercise reasonable care in onboarding and servicing accounts, including applying reasonable safeguards consistent with its eligibility restrictions, public-facing representations, and foreseeable risk of misuse of its platform as a gambling-funding rail.

447. Coinbase breached that duty by, among other things: (i) permitting an account to be opened and used by Plaintiff while he was a minor (and therefore ineligible under Coinbase's stated eligibility requirement); (ii) failing to apply reasonable onboarding safeguards in light of identity-and-funding inconsistencies alleged herein; (iii) continuing to process repeated fiat-to-cryptocurrency purchases and outbound transfers consistent with a foreseeable, prohibited gambling-funding pattern while collecting fees and spreads; and (iv) failing to require heightened verification, place holds, restrict transfers, or suspend activity despite multiple converging indicators warranting escalation, including youth-associated indicators tied to Plaintiff's funding source and the high-velocity conversion-and-transfer pattern alleged herein.

448. Plaintiff does not allege that Coinbase was required to guarantee compliance with gambling laws or to prevent all unlawful use of cryptocurrency, and Plaintiff does not seek to privately enforce the Bank Secrecy Act, AML regulations, UIGEA, the NYDFS Consent Order, or any other regulatory scheme. Plaintiff alleges ordinary negligence based on Coinbase's common-law duty of reasonable care arising from Coinbase's undertaking, eligibility restrictions, and foreseeable risk to minor consumers.

449. Coinbase's negligence was a substantial factor in causing Plaintiff's injuries and losses incurred while Plaintiff was under eighteen, including enabling the repeated conversion-

and-transfer cycle that funded Plaintiff's offshore gambling deposits and prolonging Plaintiff's loss cycle, and including the fees and spreads Coinbase collected on those transactions.

450. The involvement of third-party misconduct does not sever proximate cause where the intervening conduct was a foreseeable consequence of the risk created by the defendant's negligence. Here, the foreseeable misuse of Coinbase's platform as a gambling-funding rail—particularly by ineligible users including minors—was the very risk that reasonable onboarding and escalation safeguards were intended to address.

451. As a direct and proximate result of Coinbase's negligence, Plaintiff sustained damages, including economic losses and related injuries, in an amount to be proven at trial. Plaintiff seeks damages from Coinbase only for losses incurred while Plaintiff was under eighteen.

452. Plaintiff is entitled to compensatory damages, attorneys' fees where recoverable, costs, interest, and such other and further relief as the Court deems just and proper.

**COUNT IV**
**Negligence Per Se**
**(As to Stake Defendants only)**

453. Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

454. As alleged above, New York law prohibits most forms of gambling, and specifically the types of gambling promoted and operated by Defendants. And, as relevant here, New York prohibits minors from all forms of gambling. *See, e.g.*, N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1332(1) ("No person under the age at which a person is authorized to purchase and consume alcoholic beverages shall enter, or wager in, a licensed gaming facility"); N.Y. Comp. Codes R. & Regs. Tit. 9, § 5313.2(b) ("A gaming facility licensee shall post signs that include a statement that is similar to the following: 'It is unlawful for any individual under 21 years of age

to enter or remain in any area where gaming is conducted. It is unlawful for any individual under 21 years of age to wager, play or attempt to play a slot machine or table game. Individuals violating this prohibition will be removed and may be subject to arrest and criminal prosecution.'"); § 5329.19(a) ("No person under 21 years of age may place a wager with a casino sports wagering licensee"); and § 5313.2(c) ("A gaming facility licensee shall identify and remove any person who is under 21 years of age and not otherwise authorized by law to be on the gaming floor and the gaming floor, in areas off the gaming floor where gaming activity is conducted or engaging in gaming-related activities.")

455. Furthermore, New York prohibits any advertisements that "[d]epict any person under the age of twenty-one engaging in gaming and related activities[.]" N.Y. Rac. Pari-Mut. Wag. & Breed. Law §§ 1363(2)(c).

456. Additionally, New York has several laws requiring gambling providers to conspicuously post signs that tell users how to get assistance with gambling addiction and provide instructions on how to access New York's Voluntary Self-Exclusion Program. *See, e.g.*, N.Y. Comp. Codes R. & Regs. Tit. 9 § 5325.2(a) (requiring each gaming facility licensee to "submit for commission review and approval a problem gambling plan"); § 5325.4(a) (requiring each gaming facility licensee to "submit to the commission quarterly updates and an annual summary of its problem gambling plan and goals"); § 5325.5 (requiring each gaming facility licensee to "post signs in a size as approved in writing by the commission that include the problem gambling assistance message" approved by the commission); § 5325.6(b) (requiring all advertisements to "contain a problem gambling assistance message comparable to one of the following: (1) If you or someone you know has a gambling problem, help is available. Call (877-8-HOPENY) or text HOPENY (467369); (2) Gambling Problem? Call (877-8-HOPENY) or text HOPENY (467369);

or (3) any other message approved in writing by the commission."); § 5325.6(c)(4)(i) ("for websites, including social media sites and mobile phone applications, the problem gambling assistance message must be posted on each webpage or profile page and on any gaming-related advertisement posted on the webpage or profile page"); § 5327.1(b) ("Each gaming facility licensee shall exclude from its premises any person who such gaming facility licensee knows meets the exclusion criteria"); § 5327.3 ("The placement of a person on the excluded persons list shall have the effect of requiring the exclusion or ejection of the excluded person from casino sports wagering licensee and sports pool vendor licensee shall comply with the problem gaming, self-exclusion and excluded person requirements.")

457. Defendants here negligently failed to comply with any of these laws. Defendants had no effective system to determine the age or location of an online user, and thus no way to determine whether that user was or is in New York and whether Defendants needed to comply with New York law with respect to that user. Indeed, Defendants had no competent age verification system at all, rendering their operation illegal in all 50 states.

458. Defendants also directly violated N.Y. Rac. Pari-Mut. Wag. & Breed. Law §§ 1363(2)(c) by actively promoting their gaming platforms to minors and depicting people under the age of 21 engaged in gambling activities.

459. All of the above laws created statutory duties and obligations for Defendants herein.

460. These laws were designed and intended to protect minors from being exposed to gambling promotions and from being allowed to gamble.

461. Plaintiff is among the class of persons these laws were designed to protect. Plaintiff was a minor when he was exposed to Defendants' relentless marketing and when he started gambling on Defendants' platforms. And he was also a problem gambler who needed help.

462. Defendants' breach of their statutory duties set forth above has directly and proximately injured Plaintiff, including but not limited to: (i) actual damages and economic losses; and (2) noneconomic damages to be determined.

463. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

464. Plaintiff is entitled to damages in an amount to be proven at trial, and to equitable relief, including injunctive relief.

**COUNT V**
**Negligence**
**(As to all Defendants except Coinbase)**

465. Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

466. At all times relevant herein, Defendants had, and continue to have, a duty to prevent New York residents, and especially minors, from accessing and using any part of Defendants' gambling operations that are illegal under New York law. This duty arises from New York laws and public policies regulating gambling and providing clear age restrictions on who can access and participate in legal gambling operations.

467. Defendants also had, and continue to have, a legal duty not to promote their gambling platforms and facilities to minors or in a way that is designed to attract minors. This duty also arises from New York laws and public policies regulating gambling and providing clear age restrictions on who can access and participate in legal gambling operations.

468. At the very minimum, Defendants' duties required them to design, implement, and maintain proper age and location verification systems for their platforms (and to prohibit the use of VPNs or other similar technology to evade those systems) to prevent illegal underage gambling.

469. Defendants' duties also required them to produce or approve appropriate advertising and promotional materials and to ensure their advertisements, whether created and publicized by Defendants themselves or third-party influencers paid by Defendants, did not target or appeal to minors and were not visible in locations such as the State of New York where Defendants' gambling activities are illegal.

470. Defendants breached their duties of care by, among other things, failing to take any of these actions. As alleged more fully above, Defendants promoted their gambling platforms in the State of New York, used paid influencers and game-like designs to appeal to minors, allowed and, indeed, encouraged access to their platforms by New York residents, including Plaintiff, and failed to employ any viable age verification systems.

471. Defendants' breach of their duties provided the means for Plaintiff and other New York residents to see Defendants' advertisements and promotions, access Defendants' gambling platforms, and evade any restrictions on location or age.

472. Had Defendants adequately designed, employed, and maintained appropriate age and location verification systems and not used promotions aimed at recruiting minor users, Plaintiff would not have known about, or at least would not have been able to access, Defendants' systems.

473. Defendants' breach of their duties has directly and proximately injured Plaintiff, including but not limited to: (i) actual damages and economic losses; and (2) noneconomic damages to be determined.

474. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

475. Defendants' conduct was not merely negligent, but gross and wanton, reflecting a reckless disregard for the foreseeable safety and welfare of minors and the public. By structuring and operating an integrated system that facilitated underage access to offshore gambling activity prohibited under New York law, Defendants acted with conscious disregard of known risks, justifying an award of punitive damages.

476. Plaintiff is entitled to damages in an amount to be proven at trial, and to equitable relief, including injunctive relief.

## COUNT VI
## Unjust Enrichment
## (As to All Defendants)

477. Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

478. Plaintiff conferred a monetary benefit on Defendants. Specifically, Plaintiff engaged in Defendants' gambling activities using Defendant Coinbase's cryptocurrencies and platform. These transactions provided financial gains to Defendants.

479. Defendants knew that Plaintiff conferred a benefit on Defendants and accepted or retained that benefit. Defendants retained this benefit despite actual or constructive knowledge that the transactions involved were illegal and prohibited by numerous different laws.

480. Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiff because Defendants benefitted at the expense of Plaintiff and did so through unlawful means.

481. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered monetary injury in the form of all benefits provided to Defendants.

482. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

483. Defendant should be compelled to disgorge and restore to Plaintiff all proceeds and benefits that it unjustly received from Plaintiff, including through a constructive trust or other equitable restitutionary relief.

**COUNT VII**
**Declaratory Judgment Pursuant to CPLR § 3001**
**(Against all Defendants)**

484. Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

485. An actual, justiciable controversy exists between Plaintiff and Defendants concerning whether any valid and enforceable agreement exists requiring Plaintiff to arbitrate or litigate in a contractual forum, including any arbitration, delegation, forum-selection, or choice-of-law provisions contained in Defendants' Terms of Service or User Agreements (collectively, the "**Disputed Contracts**").

486. Upon information and belief, one or more Defendants—including the Stake Defendants—may assert that Plaintiff assented to online Terms of Service containing arbitration, delegation, forum-selection, or choice-of-law provisions. Plaintiff disputes the existence, scope, and enforceability of any such purported agreements and pleads those issues in the alternative, subject to proof through discovery.

487. Defendants' purported agreements, if any, were presented through online clickwrap or browsewrap processes. The existence, scope, and enforceability of any such agreements—including the manner of assent—are disputed and will be established through discovery.

488. Plaintiff opened and used a Stake account while a minor and, to the extent any Defendant contends those accounts were governed by Terms of Service containing arbitration, delegation, forum-selection, or choice-of-law provisions, Plaintiff disaffirms and voids any such provisions as applied to him based on infancy and lack of capacity, and limits his claims to conduct and injuries incurred while he was a minor, as pleaded herein.

489. As to the Coinbase Defendants, no Disputed Contract was formed with Plaintiff because Coinbase's User Agreement expressly conditions eligibility on the user being at least eighteen years old. Plaintiff was under eighteen at the time of any purported acceptance. Because that express eligibility condition was not satisfied, no agreement–including any agreement to arbitrate or delegate arbitrability– was formed with Plaintiff and the Coinbase Defendants.

490. Alternatively, even if any Disputed Contract could be deemed formed with any Defendant, New York law treats contracts entered into by minors as voidable at the minor's election under the common-law Infancy Doctrine and N.Y. General Obligations Law § 3-101. Plaintiff has exercised that right by expressly disaffirming any purported agreement entered into while he was a minor, including any arbitration, delegation, forum-selection, or choice-of-law provision, through the filing of this Complaint. Plaintiff does not seek to enforce any contractual benefit under the purported agreement and limits his claims to conduct occurring while he was a minor.

491. Defendants contend, or will contend, that an arbitrator must decide these issues pursuant to a delegation clause contained within the purported agreement. Absent a valid

agreement formed with Plaintiff—or in light of Plaintiff's disaffirmance—no enforceable delegation clause binds Plaintiff, and the Court retains authority to determine whether any agreement to arbitrate exists.

492. Plaintiff therefore seeks a judicial declaration from this Court that:

(a) no valid and enforceable agreement to arbitrate was ever formed with the Coinbase Defendants;

(b) alternatively, any purported Disputed Contract with any Defendant was voidable and has been disaffirmed by Plaintiff;

(c) no arbitration or delegation provision is enforceable against Plaintiff as to any Defendant based on conduct occurring while Plaintiff was a minor; and

(d) the Court retains jurisdiction to adjudicate Plaintiff's claims.

493. A judicial declaration is necessary and appropriate to determine the rights and obligations of the parties and to prevent Plaintiff from being compelled to arbitrate or litigate in any contractual forum based on a purported agreement that was never formed or, alternatively, is unenforceable as to Plaintiff.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks judgment against Defendants, as follows:

### A. Declaratory Judgment

1. A declaration that no agreement to arbitrate was formed with Coinbase Defendants due to the express eligibility condition, and that any purported arbitration, delegation, and/or forum-selection provisions asserted by any Defendant are unenforceable as to Plaintiff based on infancy and disaffirmance for conduct occurring while Plaintiff was a minor.

**B. Compensatory Damages (Economic)**

1. An award of damages in an amount to be determined at trial, but no less than the total funds misappropriated from Plaintiff.
2. An award for the costs of Plaintiff's past and future medical care, psychological therapy, and vocational rehabilitation necessary to restore his economic capacity.

**C. Compensatory Damages (Non-Economic)**

1. An award for Plaintiff's pain and suffering, emotional distress, loss of enjoyment of life, and loss of youth caused by the Defendants' willful exploitation and grooming.

**D. Punitive Damages**

1. An award of Punitive Damages against all Defendants in an amount sufficient to punish their willful, wanton, and reckless misconduct, and to deter similar corporate malfeasance. Plaintiff requests an award of Punitive Damages in an amount commensurate with Defendants' revenue to ensure meaningful deterrence.

**E. Statutory Damages**

1. An award of statutory treble damages and reasonable attorney's fees pursuant to N.Y. Gen. Bus. Law § 349(h).

**F. Injunctive Relief**

1. An Order enjoining the Operator Defendants (Stake) from accepting wagers from New York users unless, before any deposit or wagering, the user completes robust age and identity verification, including document verification plus liveness/selfie verification, and prohibiting acceptance of wagers where geolocation controls indicate VPN/proxy use or location inconsistency.

**G. Interest & Costs**

1. Pre-judgment and post-judgment interest on all amounts awarded, as allowed by law.

**H. Such other and further relief as this Court may deem just and proper.**

## IX. JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all issues so triable pursuant to CPLR § 4102.

Dated: April 10, 2026

Respectfully Submitted,

David R. Buchanan
Nigel P. Halliday (*pro hac vice to be filed*)
**SEEGER WEISS LLP**
55 Challenger Road, Sixth Floor
Ridgefield Park, NJ 07660
Telephone: (973) 639-9100
Facsimile: (973) 639-8656
*dbuchanan@seegerweiss.com*
*nhalliday@seegerweiss.com*

Frederick Schenk (*pro hac vice to be filed*)
Benjamin S. Schenk (*pro hac vice to be filed*)
**THE SCHENK LAW FIRM, LLP**
600 West Broadway, Suite 700
San Diego, California 92101
Telephone: (858) 424-4444
Facsimile: (858) 206- 9008
*fred@schenklawfirm.com*
*ben@schenklawfirm.com*

Troy Rafferty (*pro hac vice to be filed*)
Madeline Pendley (*pro hac vice to be filed*)
**RAFFERTY DOMNICK CUNNINGHAM & YAFFA**
815 South Palafox Street, 3rd Floor
Pensacola, FL 32502
Telephone: (850) 208-0830
*troy@pbglaw.com*
*madeline@pbglaw.com*

***Counsel for Plaintiff***

[NYSCEF No. 7]

Part 34
At ~~the Ex Parte Motion Office~~ of the Supreme Court of the State of New York, held in and for the County of New York, at the Courthouse located at 60 Centre Street, New York, NY on the ______ day of ________, 20__

APR 14 2026

PRESENT:

Hon. HON. DAKOTA D. RAMSEUR
J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

MS # 1

JOHN DOE,

Plaintiff,

-against-

MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN COINBASE, INC.; and COINBASE GLOBAL, INC.,

Defendants.

Index No.: 154566/2026

ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER
Maintain pseudonym caption

Upon reading the Summons with Notice and Complaint in this action, dated April 10, 2026, the Affidavit/Affirmation in support of their motion to assign an index number to this matter with the above caption to the parties and their respective counsel,

Let the plaintiff John Doe, SHOW CAUSE at an IAS Part 34, Room 341 of this Court, to be held before The Hon. Ramseur in an ______, at the County of New York Courthouse, located at 60 Centre Street, New York, New York, on the 19th day of May, 2026 at 2:30 in the pm or as soon as the parties to this proceeding may

be heard, why an order should not be issued, directing that the County Clerk enter the caption of the above-entitled proceeding in the current minute books and indices of actions and proceedings maintained in his office under the title of JOHN DOE, vs. MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN COINBASE, INC.; and COINBASE GLOBAL, INC., and it is

HON. JAMES G. CLYNES J.S.C.
APR 10 2026

**ORDERED** that, pending the hearing of this matter BEFORE THE JUSTICE TO BE ASSIGNED, the Clerk of this Court, upon payment of the proper fees, is hereby directed to assign an index number to this proceeding, and to accept for filing a Request for Judicial Intervention ("RJI") bearing the following caption, namely:

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

JOHN DOE,

Plaintiff,

-against-

MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN COINBASE, INC.; and COINBASE GLOBAL, INC.,

Defendants.

---

HON. DARC A.D. RAMSEU... J.S.C.
APR 14 2026
JSC

and it is further

**ORDERED** that, personal service of a copy of this Order to Show Cause together with the papers upon which it is based and the Summons with Notice/Summons and Complaint be served upon Defendants, on or before the 17th day of April, 2026 Via certified mail w Return receipt OR in person and/OR email w/ Acknowledgment

**ENTER~~ED~~:** ______________________
JSC
**HON. DAKOTA D. RAMSEUR**
**J.S.C.**
APR 14 2026

# [NYSCEF No. 8]

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| JOHN DOE,<br><br>Plaintiff,<br><br>vs.<br><br>MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN, COINBASE, INC.; and COINBASE GLOBAL, INC.<br><br>Defendants. | Index No.: 154566/2026<br><br>**AFFIRMATION OF SERVICE** |

I, David R. Buchanan, declare under penalty of perjury that I caused a copy of the Summons with Notice, Proposed Order to Show Cause with TRO, Memorandum of Law in Support, Affirmation in Support, RJI, Complaint, Order to Show Cause with TRO, Notice of Electronic Case Filing, and Local Rules Part 34, via Certified Mail with Return Receipt on the Domestic Defendants postmarked 4/14/2026 and via FedEx on the International Defendants postmarked 4/15/2026. In addition to the service described above, my firm is in the process of serving each foreign defendant under the procedures and processes established by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.

Dated: April 17, 2026

/s/ *David R. Buchanan*
David R. Buchanan
**SEEGER WEISS LLP**

55 Challenger Road, Sixth Floor
Ridgefield Park, NJ 07660
Telephone: (973) 639-9100
Facsimile: (973) 639-8656
*dbuchanan@seegerweiss.com*

**TO: (continued on next page)**
**MEDIUM RARE N.V. D/B/A STAKE.COM**
Seru Loraweg 17B, Curaçao

**SWEEPSTEAKS LTD. d/b/a STAKE.US**
28 Oktovrio, 313 Omrania BLD, Limassol, CY-3105, Cyprus

**SWEEPSTEAKS LTD. d/b/a STAKE.US**
13101 Preston Road, Suite 110-5027 Dallas, TX 75240

**EASYGO GROUP HOLDINGS PTY LTD.**
Level 2, 287-293 Collins Street, Melbourne VIC 3000, Australia

**EASYGO ENTERTAINMENT PTY LTD.**
Level 2, 287-293 Collins Street, Melbourne VIC 3000, Australia

**MEDIUM RARE LTD.**
7-9 Riga Feraiou, Lizantia Court, Office 310, Agioi Omologites, 1087 Nicosia, Cyprus

**SLICEMEDIA B.V.**
Fransche Bloemweg 4, Willemstad, Curaçao

**BIJAN TEHRANI**
7 Riverside Quay, Unit 8401, Melbourne VIC 2006, Australia

**EDWARD CRAVEN**
35 Queens Bridge Street, Unit 6301, Southbank VIC 3006, Australia

**CHRISTOPHER FREEMAN**
788 NE 23rd ST, Unit 3602, Miami, FL 33137- 5913

**COINBASE GLOBAL, INC.**
c/o Registered Agent - CT Corporation System, 1999 Bryan St. #900, Dallas, Texas 75201

**COINBASE, INC.**
c/o Registered Agent - CT Corporation System, 1999 Bryan St. #900, Dallas, Texas 75201

# [NYSCEF No. 9]

**IN THE SUPREME COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YORK**

| | |
|---|---|
| **JOHN DOE**<br>Plaintiff/Petitioner<br>vs.<br>**MEDIUM RARE N.V. d/b/a STAKE.COM; ET AL.**<br>Defendant/Respondent | Hearing Date:<br>INDEX NO: **154566/2026**<br>Index Date: **04/10/2026**<br>AFFIRMATION OF SERVICE OF:<br>**SUMMONS WITH NOTICE; ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER; PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR AN ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER; AFFIRMATION IN SUPPORT OF ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER; REQUEST FOR JUDICIAL INTERVENTION; COMPLAINT FOR DAMAGES; CURRENT DOCKET COPY; NOTICE OF ELECTRONIC FILING; PART 34 RULES** |

Received by **Brenda Rice**, on the **15th day of April, 2026 at 11:16 AM** to be served upon **COINBASE GLOBAL, INC. c/o c/o CT Corporation System, Registered Agent** at **1999 Bryan St. #900, Dallas, Dallas County, TX 75201**.

The undersigned, affirms: That s(he) is now and at all times herein mentioned was a citizen of the United States, over the age of eighteen, not an officer of a plaintiff corporation, not a party to nor interested in the above entitled action, and is competent to be a witness therein.

On the **15th day of April, 2026 at 2:14 PM** at the address of **1999 Bryan St. #900, Dallas, Dallas County, TX 75201**, this affiant served the **SUMMONS WITH NOTICE; ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER; PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR AN ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER; AFFIRMATION IN SUPPORT OF ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER; REQUEST FOR JUDICIAL INTERVENTION; COMPLAINT FOR DAMAGES; CURRENT DOCKET COPY; NOTICE OF ELECTRONIC FILING; PART 34 RULES** upon **COINBASE GLOBAL, INC. c/o c/o CT Corporation System, Registered Agent** in the manner described below:

**CORPORATE SERVICE**, by personally delivering **1** true and correct copy(ies) of the **SUMMONS WITH NOTICE; ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER; PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR AN ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER; AFFIRMATION IN SUPPORT OF ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER; REQUEST FOR JUDICIAL INTERVENTION; COMPLAINT FOR DAMAGES; CURRENT DOCKET COPY; NOTICE OF ELECTRONIC FILING; PART 34 RULES**, with the date and hour of service endorsed thereon by this affiant, to the corporation described as the named defendant.

THE DESCRIPTION OF THE PERSON WITH WHOM THE COPY(IES) OF THIS PROCESS WAS LEFT IS AS FOLLOWS:
**CT Corporation System, Registered Agent, I delivered the documents to CT Corporation System, Registered Agent. The individual appeared to be a bald black male contact 25-35 years of age, 5'10"-6'0" tall and weighing 180-200 lbs with a beard, glasses and piercings. Body cam footage available upon request.**

**The undersigned asked the indicated person whether the defendant and/or present occupant was presently in the military service of the United States Government or in active duty in the military service of the State of New York or a dependent of anybody in the military and defendant and/or present occupant refused to indicate.**

I affirm, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

Executed on 04/16/2026.

Edit

**Brenda Rice, Reg. # PSC-28702, JBCC, TX**

ABC Legal Services, LLC
DCA Lic. #1380619 Exp. 02/28/28
147 Prince St, Suite 4-6, Brooklyn, NY 11201

Page 1 of 1 Tracking #: **0218676997**
FOR: **Seeger Weiss LLP**
REF: **25004-002**

# [NYSCEF No. 10]

## IN THE SUPREME COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YORK

**JOHN DOE**
Plaintiff/Petitioner

vs.

**MEDIUM RARE N.V. d/b/a STAKE.COM; ET AL.**
Defendant/Respondent

Hearing Date:
INDEX NO: **154566/2026**
Index Date: **04/10/2026**
AFFIRMATION OF SERVICE OF:
**SUMMONS WITH NOTICE; ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER; PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR AN ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER; AFFIRMATION IN SUPPORT OF ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER; REQUEST FOR JUDICIAL INTERVENTION; COMPLAINT FOR DAMAGES; CURRENT DOCKET COPY; NOTICE OF ELECTRONIC FILING; PART 34 RULES**

Received by **STANLEY IWUOHA**, on the **14th day of April, 2026 at 5:42 PM** to be served upon **SWEEPSTEAKS LTD. d/b/a STAKE. US** at **13101 Preston Road Suite 110-5027, Dallas, Dallas County, TX 75240.**

The undersigned, affirms: That s(he) is now and at all times herein mentioned was a citizen of the United States, over the age of eighteen, not an officer of a plaintiff corporation, not a party to nor interested in the above entitled action, and is competent to be a witness therein.

On the **15th day of April, 2026 at 12:04 PM** at the address of **13101 Preston Road Suite 110-5027, Dallas, Dallas County, TX 75240**, this affiant served the **SUMMONS WITH NOTICE; ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER; PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR AN ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER; AFFIRMATION IN SUPPORT OF ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER; REQUEST FOR JUDICIAL INTERVENTION; COMPLAINT FOR DAMAGES; CURRENT DOCKET COPY; NOTICE OF ELECTRONIC FILING; PART 34 RULES** upon **SWEEPSTEAKS LTD. d/b/a STAKE.US** in the manner described below:

**CORPORATE SERVICE**, by personally delivering **1** true and correct copy(ies) of the **SUMMONS WITH NOTICE; ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER; PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR AN ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER; AFFIRMATION IN SUPPORT OF ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER; REQUEST FOR JUDICIAL INTERVENTION; COMPLAINT FOR DAMAGES; CURRENT DOCKET COPY; NOTICE OF ELECTRONIC FILING; PART 34 RULES**, with the date and hour of service endorsed thereon by this affiant, to the corporation described as the named defendant.

THE DESCRIPTION OF THE PERSON WITH WHOM THE COPY(IES) OF THIS PROCESS WAS LEFT IS AS FOLLOWS:
**Neal Charity, I delivered the documents to Neal Charity who identified themselves as the person authorized to accept with identity confirmed by subject stating their name. The individual accepted service with direct delivery. The individual appeared to be a black-haired black female contact 25-35 years of age, 5'10"-6'0" tall and weighing 200-240 lbs with piercings.**

**The undersigned asked the indicated person whether the defendant and/or present occupant was presently in the military service of the United States Government or in active duty in the military service of the State of New York or a dependent of anybody in the military and defendant and/or present occupant refused to indicate.**

I affirm, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

Executed on 04/15/2026.

[signature]

**STANLEY IWUOHA, Reg. # PSC-28127, JBCC, TX**

ABC Legal Services, LLC
DCA Lic. #1380619 Exp, 02/28/28
147 Prince St, Suite 4-6, Brooklyn, NY 11201


FOR: **Seeger Weiss LLP**
REF: **25004-002**
Tracking #: **0218644071**

# [NYSCEF No. 11]

IN THE SUPREME COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YORK

| | |
|---|---|
| **JOHN DOE**<br>Plaintiff/Petitioner<br>vs.<br>**Medium Rare N.V. d/b/a Stake.com; et al**<br>Defendant/Respondent | Hearing Date:<br>INDEX NO: **154566/2026**<br>Index Date: **04/07/2026**<br>AFFIRMATION OF SERVICE OF:<br>**Complaint For Damages; Summons With Notice; Order To Show Cause With Temporary Restraining Order; Plaintiff's Memorandum Of Law; Request For Judicial Intervention; Affirmation In Support Of Order To Show Cause With Temporary Restraining Order** |

Received by **Halie Merriman**, on the **28th day of April, 2026 at 10:57 AM** to be served upon **Coinbase, Inc. c/o CORPORATION SERVICE COMPANY, C/O** at **80 State St, Albany, Albany County, NY 12207.**

The undersigned, affirms: That s(he) is now and at all times herein mentioned was a citizen of the United States, over the age of eighteen, not an officer of a plaintiff corporation, not a party to nor interested in the above entitled action, and is competent to be a witness therein.

On the **28th day of April, 2026 at 2:56 PM** at the address of **80 State St, Albany, Albany County, NY 12207**, this affiant served the **COMPLAINT FOR DAMAGES; SUMMONS WITH NOTICE; ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER; PLAINTIFF'S MEMORANDUM OF LAW; REQUEST FOR JUDICIAL INTERVENTION; AFFIRMATION IN SUPPORT OF ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER** upon **Coinbase, Inc. c/o CORPORATION SERVICE COMPANY, C/O** in the manner described below:

**CORPORATE SERVICE**, by personally delivering **1** true and correct copy(ies) of the **COMPLAINT FOR DAMAGES; SUMMONS WITH NOTICE; ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER; PLAINTIFF'S MEMORANDUM OF LAW; REQUEST FOR JUDICIAL INTERVENTION; AFFIRMATION IN SUPPORT OF ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER**, with the date and hour of service endorsed thereon by this affiant, to the corporation described as the named defendant.

THE DESCRIPTION OF THE PERSON WITH WHOM THE COPY(IES) OF THIS PROCESS WAS LEFT IS AS FOLLOWS: **CORPORATION SERVICE COMPANY, C/O, I delivered the documents to CORPORATION SERVICE COMPANY, C/O. The individual accepted service with direct delivery. The individual appeared to be a brown-haired black female contact 35-45 years of age, 5'4"-5'6" tall and weighing 200-240 lbs with an accent.**

**The undersigned asked the indicated person whether the defendant and/or present occupant was presently in the military service of the United States Government or in active duty in the military service of the State of New York or a dependent of anybody in the military and defendant and/or present occupant refused to indicate.**

I affirm, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

Executed on 04/28/2026.

Halie Merriman

**Halie Merriman, NY**
ABC Legal Services, LLC
DCA Lic. #1380619 Exp, 02/28/28
147 Prince St, Suite 4-6, Brooklyn, NY 11201


FOR: **Seeger Weiss LLP**
REF: **25004-002**
Tracking #: **0220684796**

# [NYSCEF No. 12]

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

JOHN DOE,

Plaintiff,

-against-

MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN COINBASE, INC., and COINBASE GLOBAL, INC.,

Defendants.

**Index No.: 154566/2026**

**NOTICE OF APPEARANCE**

**PLEASE TAKE NOTICE** that David H. McGill of Orrick, Herrington & Sutcliffe LLP, with offices at 2100 Pennsylvania Avenue, NW, Washington, D.C. 20037, hereby enters his appearance on behalf of Defendants Medium Rare N.V. d/b/a Stake.com, Sweepsteaks Ltd. d/b/a Stake.us, Easygo Group Holdings Pty Ltd., Easygo Entertainment Pty Ltd., Medium Rare Ltd., Slicemedia B.V., Bijan Tehrani, and Edward Craven in the above-captioned action.

I hereby certify that I am admitted to practice before this court.

Dated: Washington, DC
May 8, 2026

Respectfully submitted,

By: */s/ David H. McGill*
David H. McGill
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
2100 Pennsylvania Ave. NW
Washington, D.C. 20037
Tel: (202) 229-8400
Facsimile: (202 339-8500
*dmcgill@orrick.com*

*Counsel for Defendants*
MEDIUM RARE N.V. d/b/a STAKE.COM,
SWEEPSTEAKS LTD. d/b/a STAKE.US,
EASYGO GROUP HOLDINGS PTY LTD.,
EASYGO ENTERTAINMENT PTY LTD.,
MEDIUM RARE LTD., SLICEMEDIA B.V.,
BIJAN TEHRANI, and EDWARD CRAVEN

# [NYSCEF No. 13]

**SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK**

JOHN DOE,

Plaintiff,

-against-

MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN COINBASE, INC., and COINBASE GLOBAL, INC.,

Defendants.

**Index No. 154566/2026**

**STIPULATION REGARDING STAKE DEFENDANTS' TIME TO ANSWER OR OTHERWISE RESPOND TO THE COMPLAINT**

Defendants MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, and EDWARD CRAVEN (collectively, the "Stake Defendants"), and Plaintiff John Doe ("Plaintiff," and together with the Stake Defendants, the "Stipulating Parties"), by their respective attorneys, stipulate and agree as follows:

**WHEREAS**, on April 10, 2026, Plaintiff electronically filed a Complaint against the Stake Defendants (NYSCEF Doc. No. 6);

**WHEREAS**, on April 14, 2026, the Court ordered that "this Order to Show Cause together with the papers upon which it is based and the Summons with Notice/Summons and Complaint be served upon Defendants, on or before the 17th day of April, 2026 via certified mail w[ith] return receipt or in person and/or email w[ith] acknowledgement[.]" (NYSCEF Doc. No. 7);

**WHEREAS**, on April 17, 2026, Plaintiff electronically filed an Affirmation of Service stating that Plaintiff had "caused a copy of the Summons with Notice, Proposed Order to Show Cause with TRO, Memorandum of Law in Support, Affirmation in Support, RJI, Complaint, Order to Show Cause with TRO, Notice of Electronic Filing, and Local Rules Part 34, via Certified Mail with Return Receipt on the Domestic Defendants postmarked 4/14/2026 and via FedEx on the International Defendants postmarked 4/15/2026," and stating that Plaintiff's counsel "w[as] in the process of serving each foreign defendant under the procedures and processes established by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters." (NYSCEF Doc. No. 8);

**WHEREAS**, on April 29, 2026, Plaintiff electronically filed an Affirmation of Service on Sweepsteaks Ltd. d/b/a Stake.us ("Stake.us"), setting Stake.us's deadline to respond to the Complaint as May 15, 2026 (NYSCEF Doc. No. 10);

**WHEREAS**, the Stake Defendants agree to waive service of process;

**WHEREAS**, the Parties have met and conferred in good faith and agree that there is good cause to continue the Stake Defendants' time to move, answer, or otherwise respond to the Complaint and to adopt the following briefing schedule;

**NOW, IT IS HEREBY STIPULATED AND AGREED**, by and between the undersigned counsel for Plaintiff and the Stake Defendants, that:

1. The Stake Defendants' time to move, answer, or otherwise respond to the Complaint is extended to July 15, 2026.
2. Plaintiff's opposition to any motion filed by the Stake Defendants shall be due on September 23, 2026.

3. The Stake Defendants' reply in support of any motion shall be due on November 9, 2026.

4. The Stake Defendants waive any defenses solely as to the manner of service of the Summons and Complaint. No other defenses are waived, including any defenses as to jurisdiction, venue, or the sufficiency of the pleadings.

5. By entering into this Stipulation, neither Plaintiff nor the Stake Defendants waive or prejudice any other claims or defenses they may have.

**IT IS SO STIPULATED**

Dated: New York, New York
May 8, 2026

*/s/ David R. Buchanan*
David R. Buchanan
Nigel P. Halliday *(pro hac vice to be filed)*
**SEEGER WEISS LLP**
55 Challenger Road, Sixth Floor
Ridgefield Park, New Jersey 07660
Tel: (973) 639-9100
Fax: (973) 639-8656
dbuchanan@seegerweiss.com
nhalliday@seegerweiss.com

Frederick Schenk *(pro hac vice to be filed)*
Benjamin S. Schenk *(pro hac vice to be filed)*
**THE SCHENK LAW FIRM, LLP**
600 West Broadway, Suite 700
San Diego, California 92101
Tel: (858) 424-444
Fax: (858) 206-9008
fred@schenklawfirm.com
ben@schenklawfirm.com

Troy Rafferty *(pro hac vice to be filed)*
Madeline Pendley *(pro hac vice to be filed)*
**RAFFERTY DOMNICK CUNNINGHAM & YAFFA**
815 South Palfox Street, 3rd Floor

*/s/ David H. McGill*
David H. McGill
Brian Pollock *(pro hac vice to be filed)*
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
2100 Pennsylvania Ave. NW
Washington, D.C. 20037
Tel: (202) 229-8400
Fax: (202) 339-8500
dmcgill@orrick.com
bpollock@orrick.com

Tania B. Suarez-Marquez
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
51 West 52nd Street
New York, New York 10019
Tel: (212) 506-5201
tsuarezmarquez@orrick.com

***Counsel for Defendants***
MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, and EDWARD CRAVEN

Pensacola, Florida 32502
Tel: (850) 208-0830
troy@pbglaw.com
madeline@pgblaw.com

***Counsel for Plaintiff***
John Doe

# [NYSCEF No. 14]

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

JOHN DOE,

Plaintiff,

-against-

MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN COINBASE, INC., and COINBASE GLOBAL, INC.,

Defendants.

**Index No.: 154566/2026**

**NOTICE OF APPEARANCE**

**PLEASE TAKE NOTICE** that Tania B. Suarez-Marquez of Orrick, Herrington & Sutcliffe LLP, with offices at 51 West, 52nd Street, New York, New York, 10019, hereby enters her appearance on behalf of Defendants Medium Rare N.V. d/b/a Stake.com, Sweepsteaks Ltd. d/b/a Stake.us, Easygo Group Holdings Pty Ltd., Easygo Entertainment Pty Ltd., Medium Rare Ltd., Slicemedia B.V., Bijan Tehrani, and Edward Craven in the above-captioned action.

I hereby certify that I am admitted to practice before this court.

Dated: New York, New York
May 13, 2026

Respectfully submitted,

By: */s/ Tania B. Suarez-Marquez*
Tania B. Suarez-Marquez
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
51 West 52nd Street,
New York, N.Y., 10019
Tel: (212) 506-5201
*tsuarezmarquez@orrick.com*

*Counsel for Defendants*
MEDIUM RARE N.V. d/b/a STAKE.COM,
SWEEPSTEAKS LTD. d/b/a STAKE.US,
EASYGO GROUP HOLDINGS PTY LTD.,
EASYGO ENTERTAINMENT PTY LTD.,
MEDIUM RARE LTD., SLICEMEDIA B.V.,
BIJAN TEHRANI, and EDWARD CRAVEN

# [NYSCEF No. 15]

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

JOHN DOE,

Plaintiff,

-against-

MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN COINBASE, INC., and COINBASE GLOBAL, INC.,

Defendants.

**Index No. 154566/2026**

**STIPULATION REGARDING COINBASE DEFENDANTS' TIME TO ANSWER OR OTHERWISE RESPOND TO THE COMPLAINT**

Defendants COINBASE, INC. and COINBASE GLOBAL, INC. (collectively, the "Coinbase Defendants"), and Plaintiff John Doe ("Plaintiff," and together with the Coinbase Defendants, the "Stipulating Parties"), by their respective attorneys, stipulate and agree as follows:

**WHEREAS**, on April 10, 2026, Plaintiff electronically filed a Complaint against the Coinbase Defendants (NYSCEF Doc. No. 6);

**WHEREAS**, on April 14, 2026, the Court ordered that "this Order to Show Cause together with the papers upon which it is based and the Summons with Notice/Summons and Complaint be served upon Defendants, on or before the 17th day of April, 2026 via certified mail w[ith] return receipt or in person and/or email w[ith] acknowledgement[.]" (NYSCEF Doc. No. 7);

**WHEREAS**, on April 17, 2026, Plaintiff electronically filed an Affirmation of Service stating that Plaintiff had "caused a copy of the Summons with Notice, Proposed Order to Show Cause with TRO, Memorandum of Law in Support, Affirmation in Support, RJI, Complaint, Order to Show Cause with TRO, Notice of Electronic Filing, and Local Rules Part 34, via Certified Mail

with Return Receipt on the Domestic Defendants postmarked 4/14/2026 and via FedEx on the International Defendants postmarked 4/15/2026," and stating that Plaintiff's counsel "w[as] in the process of serving each foreign defendant under the procedures and processes established by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters." (NYSCEF Doc. No. 8);

**WHEREAS**, on April 29, 2026, Plaintiff electronically filed Affirmations of Service regarding each of the Coinbase Defendants, setting their deadline to respond to the Complaint as May 15, 2026 and May 18, 2026 (NYSCEF Doc. Nos. 9, 11);

**WHEREAS**, the Parties have met and conferred in good faith and agree that there is good cause to continue the Coinbase Defendants' time to move, answer, or otherwise respond to the Complaint and to adopt the following briefing schedule;

**NOW, IT IS HEREBY STIPULATED AND AGREED**, by and between the undersigned counsel for Plaintiff and the Coinbase Defendants, that:

1. The Coinbase Defendants' time to move, answer, or otherwise respond to the Complaint is extended to July 15, 2026.
2. Plaintiff's opposition to any motion filed by the Coinbase Defendants shall be due on September 23, 2026.
3. The Coinbase Defendants' reply in support of any motion shall be due on November 9, 2026.
4. By entering into this Stipulation, neither Plaintiff nor the Coinbase Defendants waive or prejudice any claims or defenses they may have.

**IT IS SO STIPULATED**

Dated: New York, New York
May 14, 2026

/s/ David R. Buchanan
David R. Buchanan
Nigel P. Halliday *(pro hac vice to be filed)*
**SEEGER WEISS LLP**
55 Challenger Road, Sixth Floor
Ridgefield Park, New Jersey 07660
Tel: (973) 639-9100
Fax: (973) 639-8656
dbuchanan@seegerweiss.com
nhalliday@seegerweiss.com

Frederick Schenk *(pro hac vice to be filed)*
Benjamin S. Schenk *(pro hac vice to be filed)*
**THE SCHENK LAW FIRM, LLP**
600 West Broadway, Suite 700
San Diego, California 92101
Tel: (858) 424-444
Fax: (858) 206-9008
fred@schenklawfirm.com
ben@schenklawfirm.com

Troy Rafferty *(pro hac vice to be filed)*
Madeline Pendley *(pro hac vice to be filed)*
**RAFFERTY DOMNICK CUNNINGHAM & YAFFA**
815 South Palfox Street, 3rd Floor
Pensacola, Florida 32502
Tel: (850) 208-0830
troy@pbglaw.com
madeline@pgblaw.com

***Counsel for Plaintiff***
John Doe

/s/ Lara A. Flath
Alexander C. Drylewski
Lara A. Flath
Michael W. McTigue Jr.
Meredith C. Slawe
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
One Manhattan West
New York, New York 10001
Phone: (212) 735-3000
Facsimile: (212) 735-2000
lara.flath@skadden.com

***Counsel for Defendants***
Coinbase, Inc. and Coinbase Global, Inc.

# [NYSCEF No. 16]

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

JOHN DOE,

Plaintiff,

v.

MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTREAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN, COINBASE, INC.; and COINBASE GLOBAL, INC.

Defendants.

Index # 154566/2026

**Hon. Dakota D. Ramseur**

**NOTICE OF APPEARANCE**

PLEASE TAKE NOTICE that Lara A. Flath, a member of the law firm of Skadden, Arps, Slate, Meagher & Flom LLP and of the Bar of the State of New York, hereby enters her appearance in this action as counsel for Defendants Coinbase, Inc. and Coinbase Global, Inc.

Dated: New York, New York
May 15, 2026

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM, LLP

*/s/ Lara A. Flath*

Lara A. Flath
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
Fax: (212) 735-2000
lara.flath@skadden.com

*Counsel for Defendants Coinbase, Inc. and Coinbase Global, Inc.*

[NYSCEF No. 17]

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

JOHN DOE,

Plaintiff,

v.

MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTREAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN, COINBASE, INC.; and COINBASE GLOBAL, INC.

Defendants.

Index # 154566/2026

**Hon. Dakota D. Ramseur**

**NOTICE OF APPEARANCE**

PLEASE TAKE NOTICE that Alexander C. Drylewski, a member of the law firm of Skadden, Arps, Slate, Meagher & Flom LLP and of the Bar of the State of New York, hereby enters his appearance in this action as counsel for Defendants Coinbase, Inc. and Coinbase Global, Inc.

Dated: New York, New York
May 15, 2026

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM, LLP

*/s/ Alexander C. Drylewski*

Alexander C. Drylewski
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
Fax: (212) 735-2000
alexander.drylewski@skadden.com

*Counsel for Defendants Coinbase, Inc. and Coinbase Global, Inc.*

# [NYSCEF No. 18]

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| JOHN DOE,<br><br>Plaintiff,<br><br>v.<br><br>MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTREAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN, COINBASE, INC.; and COINBASE GLOBAL, INC.<br><br>Defendants. | Index # 154566/2026<br><br>**Hon. Dakota D. Ramseur**<br><br>**NOTICE OF APPEARANCE** |

PLEASE TAKE NOTICE that Michael W. McTigue Jr., a member of the law firm of Skadden, Arps, Slate, Meagher & Flom LLP and of the Bar of the State of New York, hereby enters his appearance in this action as counsel for Defendants Coinbase, Inc. and Coinbase Global, Inc.

Dated: New York, New York
May 15, 2026

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM, LLP

*Michael W. McTigue Jr.*

Michael W. McTigue Jr.
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
Fax: (212) 735-2000
michael.mctigue@skadden.com

*Counsel for Defendants Coinbase, Inc. and Coinbase Global, Inc.*

[NYSCEF No. 19]

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

JOHN DOE,

Plaintiff,

v.

MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTREAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN, COINBASE, INC.; and COINBASE GLOBAL, INC.

Defendants.

Index # 154566/2026

**Hon. Dakota D. Ramseur**

**NOTICE OF APPEARANCE**

PLEASE TAKE NOTICE that Meredith C. Slawe, a member of the law firm of Skadden, Arps, Slate, Meagher & Flom LLP and of the Bar of the State of New York, hereby enters her appearance in this action as counsel for Defendants Coinbase, Inc. and Coinbase Global, Inc.

Dated: New York, New York
May 15, 2026

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM, LLP

*/s/ Meredith C. Slawe*

Meredith C. Slawe
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
Fax: (212) 735-2000
meredith.slawe@skadden.com

*Counsel for Defendants Coinbase, Inc. and Coinbase Global, Inc.*

# [NYSCEF No. 20]

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| JOHN DOE,<br><br>Plaintiff,<br><br>vs.<br><br>MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN, COINBASE, INC.; and COINBASE GLOBAL, INC.<br><br>Defendants. | Index No.: 154566/2026<br><br>**Hon. Dakota D. Ramseur**<br><br>**NOTICE OF APPEARANCE** |

PLEASE TAKE NOTICE that Michael J. Castiglione, Counsel at Seeger Weiss LLP and of the Bar of the State of New York, hereby enters his appearance in this action as counsel for Plaintiff John Doe.

Dated: May 15, 2026

*/s/ Michael J. Castiglione*
Michael J. Castiglione
**SEEGER WEISS LLP**
100 Church Street
New York, NY 10007-2601
Telephone: (212) 584-0700
Facsimile: (973) 639-8656
*MCastiglione@SeegerWeiss.com*

# [NYSCEF No. 21]

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

JOHN DOE,

Plaintiff,

-against-

MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN COINBASE, INC., and COINBASE GLOBAL, INC.,

Defendants.

**Index No. 154566/2026**

**STIPULATION REGARDING DEFENDANT FREEMAN'S TIME TO ANSWER OR OTHERWISE RESPOND TO THE COMPLAINT**

Defendant CHRISTOPHER FREEMAN and Plaintiff John Doe ("Plaintiff," and together with Defendant Freeman, the "Stipulating Parties"), by their respective attorneys, stipulate and agree as follows:

**WHEREAS**, on April 10, 2026, Plaintiff electronically filed a Complaint against Freeman (NYSCEF Doc. No. 6);

**WHEREAS**, on April 14, 2026, the Court ordered that "this Order to Show Cause together with the papers upon which it is based and the Summons with Notice/Summons and Complaint be served upon Defendants, on or before the 17th day of April, 2026 via certified mail w[ith] return receipt or in person and/or email w[ith] acknowledgement[.]" (NYSCEF Doc. No. 7);

**WHEREAS**, on April 17, 2026, Plaintiff electronically filed an Affirmation of Service stating that Plaintiff had "caused a copy of the Summons with Notice, Proposed Order to Show Cause with TRO, Memorandum of Law in Support, Affirmation in Support, RJI, Complaint, Order to Show Cause with TRO, Notice of Electronic Filing, and Local Rules Part 34, via Certified Mail

with Return Receipt on the Domestic Defendants postmarked 4/14/2026 and via FedEx on the International Defendants postmarked 4/15/2026," and stating that Plaintiff's counsel "w[as] in the process of serving each foreign defendant under the procedures and processes established by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters." (NYSCEF Doc. No. 8);

**WHEREAS**, the Parties have met and conferred in good faith and agree that there is good cause to continue Defendant Freeman's time to move, answer, or otherwise respond to the Complaint and to adopt the following briefing schedule;

**NOW, IT IS HEREBY STIPULATED AND AGREED**, by and between the undersigned counsel for Plaintiff and Defendant Freeman, that:

1. Defendant Freeman's time to move, answer, or otherwise respond to the Complaint is extended to July 15, 2026.
2. Plaintiff's opposition to any motion filed by Defendant Freeman shall be due on September 23, 2026.
3. Defendant Freeman's reply in support of any motion shall be due on November 9, 2026.
4. By entering into this Stipulation, neither Plaintiff nor Defendant Freeman waive or prejudice any claims or defenses they may have.

**IT IS SO STIPULATED**

Dated: New York, New York
May 18, 2026

| | |
|---|---|
| */s/ David R. Buchanan* | */s/ E. Scott Schirick* |
| David R. Buchanan | E. Scott Schirick |
| Nigel P. Halliday *(pro hac vice to be filed)* | Joseph G. Tully |
| **SEEGER WEISS LLP** | **ALSTON & BIRD LLP** |

55 Challenger Road, Sixth Floor
Ridgefield Park, New Jersey 07660
Tel: (973) 639-9100
Fax: (973) 639-8656
dbuchanan@seegerweiss.com
nhalliday@seegerweiss.com

Michael J. Castiglione
**SEEGER WEISS LLP**
100 Church Street
New York, NY 10007-2601
Telephone: (212) 584-0700
Facsimile: (973) 639-8656
MCastiglione@SeegerWeiss.com

Frederick Schenk *(pro hac vice to be filed)*
Benjamin S. Schenk *(pro hac vice to be filed)*
**THE SCHENK LAW FIRM, LLP**
600 West Broadway, Suite 700
San Diego, California 92101
Tel: (858) 424-444
Fax: (858) 206-9008
fred@schenklawfirm.com
ben@schenklawfirm.com

Troy Rafferty *(pro hac vice to be filed)*
Madeline Pendley *(pro hac vice to be filed)*
**RAFFERTY DOMNICK CUNNINGHAM & YAFFA**
815 South Palfox Street, 3rd Floor
Pensacola, Florida 32502
Tel: (850) 208-08*30*
troy@pbglaw.com
madeline@pgblaw.com

***Counsel for Plaintiff***
John Doe

90 Park Avenue, 15th Floor
New York, New York 10016
Tel: (212) 210 – 9400
Fax: (212) 210 – 9444
Scott.schirick@alston.com
Joe.tully@alston.com

***Counsel for Defendant***
Christopher Freeman

# [NYSCEF No. 22]

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

JOHN DOE,

Plaintiff,

-against-

MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN COINBASE, INC., and COINBASE GLOBAL, INC.,

Defendants.

**Index No. 154566/2026**

**NOTICE OF APPEARANCE**

**PLEASE TAKE NOTICE** that Joseph Tully of Alston & Bird LLP, with offices at 90 Park Avenue, 15th Floor, New York, New York 10016, hereby enters his appearance on behalf of Defendant Christopher Freeman in the above-captioned action.

I hereby certify that I am admitted to practice before this Court.

Dated: May 18, 2026

*/s/ Joseph Tully*
Joseph Tully
**ALSTON & BIRD LLP**
90 Park Avenue, 15th Floor
New York, New York 10016
Tel: (212) 210 – 9400
Joe.tully@alston.com

*Attorneys for Defendant*
Christopher Freeman

# [NYSCEF No.23]

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

JOHN DOE,

Plaintiff,

-against-

MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN COINBASE, INC., and COINBASE GLOBAL, INC.,

Defendants.

**Index No. 154566/2026**

**NOTICE OF APPEARANCE**

**PLEASE TAKE NOTICE** that E. Scott Schirick of Alston & Bird LLP, with offices at 90 Park Avenue, 15th Floor, New York, New York 10016, hereby enters his appearance on behalf of Defendant Christopher Freeman in the above-captioned action.

I hereby certify that I am admitted to practice before this Court.

Dated: May 18, 2026

*/s/ E. Scott Schirick*___________
E. Scott Schirick
**ALSTON & BIRD LLP**
90 Park Avenue, 15th Floor
New York, New York 10016
Tel: (212) 210 – 9400
Scott.schirick@alston.com

*Attorneys for Defendant*
Christopher Freeman

# [NYSCEF No. 24]

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| JOHN DOE,<br><br>Plaintiff,<br><br>vs.<br><br>MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN, COINBASE, INC.; and COINBASE GLOBAL, INC.<br><br>Defendants. | Index No.: 154566/2026<br>Hon. Dakota D. Ramseur (IAS Part 34)<br><br>Motion Sequence No. ___<br><br>**NOTICE OF MOTION FOR ADMISSION *PRO HAC VICE* OF NIGEL P. HALLIDAY FOR PLAINTIFF JOHN DOE** |

**PLEASE TAKE NOTICE** that, upon the annexed Affirmation of Nigel P. Halliday, sworn to on May 18, 2026, accompanied by his Certificates of Good Standing from the States of Tennessee and New Jersey; and the Affirmation of David R. Buchanan, a member of the Bar of the State of New York and attorney of record herein for plaintiff John Doe, dated May 18, 2026, together with all pleadings and proceedings theretofore had herein, John Doe will move this Court, at 9:30 am on the 8th day of June, 2026, or as soon thereafter as counsel may be heard, at the Courthouse of the New York County Supreme Court, 60 Centre Street, New York, New York 10007, in the Motion Submission Part, Room 130, for an order pursuant to §520.11 of the Rules of the Court of Appeals and §602.2(a) of the Rules of the Appellate Division, First Department, admitting non-resident counsel Nigel P. Halliday to the Bar of this Court, *pro hac vice*, for purposes of appearing and participating on behalf of John Doe in the above-

captioned action.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to CPLR §2214(b),

Answering papers, if any, shall be served two days before the return date.

Dated: May 18, 2026

Respectfully Submitted,

**SEEGER WEISS LLP**

*/s/ David R. Buchanan*

David R. Buchanan
**SEEGER WEISS LLP**
55 Challenger Road, Sixth Floor
Ridgefield Park, NJ 07660
Telephone: (973) 639-9100
Facsimile: (973) 639-8656
*dbuchanan@seegerweiss.com*

# [NYSCEF No. 25]

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| JOHN DOE,<br><br>Plaintiff,<br><br>vs.<br><br>MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN, COINBASE, INC.; and COINBASE GLOBAL, INC.<br><br>Defendants. | Index No.: 154566/2026<br>Hon. Dakota D. Ramseur (IAS Part 34)<br><br>**AFFIRMATION OF DAVID R. BUCHANAN IN SUPPORT OF MOTION FOR ADMISSION *PRO HAC VICE* OF NIGEL P. HALLIDAY FOR PLAINTIFF JOHN DOE** |

DAVID R. BUCHANAN, an attorney duly admitted to practice before the Courts of the State of New York, hereby affirms pursuant to Rule 2106 of the New York Civil Practice Law and Rules ("CPLR"), under penalties of perjury, that:

1. I am a partner with the firm of Seeger Weiss LLP, attorneys of record for plaintiff John Doe in this action, and, as such, I am familiar with the matters set forth herein.

2. I make this affirmation in support of John Doe's application for an Order pursuant to 22 NYCRR §§ 520.11 and 602.2 admitting attorney Nigel P. Halliday, Esq., to practice before this Court on a *pro hac vice* basis in this action.

3. Pursuant to CPLR 2217(b), I hereby affirm that no prior application for the relief requested herein has been made in this action.

4. As set forth in his accompanying affirmation (the "Halliday Aff."), Mr. Halliday is a member in good standing of the Bar of the States of Tennessee and New Jersey, as well as of the United States District Court for the Middle District of Tennessee and the

United States District Court for the District of New Jersey. *See* Halliday Aff. ¶ 2, Exhibit A. A Certificate of Good Standing indicating that Mr. Halliday is a member of good standing of the Bar of the State of New Jersey and as Exhibit B, a Certificate of Good Standing from the State of Tennessee is annexed to the Halliday Aff., satisfying the requirements of 22 NYCRR §§ 520.11(a) and 602.2. *Id.*

5. Mr. Halliday has not been disciplined in any of the jurisdictions in which he is admitted. *Id.* ¶ 2. Additionally, Mr. Halliday has sworn that he has read the disciplinary and ethical rules of the State of New York and promised to abide by such rules, thereby satisfying the requirements of 22 NYCRR § 520.11(e). *Id.* ¶ 4.

6. I have worked with Mr. Halliday since 2020, and I believe him to be an extremely capable lawyer and of the highest moral character, who has undertaken responsibility to the attorneys of record in this case, as required by 22 NYCRR §§ 520.11(c) and 520.12. *See* Halliday Aff. ¶ 5.

7. Based on the foregoing, I respectfully request that the Court enter the attached proposed Order granting John Doe's application pursuant to 22 NYCRR §§ 520.11 and 602.2, and admitting attorney Nigel P. Halliday to practice before this Court on a *pro hac vice* basis in this action.

Dated: May 18, 2026

*<u>/s/ David R. Buchanan</u>*

David R. Buchanan

**CERTIFICATION OF WORD COUNT**

I hereby certify pursuant to 22 NYCRR § 202.8-b that the total number of words in this Affirmation, inclusive of heading and footnotes, and exclusive of the caption and signature block, is 415 words. Accordingly, this Affirmation complies with the word count limit set forth in 22 NYCRR § 202.8-b.

Dated: May 18, 2026

**SEEGER WEISS LLP**

*/s/ David R. Buchanan*

David R. Buchanan
**SEEGER WEISS LLP**
55 Challenger Road, Sixth Floor
Ridgefield Park, NJ 07660
Telephone: (973) 639-9100
Facsimile: (973) 639-8656
*dbuchanan@seegerweiss.com*

# [NYSCEF No. 26]

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

JOHN DOE,

Plaintiff,

vs.

MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN, COINBASE, INC.; and COINBASE GLOBAL, INC.

Defendants.

Index No.: 154566/2026
Hon. Dakota D. Ramseur (IAS Part 34)

**AFFIRMATION OF NIGEL P. HALLIDAY IN SUPPORT OF MOTION FOR ADMISSION *PRO HAC VICE* FOR PLAINTIFF JOHN DOE**

I, Nigel P. Halliday submit this affirmation in support of the application for my admission to this action *pro hac vice*, pursuant to 22 NYCRR §§ 520.11 and 602.2.

1. I am a member in good standing of the Bar of the State of New Jersey and an associate with the firm of Seeger Weiss LLP ("Seeger Weiss"). I make this affirmation in support of my application to appear *pro hac vice* on behalf of plaintiff John Doe in this matter.

2. I am a 2019 graduate of Vanderbilt Law School and have been a member in good standing of the bar of the State of Tennessee since 2019 and a member in good standing of the bar of the State of New Jersey since 2020. I am also a member in good standing of the bar for the United States District Court for the District of New Jersey and the United States District Court for the Middle District of Tennessee. Annexed hereto as Exhibit A is an original Certificate of Good Standing from the State of New Jersey, and as Exhibit B, a copy of my Certificate of Good Standing from the State of Tennessee. I have not been disciplined in any jurisdiction in which I am admitted.

3. John Doe has retained Seeger Weiss, in association with co-counsel, to represent him in this action, and I am one of the attorneys handling this matter on behalf of Seeger Weiss. I have acquired extensive experience and knowledge concerning the facts and specific issues involved in this case.

4. I have never been convicted of a felony, censured, disbarred, or denied admission or readmission by any court, and there are no disciplinary proceedings pending against me in any state or federal court.

5. I am familiar with and shall comply with the standards of professional conduct imposed upon members of the New York Bar, including the rules of court governing the conduct of attorneys and the Disciplinary Rules of the Code of Professional Responsibility.

6. If admitted *pro hac vice*, I shall be subject to the jurisdiction of the courts of this State with respect to any acts occurring during the course of my participation in this action.

7. If admitted *pro hac vice*, I shall have all pleadings, briefs, and other papers filed with the Court signed by attorneys of record authorized to practice in New York, who shall be held responsible for such papers and for the conduct of this action.

8. If admitted *pro hac vice*, I shall notify the Court immediately of any matter that affects my standing in this or any other jurisdiction.

9. In connection with this action, David R. Buchanan, a partner of Seeger Weiss and a member of good standing of the Bar of the state of New York, will be associated with me in my representation of John Doe on a *pro hac vice* basis. Mr. Buchanan shall continue to be counsel of record in this matter.

10. Accordingly, I respectfully request permission to appear *pro hac vice* in this matter on behalf of John Doe.

I affirm this 18th day of May 2026, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

Nigel P. Halliday

**CERTIFICATION OF WORD COUNT**

I hereby certify pursuant to 22 NYCRR § 202.8-b that the total number of words in this Affirmation, inclusive of heading and footnotes, and exclusive of the caption and signature block, is 565 words. Accordingly, this Affirmation complies with the word count limit set forth in 22 NYCRR § 202.8-b.

Dated: May 18, 2026

**SEEGER WEISS LLP**

*/s/ David R. Buchanan*

David R. Buchanan
**SEEGER WEISS LLP**
55 Challenger Road, Sixth Floor
Ridgefield Park, NJ 07660
Telephone: (973) 639-9100
Facsimile: (973) 639-8656
*dbuchanan@seegerweiss.com*

# [NYSCEF No. 27]

# EXHIBIT A

# Supreme Court of New Jersey

# Certificate of Good Standing

*This is to certify that* **NIGEL P HALLIDAY** *(No.* **344762020** *) was constituted and appointed an Attorney at Law of New Jersey on* **July 17, 2020** *and, as such, has been admitted to practice before the Supreme Court and all other courts of this State as an Attorney at Law, according to its laws, rules, and customs.*

*I further certify that as of this date, the above-named is an Attorney at Law in Good Standing. For the purpose of this Certificate, an attorney is in "Good Standing" if the Court's records reflect that the attorney: 1) is current with all assessments imposed as a part of the filing of the annual Attorney Registration Statement, including, but not limited to, all obligations to the New Jersey Lawyers' Fund for Client Protection; 2) is not suspended or disbarred from the practice of law; 3) has not resigned from the Bar of this State; and 4) has not been transferred to Disability Inactive status pursuant to Rule 1:20-12.*

*Please note that this Certificate does not constitute confirmation of an attorney's satisfaction of the administrative requirements of Rule 1:21-1(a) for eligibility to practice law in this State.*

*In testimony whereof, I have hereunto set my hand and affixed the Seal of the Supreme Court, at Trenton, this 16th day of April, 2026.*

*Clerk of the Supreme Court*

# [NYSCEF No. 28]

# EXHIBIT B

# *Supreme Court of Tennessee*

# *Certificate of Good Standing*

*I, James M. Hivner, Clerk of the Supreme Court of the State of Tennessee, do hereby certify that*

*Nigel P. Halliday*

*is a licensed and practicing attorney of the Courts of this State, having been admitted to practice on November 5, 2019, and is presently in good standing. The Supreme Court is the Court of last resort in Tennessee.*

*In testimony whereof, I have set my hand and affixed the seal of the Court on this the 24th day of April, 2026.*

*James M. Hivner*
*Clerk of the Supreme Court of Tennessee*

By ______________________
Donna Gilmore, D.C.

# [NYSCEF No. 29]

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| JOHN DOE,<br><br>Plaintiff,<br><br>vs.<br><br>MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN, COINBASE, INC.; and COINBASE GLOBAL, INC.<br><br>Defendants. | Index No.: 154566/2026<br>Hon. Dakota D. Ramseur (IAS Part 34)<br><br>**[PROPOSED] ORDER ADMITTING NIGEL P. HALLIDAY TO APPEAR *PRO HAC VICE* FOR PLAINTIFF JOHN DOE** |

Nigel P. Halliday, Esq, having applied to this Court for admission *pro hac vice* to represent plaintiff John Doe in this action, and said applicant having submitted in support thereof the affirmation of David R. Buchanan, Esq., a member of the Bar of the State of New York and attorney of record herein for John Doe, dated April __, 2026; the affirmation of applicant Nigel P. Halliday, Esq., sworn to on April __, 2026, and the exhibits thereto (Certificates of Good Standing from the States of Tennessee and New Jersey); and the Court having reviewed the foregoing submissions and due deliberation having been had, it is now therefore

**ORDERED** that the motion is granted and Nigel P. Halliday, Esq. is permitted to appear and to participate in this action on behalf of John Doe; and it is further

**ORDERED** that Nigel P. Halliday, Esq. shall at all times be associated herein with

counsel who is a member in good standing of the Bar of the State of New York and is attorney of record for the party in question and all pleadings, briefs, and other papers filed with the Court shall be signed by the attorney of record, who shall be responsible for such papers and for the conduct of this action; and it is further

**ORDERED** that, pursuant to Section 520.11 of the Rules of the Court of Appeals and Section 602.2 of the Rules of the Appellate Division, First Department, the attorneys hereby admitted *pro hac vice* shall abide by the standards of professional conduct imposed upon members of the New York Bar, including the Rules of the Courts governing the conduct of attorneys and the Disciplinary Rules of the Code of Professional Responsibility; and it is further

**ORDERED** that Nigel P. Halliday, Esq. shall be subject to the jurisdiction of the Courts of the State of New York with respect to any acts occurring during the course of his participation in this matter; and it is further

**ORDERED** that said counsel shall notify the Court immediately of any matter or event in this or any other jurisdiction which affects their standing as a member of the Bar.

Dated: May __, 2026

ENTER:

______________________________

Hon. Dakota D. Ramseur

# [NYSCEF No. 30]

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| JOHN DOE,<br><br>Plaintiff,<br><br>v.<br><br>MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN, COINBASE, INC.; and COINBASE GLOBAL, INC.<br><br>Defendants. | Index No.: 154566/2026<br><br>**Hon. Dakota D. Ramseur**<br><br>Part 34<br><br>Motion Seq. No. 001 |

# DEFENDANTS COINBASE, INC. AND COINBASE GLOBAL, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Phone: (212) 735-3000
Facsimile: (212) 735-2000

*Counsel for Defendants Coinbase, Inc. and Coinbase Global, Inc.*

Defendants Coinbase, Inc. and Coinbase Global, Inc. (the "Coinbase Defendants") respectfully submit this memorandum of law in opposition to Plaintiff John Doe's motion by order to show cause with temporary restraining order allowing him to proceed anonymously and permitting the use of the pseudonym "John Doe" in all papers filed in the above-captioned case (Mot. Seq. 001, NYSCEF Nos. 2, 3, 4, 7).[1]

## INTRODUCTION

As Plaintiff concedes (NYSCEF No. 3 ("Br.") at 3), New York law establishes a "customary and constitutionally embedded presumption of openness in judicial proceedings," which includes parties proceeding under their own names. *J. Doe No. 1 v. CBS Broad. Inc.*, 24 A.D.3d 215, 215 (1st Dep't 2005). And the purported risk of "social stigmatization, embarrassment, and humiliation" (Br. at 3) and general "mental harm" (*id*. at 1) fails to implicate a "substantial privacy right" that is required to overcome this presumption—particularly as Plaintiff is no longer a minor and initiated this litigation rather than filing in arbitration as the Coinbase, Inc. User Agreement requires. "[C]laims of public humiliation and embarrassment are ***not*** sufficient grounds" to permit a plaintiff "to proceed anonymously." *Anonymous v. Lerner*, 124 A.D.3d 487, 488 (1st Dep't 2015) (citation modified). Moreover, Plaintiff cannot demand a trial by jury (NYSCEF No. 6 ("Compl.") at 1) and yet simultaneously demand that this Court deprive the Coinbase Defendants of their due process right to defend themselves and their reputations while Plaintiff hides behind a fictitious identity. *See Lerner*, 124 A.D.3d at 487; *F.L. v. Doe*, 70

[1] By submitting this opposition in response to the Court's order that they be served with the Order to Show Cause and Plaintiff's Complaint and that a hearing be held on the issue (*see* NYSCEF No. 7), the Coinbase Defendants expressly preserve and do not waive any rights or defenses, including their arbitration rights.

Misc. 3d 962, 964 (Sup. Ct. N.Y. Cnty. 2020). For all these reasons, Plaintiff fails to meet his burden and the Motion should be denied.

## FACTUAL BACKGROUND

On April 10, 2026, Plaintiff filed a Complaint under the pseudonym "John Doe," without prior leave of court to do so, as well as the instant Motion. (NYSCEF Nos. 6, 7.) Plaintiff alleges that, when he was a minor, he created an account on the Coinbase digital asset trading platform and subsequently used its services to engage in third-party gambling activities through the services offered by the Stake defendants. (Compl. ¶¶ 2, 12, 300). In turn, he alleges that these third-party gambling activities led to a gambling addiction. (*Id.* ¶¶ 15, 21-24.) Plaintiff asserts claims against the Coinbase Defendants for (i) violations of New York's General Business Law § 349; (ii) gross negligence; (iii) negligence; and (iv) unjust enrichment. (*Id.* ¶¶ 410-452, 477-83.) Plaintiff also seeks a declaratory judgment under CPLR § 3001. (*Id.* ¶¶ 484-93.)

As relevant to this Motion, Plaintiff admits that he is no longer as minor and is currently 20 years old. (*Id.* ¶ 319.) The Motion alleges that Plaintiff "has a genuine fear" of "unwanted, negative publicity and attention" from his lawsuit and "mental harm if his identity is publicized." (Br. at 1.) He requests that the Court allow him to use a pseudonym during the pendency of the case and to direct the parties to keep his identity confidential. (*Id.*)

## ARGUMENT

"A plaintiff does not have an automatic right to bring an action anonymously." *GCVAWCG-Doe v. Roman Cath. Archdiocese of N.Y.*, 69 Misc. 3d 648, 649 (Sup. Ct. Westchester Cnty. 2020). Instead, as Plaintiff admits (Br. at 3), there is a "customary and constitutionally embedded presumption of openness in judicial proceedings," such that parties should proceed under their own names. *CBS Broad. Inc.*, 24 A.D.3d at 215. Thus, the party seeking anonymity must provide evidence to corroborate the allegations in the request and "[o]nly those plaintiffs who

have brought forth individual facts warranting the protection of anonymity" should be granted it. *Roman Cath. Archdiocese*, 69 Misc. 3d at 651. Indeed, a court must "exercise its discretion to limit the public nature of judicial proceedings sparingly and then, *only* when unusual circumstances necessitate it." *See Anonymous v. Anonymous*, 27 A.D.3d 356, 361 (1st Dep't 2006) (citation modified).

When considering an anonymity request, courts evaluate "whether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of a sensitive and highly personal nature" and "the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously." *Doe v. Kidd*, 19 Misc. 3d 782, 788-89 (Sup. Ct. N.Y. Cnty. 2008).[2]

Here, Plaintiff asserts that, if his identity is disclosed, "he risks social stigmatization, embarrassment, and humiliation" (Br. at 3) and "mental harm" (*id.* at 1). But the First Department has made clear that "claims of public humiliation and embarrassment are *not* sufficient grounds for allowing a plaintiff to proceed anonymously." *Lerner*, 124 A.D.3d at 488 (citation modified). Desire to avoid "annoyance and criticism" attendant with litigation that Plaintiff initiated does not "implicat[e] a privacy right so substantial as to outweigh the customary and constitutionally embedded presumption of openness in judicial proceedings." *See CBS Broad.*, 24 A.D.3d at 215. Likewise, Plaintiff's general purported "fear of the unwanted, negative publicity and attention"

---

[2] Although courts may consider other factors such as those discussed in *Stevens v. Brown*, Index No. 100255/2012, 2012 N.Y. Slip Op. 31823(U), at *1 (Sup. Ct. N.Y. Cnty. July 2, 2012), in exercising their discretion to allow a plaintiff to proceed anonymously, Plaintiff only addresses four of the factors enumerated in *Stevens*: (1) whether he seeks anonymity for an "improper purpose" or to preserve privacy in a matter of a sensitive and highly personal nature; (2) whether identification poses a risk of mental of physical harm, ridicule, or personal embarrassment; (3) the magnitude of the public interest in maintaining confidentiality or knowing the party's identity; and (4) whether the other side will be prejudiced by use of the pseudonym. (Br. at 3-4). For good reason, as the other factors do not support anonymity.

cannot save his application. (Br. at 1.) Plaintiff's request for anonymity "requires plausible and actual, not speculative harm." *Roman Cath. Archdiocese*, 69 Misc. 3d at 652. What is more, Plaintiff cannot credibly assert actual harm from proceeding in public litigation as this situation is one of his own making. As the Complaint repeatedly acknowledges, Coinbase, Inc.'s User Agreement mandates that disputes with its customers be resolved through private arbitration (Compl. ¶¶ 338-345; 392-402), and, here, arbitration would have allowed Plaintiff to pursue his purported claims without any of the purported harm he claims would ensue if he cannot proceed anonymously.

The fact that Plaintiff's allegations relate to "a suit about his childhood gambling" (Br. at 3) likewise does not weigh in favor of granting him anonymity. Plaintiff admits that he is now an adult, and New York courts routinely deny requests for plaintiffs to proceed anonymously despite allegations about circumstances that occurred when they were minors. *See, e.g.*, *Roman Cath. Archdiocese*, 69 Misc. 3d at 649 (denying request for anonymity in case brought under the Child Victims Act for sexual contact when plaintiff was a minor); *Rapp v. Fowler*, 537 F. Supp. 3d 521, 530 (S.D.N.Y. 2021) (denying request for anonymity related to sexual abuse allegations when plaintiff was a minor because "[i]f a plaintiff is not a child, this factor weighs against a finding for anonymity" (citation omitted)).

Plaintiff's case law is also inapposite. (Br. at 2-3.) In *Stevens v. Brown*, plaintiff alleged she contracted sexually transmitted diseases after defendant forcibly had sex with her. 2012 N.Y. Slip Op. 31823(U), at *2. Although plaintiff's "embarrassment [w]as *not sufficient* to permit her to proceed anonymously," the Supreme Court reasoned that the "deeply personal and sensitive subject matter of the case warrant[ed] protection of plaintiff's privacy interest." *Id*. at *8-9. By contrast, Plaintiff's alleged gambling addiction is not "information of the utmost intimacy," *id*. at

*8 (citation omitted), nor does it implicate a "substantial privacy right," *Lerner*, 124 A.D.3d at 487. Similarly, *Doe v. New York Univ.*, 6 Misc. 3d 866, (Sup. Ct. N.Y. Cnty. 2004), also involved the anonymity of plaintiffs who had allegedly suffered compelling "emotional distress" as victims of sexual offenses, with the court emphasizing that "[e]mbarrassment or economic harm to the plaintiffs" would have been "insufficient." *Id.* at 903-04. *Doe v. Bellmore-Merrick Cent. High Sch. Dist.*, 1 Misc. 3d 697 (N.Y. Sup., Nassau Cnty. 2003) also centered around "infant petitioners who [were] alleged victims of sex crimes." *Id.* at 698.[3]

Not only is Plaintiff's alleged harm insufficient to overcome the presumption that litigation should proceed publicly, but he has also failed to meet his burden to establish it. *Id*. at 698-99. The Motion is supported solely by Plaintiff's attorney. (NYSCEF No. 4.) *See, e.g.*, *Doe v. Good Samaritan Hosp.*, 65 Misc. 3d 987, 989 (Sup. Ct. Nassau Cnty. 2019) (disallowing plaintiff to proceed using a pseudonym where motion was supported by "'bare bones' affirmation by counsel"). Thus, the Motion's "boilerplate, broad based statements" that Plaintiff risks a general risk of social stigmatization and embarrassment from his purported gambling addiction cannot meet his burden. *Roman Cath. Archdiocese*, 69 Misc. 3d at 652-53 (noting that this burden "does not mean giving the horrendous details of the alleged sexual abuse for the application, but it does require some real facts about the plaintiff's current circumstances—where he or she lives, and social circumstances, employment, family, and other information, if relevant. The mere fact that

---

[3] Moreover, courts often deny requests for litigants to proceed under pseudonyms even in sexual assault cases. *See, e.g.*, *Kidd*, 19 Misc. 3d at 783 (denying anonymity in case involving "multiple occasions" of alleged sexual groping); *Doe v. Skyline Autos. Inc.*, 375 F. Supp. 3d 401, 404 (S.D.N.Y. 2019) (denying anonymity in case where plaintiff alleged she was "drugged and brutally raped" by coworker); *Doe v. Townes*, No. 19-cv-8034 (ALC) (OTW), 2020 WL 2395159, at *1 (S.D.N.Y. May 12, 2020) (denying plaintiff's unopposed motion for anonymity in case involving allegations that defendant "touched, groped, and sexually assaulted" plaintiff).

the plaintiff has a relative of unspecified sanguinity who lives in or near the county of venue is of little or no value to the court. The mere fact that the internet exists is also of no value to the court.").

Finally, the Coinbase Defendants' due process rights and the public's right to access outweigh any purported risk of embarrassment. Courts have identified prejudice against a defendant when plaintiff's request for anonymity allows him "to damage defendants' professional reputation while protecting [his] own." *F.L.*, 70 Misc. 3d at 964; *see also* *Kidd*, 19 Misc. 3d at 787-88 ("[O]penness of the judicial process operates to diminish the possibilities for injustice, incompetence, perjury and fraud."). The Coinbase Defendants are entitled to defend their reputation without Plaintiff hiding behind a fictitious identity. *See* *Lerner*, 124 A.D.3d at 487.

At bottom, Plaintiff has failed to allege "a matter implicating a privacy right so substantial as to outweigh the constitutionally embedded presumption of openness in judicial proceedings" and should not be allowed to proceed pseudonymously. *CBS Broad.*, 24 A.D.3d at 215.

## CONCLUSION

For these reasons, the Coinbase Defendants respectfully request that this Court deny Plaintiff's application for an Order to Show Cause with Temporary Restraining Order, order that the caption be amended to reflect the true and complete name of Plaintiff, and direct that the Plaintiff's name shall be used for all further proceedings in this case. By submitting this opposition, the Coinbase Defendants do not waive any defenses at law or equity that may be available to them, including, but not limited to, the right to compel arbitration.

Dated: New York, New York
May 18, 2026

Respectfully submitted,

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

*/s/ Lara A. Flath*
Michael W. McTigue Jr.
Meredith C. Slawe
Alexander C. Drylewski
Lara A. Flath
One Manhattan West
New York, New York 10001
Phone: (212) 735-3000
Facsimile: (212) 735-2000
michael.mctigue@skadden.com
meredith.slawe@skadden.com
alexander.drylewski@skadden.com
lara.flath@skadden.com

*Counsel for Defendants Coinbase, Inc. and Coinbase Global, Inc.*

**ATTORNEY CERTIFICATION PURSUANT TO PART 202.8-b:**

I, Lara A. Flath, hereby certify that this Memorandum of Law complies with the word count limit set forth in Part 202.8-b of the Uniform Civil Rules for The Supreme Court & The County Court because it contains 1,945 words, excluding the parts of the Memorandum of Law exempted by Part 202.8-b. In preparing this certification, I have relied on the word count of the word processing system used to prepare this memorandum.

Dated: New York, New York
May 18, 2026

*/s/ Lara A. Flath*
Lara A. Flath

# [NYSCEF No. 31]

SUPREME COURT OF THE STATE OF
NEW YORK COUNTY OF NEW YORK

JOHN DOE,

Plaintiff,

-against-

MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN COINBASE, INC.; and COINBASE GLOBAL, INC.,

Defendants.

**Index No.: 154566/2026**

# STAKE DEFENDANTS' OPPOSITION TO PLAINTIFF JOHN DOE'S APPLICATION FOR AN ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........ 1
LEGAL STANDARD ........ 2
ARGUMENT ........ 3
I. PLAINTIFF FAILS TO MEET THE THRESHOLD EVIDENTIARY REQUIREMENTS NEEDED TO MEET HIS BURDEN ........ 3
II. PLAINTIFF HAS NOT SHOWN THE BALANCE OF INTERESTS WEIGH IN FAVOR OF GRANTING ANONYMITY. ........ 5
A. Plaintiff Has Not Demonstrated a Compelling Privacy Interest. ........ 5
B. Granting the Application Would Unfairly Prejudice the Stake Defendants. ........ 8
C. The Public Interest Weighs in Favor of Disclosure. ........ 11
III. CONCLUSION ........ 11

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Movie Classics Co. v. Time Warner Entertainment, L.P.*,
No. 603625/03, 2005 WL 3487852 (N.Y. Sup. Ct. July 8, 2005) ....................5, 11

*Anonymous v. Lerner*,
124 A.D. 3d 487 (1st Dep't 2015) ....................6, 9

*State of New York ex rel. Banerjee v Moody's Corp.*,
54 Misc. 3d 705 (N.Y. Sup. Ct. 2016) ....................2

*Deer Consumer Prods., Inc. v. Little*,
35 Misc.3d 374 (Sup. Ct. 2012) ....................3, 5, 8

*Doe v. Amherst Cent. Sch. Dist.*,
196 A.D. 3d 9 (4th Dep't 2021) ....................3, 4, 5

*Doe v. Bellmore-Merrick Cent. H.S. Dist.*,
1 Misc. 3d 697 (N. Y. Sup. Ct. 2003) ....................8

*Doe v. Black Diamond Cap. Mgmt, LLC*,
No. 22-CV-03194 (PGG) (BCM), 2023 WL 2648017 (S.D.N.Y. Mar. 27, 2023) ....................6, 7

*Doe v. Good Samaritan Hosp.*,
65 Misc. 3d 987 (N.Y. Sup. Ct. 2019) ....................2, 3, 4

*Doe v. Kidd*,
19 Misc. 3d 782 (Sup. Ct. 2008) ....................6, 9

*Doe v. MacFarland*,
66 Misc. 3d 604 (N.Y. Sup. Ct. 2019) ....................4

*Doe v. Matta*,
No. 161657/2023, 2024 N.Y. Misc. LEXIS 59339 (N.Y. Sup. Ct. Feb. 6, 2024) ....................4

*Doe v. The New York and Presbyterian Hosp.*,
No. 152438/2017, 2018 WL 1226046 (N.Y. Sup. Ct. Mar. 08, 2018) ....................2, 3, 4

*Doe v. New York Univ.*,
6 Misc. 3d 866 (N.Y. Sup. Ct. 2004) ....................3, 8, 11

*Doe v. Roman Cath. Archdiocese of New York*,
No. 59573/2019, 2019 WL 3484392 (N.Y. Sup. Ct. 2019) .......... 6, 9

*GCVAWCG-Doe v. Roman Cath. Archdiocese of New York*,
69 Misc. 3d 648 (N.Y. Sup. Ct. 2020) .......... 2, 4, 7, 10

*J. Doe No. 1 v. CBS Broad. Inc.*,
24 A.D.3d 215 (1st Dep't 2005) .......... 2, 7

*Miller v. Icon Grp. LLC*,
107 A.D.3d 585 (1st Dep't 2013) .......... 5, 11

*P.F. v. Brown*,
80 Misc. 3d 893 (N.Y. Sup. Ct. 2023) .......... 8

*Stevens v. Brown*,
No. 100255/2012, 2012 WL 2951181 (Sup. Ct., N.Y. County 2012) .......... 3, 5, 7, 8, 11

For the reasons set forth below, Defendants Medium Rare N.V. d/b/a Stake.com, Sweepsteaks Ltd. d/b/a Stake.us, Easygo Group Holdings Pty Ltd., Easygo Entertainment Pty Ltd., Medium Rare LTD., Slicemedia B.V., Bijan Tehrani, and Edward Craven (collectively, the "Stake Defendants") respectfully request that the Court deny Plaintiff John Doe's Application for an Order to Show Cause with Temporary Restraining Order (NYSCEF No. 3) (the "Application").

## INTRODUCTION

Even as his representatives in this matter have sought to intensify public attention for Plaintiff's case and galvanize a national campaign by participating in YouTube interviews, advertising on social media, and hosting a purported "community event" to discuss the case in Florida last week, Plaintiff John Doe now asks this Court to grant him the extraordinary relief of proceeding anonymously. But the Court should not allow Plaintiff to publicly wield sensational—and baseless—allegations as a sword against the Stake Defendants, including against multiple individual defendants that he publicly named in his Complaint (without legitimate need), while simultaneously seeking to shield his own identity from the public and severely curtailing the Stake Defendants' ability to investigate the underlying allegations.

New York courts apply a strong presumption in favor of open judicial proceedings, grounded in the most fundamental constitutional due process rights, and the Application does not come close to defeating that presumption here. The Application not only fails to provide the necessary evidentiary foundation to support the extraordinary relief it seeks, but it also seeks an unprecedented—and unwarranted—extension of the narrow circumstances in which New York courts have authorized that relief. To avoid unfairly prejudicing the Stake Defendants, this Court should follow longstanding precedent and deny the Application.

## LEGAL STANDARD

To proceed anonymously, a plaintiff must allege a matter implicating "a privacy right so substantial as to outweigh the customary and constitutionally embedded presumption of openness in judicial proceedings." *J. Doe No. 1 v. CBS Broad. Inc*., 24 A.D.3d 215, 215 (1st Dep't 2005). "A plaintiff does not have an automatic right to bring an action anonymously." *GCVAWCG-Doe v. Roman Cath. Archdiocese of New York*, 69 Misc. 3d 648, 649 (N.Y. Sup. Ct. 2020). Rather, the plaintiff must demonstrate that his need to proceed anonymously outweighs this presumption of openness and must provide evidence of the purported harm he will suffer if his identity is disclosed. *State of New York ex rel. Banerjee v Moody's Corp.,* 54 Misc. 3d 705, 706 (N.Y. Sup. Ct. 2016); *see also Doe v. Good Samaritan Hosp.,* 65 Misc. 3d 987, 989 (N.Y. Sup. Ct. 2019) ("The party seeking anonymity is required to provide evidence corroborating the allegations in support of the request"); *Doe v. The New York and Presbyterian Hosp*., No. 152438/2017, 2018 WL 1226046, at *3 (N.Y. Sup. Ct. Mar. 08, 2018) (similar). "The determination of whether to allow a plaintiff to proceed anonymously requires the court to 'use its discretion in balancing plaintiff's privacy interest against the presumption in favor of open trials and against any potential prejudice to defendant.'" *GCVAWCG-Doe,* 69 Misc. 3d at 650. New York courts assess numerous factors in balancing these interests, including:

> (1) whether the justification is merely to avoid annoyance or to preserve privacy in a sensitive and highly personal matter; (2) whether the party has an illegitimate ulterior motive; (3) whether identity has been kept confidential; (4) whether identification poses a risk of mental or physical harm, harassment, ridicule, or personal embarrassment; (5) whether the case involves information of the utmost intimacy; (6) whether the action is against a governmental or private entity; (7) the magnitude of public interest; (8) whether revealing identity will dissuade the party from bringing the lawsuit; (9) whether opposition to anonymity has an illegitimate basis; and (10) whether the other side will be prejudiced.

*Stevens v. Brown*, No. 100255/2012, 2012 WL 2951181 (Sup. Ct., N.Y. County 2012); *see also Doe v. New York Univ*., 6 Misc. 3d 866, 879 (N.Y. Sup. Ct. 2004) (stating that "when a court is deciding whether to allow a plaintiff to proceed anonymously, the ultimate inquiry must be whether the plaintiff has a substantial privacy right which outweighs the customary and constitutionally-embedded presumption of openness in judicial proceedings") (internal quotation marks omitted).

## ARGUMENT

### I. PLAINTIFF FAILS TO MEET THE THRESHOLD EVIDENTIARY REQUIREMENTS NEEDED TO MEET HIS BURDEN.

"A party seeking anonymity is ***required*** to provide evidence corroborating the allegations in support of the request." *Good Samaritan Hosp*., 65 Misc. 3d at 989 (emphasis added). Where courts have determined that the need for a party's anonymity overcomes "the presumption of the openness, the courts [have] granted such requests based on evidentiary proof presented by the requesting party." *Deer Consumer Prods., Inc. v. Little*, 35 Misc.3d 374, 390 (Sup. Ct. 2012). The "most basic prerequisite is an affidavit of a person with knowledge of the facts." *Doe v. Amherst Cent. Sch. Dist.*, 196 A.D. 3d 9, 14 (4th Dep't 2021). In addition, the affidavit should be supported by documentary evidence substantiating any claims made therein. *See, e.g., The New York and Presbyterian Hosp*., 2018 WL 1226046, at *3 (citing examples of instances where the evidence presented was appropriate for the court's grant of a motion to proceed under a pseudonym).

Here, Plaintiff failed to submit an affidavit from a person with knowledge of the facts and instead relies on an affidavit from his counsel to carry his evidentiary burden. That is not enough. *See Amherst Cent. Sch. Dist*., 196 A.D. 3d at 13–14. Indeed, New York courts routinely deem attorney affidavits based on second-hand knowledge of facts insufficient to meet the required evidentiary showing. *See, e.g., Good Samaritan Hosp*., 65 Misc. 3d at 989 ("On this record

consisting solely of a 'bare bones' affirmation by counsel, the Court is unable to appropriately exercise its discretionary authority."); *Amherst Cent. Sch. Dist*., 196 A.D. 3d at 13–14 (noting that plaintiff's evidence was "plainly insufficient" when it included only an affidavit of counsel and an expert, neither of which was based on personal knowledge); *GCVAWCG-Doe*, 69 Misc. 3d at 650 ("pseudonym applications with no affidavit of the plaintiff, or bare-bones, boilerplate affidavits without facts specific to the plaintiff' are "inadequate").[1] Plaintiff's failure to accompany his Application with acceptable evidence should end this inquiry. *Doe v. MacFarland*, 66 Misc. 3d 604, 623 (N.Y. Sup. Ct. 2019) ("the first inquiry by a court is whether plaintiff has provided any support for the application"); *accord Good Samaritan Hosp*., 65 Misc. 3d 987, 989–90 (N.Y. Sup. Ct. 2019) (denying application to proceed anonymously based on lack of supporting evidence).

Even if counsel's affidavit were sufficient, there is also no documentary evidence to aid the Court in determining whether Plaintiff's need for anonymity overcomes the presumption of openness. *The New York and Presbyterian Hosp*., 2018 WL 1226046, at *3. Counsel's affidavit also fails to explain why proceeding anonymously is appropriate in this case or why Plaintiff's circumstances are so exceptional as to warrant anonymity and outweigh both the public's and the Stake Defendants' interest in knowing his identity, as explained in more detail below. *See Deer*

[1] Under materially different circumstances, this Court found an attorney affidavit sufficient to support a plaintiff's request to proceed under a pseudonym in a sexual assault case. *See Doe v. Matta*, No. 161657/2023, 2024 N.Y. Misc. LEXIS 59339 (N.Y. Sup. Ct. Feb. 6, 2024). In that case, however, both the nature of the claim and the factual detail embedded in the affidavit in *Matta* were markedly different from those presented here. Although signed by counsel, the affidavit in *Matta* provided extensive factual details supporting the application directly from Doe. Compare *John Doe v. Raymond Matta*, Index No. 161657/2023, Affidavit in Support of Plaintiff's Motion for His Use of a Pseudonym for all Filings in this Sexual Assault Case, NYSCEF Doc No. 3, McGill Decl. Exhibit A, *with* Plaintiff's Affirmation in Support of Order to Show Cause with Temporary Restraining Order in this case, NYSCEF Doc. No. 4. This case does not involve the greater sensitivity inherent to sexual assault, and no such detailed affidavit is before the Court.

*Consumer Prods., Inc. v. Little*, 35 Misc. 3d 374, 389–90 (Sup. Ct. 2012); *Amherst Cent. Sch. Dist.*, 196 A.D. 3d at 13–14.

## II. PLAINTIFF HAS NOT SHOWN THE BALANCE OF INTERESTS WEIGH IN FAVOR OF GRANTING ANONYMITY.

Beyond failing to meet the basic evidentiary threshold, Plaintiff's application also fails on the legal merits. Plaintiff's Application cites the *Stevens* factors and argues that "none [of these factors] weigh against permitting [him] to file a complaint under a pseudonym" (Application at 3–4). Tellingly, however, Plaintiff does not even purport to substantively analyze six of the ten factors, each of which weighs heavily against the relief he now seeks. Even for the four factors that Plaintiff does address—namely, the need to "preserve privacy in a sensitive and highly personal matter," the "risk of mental or physical harm, harassment, ridicule, or personal embarrassment," "whether the case involves information of the utmost intimacy," and the degree of prejudice to Defendants—Plaintiff offers only bare conclusions that lack factual or legal mooring. And where plaintiffs fail to address factors in their moving papers, courts refuse to consider them in resolving the motion. *See, e.g., Am. Movie Classics Co. v. Time Warner Entertainment, L.P.,* No. 603625/03, 2005 WL 3487852, at *11 (N.Y. Sup. Ct. July 8, 2005) (declining to consider argument raised for the first time at oral argument); *Miller v. Icon Grp. LLC,* 107 A.D.3d 585, 585 (1st Dep't 2013) (argument raised for first time in reply papers was improper). For these reasons, too, the Plaintiff has failed to carry his burden.

### A. Plaintiff Has Not Demonstrated a Compelling Privacy Interest.

As stated above, Plaintiff's Application analyzes, in cursory fashion, only four of the ten *Stevens* factors. Three of these factors—the need to "preserve privacy in a sensitive and highly personal matter," the "risk of mental or physical harm, harassment, ridicule, or personal

embarrassment," and "whether the case involves information of the utmost intimacy"—address whether the party requesting anonymity has shown a sufficiently compelling privacy interest to justify his or her request. Plaintiff argues that he has done so because this suit concerns "his childhood gambling and struggles with gambling addiction." (Application at 4). But Plaintiff cannot satisfy his evidentiary burden for extraordinary relief merely by parroting conclusory allegations from the Complaint. Much more is required.

Underscoring the point, New York courts have repeatedly clarified that "[e]mbarrassment is plainly insufficient" to warrant anonymity. *See e.g. Doe v. Kidd*, 19 Misc. 3d 782, 789 (Sup. Ct. 2008) (denying Plaintiff's order to show cause in a case involving assault and battery and noting that Plaintiff sought to "merely avoid the annoyance and criticism that may attend to this type of proceeding"); *Doe v. Roman Cath. Archdiocese of New York*, No. 59573/2019, 2019 WL 3484392 at *4 (N.Y. Sup. Ct. 2019) (denying Plaintiff's application to proceed anonymously in child molestation case to "avoid potential embarrassment" and noting that "claims of public humiliation and embarrassment are not sufficient grounds for allowing plaintiff to proceed anonymously."); *Anonymous v. Lerner*, 124 A.D. 3d 487 (1st Dep't 2015) (similar).

Sensitivities related to alleged gambling as a minor and related allegations of addiction are not so extreme as to justify sealing his identity for the entirety of the litigation. On this point, *Doe v. Black Diamond Cap. Mgmt, LLC,* No. 22-CV-03194 (PGG) (BCM), 2023 WL 2648017 (S.D.N.Y. Mar. 27, 2023) is particularly instructive. In that case, the plaintiff similarly requested anonymity based on privacy concerns related to his history of alleged addiction. Specifically, the plaintiff—who was bringing claims for employment discrimination in connection with his previous "opiate addiction" and related arrest record—argued "that litigating under his true name would cause 'embarrassment to himself and his family,' due to the 'societal stigma commonly

associated with addiction,' and damage his current and future job prospects." *Id.* at *1. The court rejected the plaintiff's argument, concluding that he had not supported his contention that "his past addiction and arrest record qualify as 'highly sensitive'" subject matter and that "Plaintiff's fear of embarrassment to himself and his family, while plausible, did not tip [that factor of the analysis] in his favor." *Id.* at *3.[2]

Nor do Plaintiff's allegations of gambling as a minor justify anonymity. For starters, Plaintiff is no longer a minor, and many of the alleged events described in the Complaint appear to have taken place after he turned eighteen years old and became an adult. *See, e.g.* Compl. ¶¶ 18–19 (describing events that took place after Plaintiff started college). Moreover, even if Plaintiff were still a minor (which he is not), allegations that he struggled with a gambling addiction as a minor do not warrant the extraordinary remedy of anonymized litigation. Indeed, courts have declined to grant the same relief that Plaintiff now requests in cases involving far more sensitive allegations. *See, e.g., GCVAWCG-Doe*, 69 Misc. 3d 648, 649, 655–56 (denying request for anonymity in case related to "alleged sexual contact . . . with plaintiff when he was a minor").

Finally, although Plaintiff cites several cases in his brief, none support granting his request. In *J. Doe No. 1 v.CBS Broadcasting Inc.*, 24 A.D.3d 215 (1st Dep't 2005), the court actually *declined* to grant the request for anonymity. In the other cases, the courts granted requests for anonymity in the face of far more extreme and sensitive circumstances than those present here, and only after the plaintiff made a substantial evidentiary showing through affidavits and supporting documents. *See Stevens*, 2012 WL 2951181 (Sup. Ct. July 2, 2012) (plaintiff alleged

[2] The *Black Diamond* court also rejected the plaintiff's attempt to justify anonymity by "categoriz[ing] his past addiction as a disability," concluding that "[d]isability is not typically considered 'highly sensitive.'" 2023 WL 2648017, at *4.