UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JOHN DOE, | : | |
| Plaintiff, | : | Civil Action No. 1:26-cv-05975-JPC |
| v. | : | |
| MEDIUM RARE N.V. d/b/a STAKE.COM, SWEEPSTEAKS LTD. d/b/a STAKE.US, EASYGO GROUP HOLDINGS PTY LTD., EASYGO ENTERTAINMENT PTY LTD., MEDIUM RARE LTD., SLICEMEDIA B.V., BIJAN TEHRANI, EDWARD CRAVEN, CHRISTOPHER FREEMAN COINBASE, INC.; and COINBASE GLOBAL, INC., | : | |
| Defendants. | : | |

**DEFENDANTS COINBASE, INC.'S AND COINBASE GLOBAL, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL ARBITRATION AND TO STAY LITIGATION**

Archis A. Parasharami
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7160
Fax: (202) 661-0160
Archis.Parasharami@skadden.com

Michael W. McTigue Jr.
Meredith C. Slawe
Lara A. Flath
Alexander C. Drylewski
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001-8602
Tel: (212) 735-3546
Fax: (212) 735-2000
Michael.McTigue@skadden.com
Meredith.Slawe@skadden.com
Lara.Flath@skadden.com
Alexander.Drylewski@skadden.com

*Counsel for Defendants Coinbase, Inc. and Coinbase Global, Inc.*

# TABLE OF CONTENTS

**Page(s)**


TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

FACTUAL BACKGROUND .......... 3

A. Plaintiff Agrees To Coinbase's User Agreement In Connection With Two Accounts. .......... 3

1. Plaintiff agrees to the Coinbase User Agreement using the First Account. .......... 3

2. Plaintiff agrees to the Coinbase User Agreement in his own name. .......... 4

B. The Terms Of Plaintiffs' Arbitration Agreements. .......... 6

1. 2025 Coinbase User Agreement. .......... 6

2. 2022 and 2023 Coinbase User Agreements. .......... 8

C. Plaintiff Files This Lawsuit Notwithstanding His Arbitration Agreements. .......... 9

LEGAL STANDARD .......... 10

ARGUMENT .......... 12

I. The FAA Requires Enforcement Of Plaintiff's Arbitration Agreements. .......... 12

A. Plaintiff Repeatedly Agreed To Arbitrate. .......... 12

B. The Court Should Compel Arbitration Under The 2025 User Agreement, Which Encompasses Plaintiff's Claims. .......... 14

C. Alternatively, The Court Should Compel Arbitration Under The 2022 Or 2023 User Agreements. .......... 17

1. The 2022 and 2023 Arbitration Agreements clearly and unmistakably delegate questions of arbitrability to the arbitrator. .......... 17

2. The 2022 and 2023 Arbitration Agreements encompass Plaintiff's claims and are valid and enforceable. .......... 19

II. All Proceedings Against Coinbase Should Be Stayed Pending Completion Of Arbitration. .......... 21

CONCLUSION .......... 22

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Aggarwal v. Coinbase, Inc.*,
685 F. Supp. 3d 867 (N.D. Cal. 2023) ....................13, 18

*Alfia v. Coinbase Global, Inc.*,
2022 WL 3205036 (N.D. Cal. July 22, 2022)....................1, 13

*AT&T Technologies, Inc. v. Communications Workers of America*,
475 U.S. 643 (1986)....................12

*Career Placement of White Plains, Inc. v. Vaus*,
354 N.Y.S. 2d 764 (N.Y. Sup. Ct., Westchester Cnty., 1974)....................20, 21

*Contec Corp. v. Remote Solution, Co.*,
398 F.3d 205 (2d Cir. 2005)....................17

*Cordero v. Coinbase*,
2025 WL 2223495 (N.D. Cal. Aug. 5, 2025) ....................13, 17

*David L. Threlkeld & Co., Inc. v. Metallgesellschaft Ltd. (London)*,
923 F.2d 245 (2d Cir. 1991)....................15

*Doe #1 v. College Board*,
440 F. Supp. 3d 349 (S.D.N.Y. 2020)....................18, 20

*Donovan v. Coinbase Global, Inc.*,
649 F. Supp. 3d 946 (N.D. Cal. 2023) ....................1, 13, 18

*Feld v. Postmates, Inc.*,
442 F. Supp. 3d 825 (S.D.N.Y. 2020)....................14

*Frazier v. X Corp.*,
155 F.4th 87 (2d Cir. 2025) ....................10, 11

*Ghazizadeh v. Coursera, Inc.*,
737 F. Supp. 3d 911 (N.D. Cal. 2024) ....................14

*Gilmer v. Interstate/Johnson Lane Corp.*,
500 U.S. 20 (1991)....................11

*Hastings v. Dollarhide*,
24 Cal. 195 (1864) ....................20

*Heabeart v. Coinbase, Inc.*,
832 F. Supp. 3d 399 (S.D.N.Y. 2026)....................1, 14, 16

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019)....................11

*Hird v. iMergent, Inc.*,
2011 WL 43529 (S.D.N.Y. Jan. 6, 2011)....................15

*K.F.C. v. Snap Inc.*,
29 F.4th 835 (7th Cir. 2022)....................18, 19

*Kamath v. Coinbase, Inc.*,
2024 WL 950163 (N.D. Cal. Mar. 5, 2024)....................14, 18

*Lamps Plus, Inc. v. Varela*,
587 U.S. 176 (2019)....................16

*Levenberg v. Ludington*,
274 N.Y.S. 193 (N.Y. Cnty. Ct., Monroe Cnty., 1934)....................21

*Meadows v. Cebridge Acquisition, LLC*,
132 F.4th 716 (4th Cir. 2025)....................16

*Melendez v. Ethical Culture Fieldston School*,
789 F. Supp. 3d 316 (S.D.N.Y. 2025)....................19

*Meyer v. Uber Technologies, Inc.*,
868 F.3d 66 (2d Cir. 2017)....................11, 12, 13, 14

*N.A. v. Nintendo of America, Inc.*,
2023 WL 8587628 (N.D. Cal. Dec. 11, 2023)....................18

*Pearl v. Coinbase Global, Inc.*,
2023 WL 1769190 (N.D. Cal. Feb. 3, 2023)....................1, 13, 18

*Rent-A-Center, West, Inc. v. Jackson*,
561 U.S. 63 (2010)....................11, 17

*Reznik v. Coinbase, Inc.*,
2024 WL 1055002 (S.D.N.Y. Mar. 11, 2014)....................12, 13

*Rubenstein v. Vivid Seats, Inc.*,
2025 WL 2773161 (E.D.N.Y. Sept. 29, 2025)....................16

*S.T.G. ex rel. Garcia v. Epic Games, Inc.*,
752 F. Supp. 3d 1200 (S.D. Cal. 2024)....................18

*Shahriar v. Smith & Wollensky Restaurant Group, Inc.*,
659 F.3d 234 (2d Cir. 2011)....................................................................................10

*Smith v. Spizzirri*,
601 U.S. 472 (2024)...............................................................................................21

*In re StockX Customer Data Security Breach Litigation*,
19 F.4th 873 (6th Cir. 2021) ...........................................................................18, 19

*Sultan v. Coinbase, Inc.*,
354 F. Supp. 3d 156 (E.D.N.Y. 2019) ......................................................................10

*In re Uber Technologies, Inc.*,
2019 WL 6317770 (C.D. Cal. Aug. 19, 2019)...........................................................14

*United States v. Cheng Le*,
902 F.3d 104 (2d Cir. 2018)....................................................................................10

*Velazquez v. CEC Entertainment, LLC*,
2024 WL 4560169 (C.D. Cal. Oct. 23, 2024).......................................................20, 21

*Vitzethum v. Dominick & Dominick Inc.*,
1996 WL 19062 (S.D.N.Y. Jan. 18, 1996) ...................................................................1

*Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Jr. University*,
489 U.S. 468 (1989)...............................................................................................11

*Williams v. Moon Active Ltd.*,
811 F. Supp. 3d 1079 (N.D. Cal. 2025) ................................................................2, 19

*Ziboukh v. Whaleco, Inc.*,
795 F. Supp. 3d 349 (E.D.N.Y. 2025) ..................................................................2, 19

**STATUTES**

9 U.S.C. § 2..........................................................................................................10

9 U.S.C. § 3..........................................................................................................21

Cal. Fam. Code § 6700 ...........................................................................................18

**INTRODUCTION**

Plaintiff's claims against defendants Coinbase, Inc. and Coinbase Global, Inc. should be compelled to arbitration and stayed pursuant to Section 3 of the Federal Arbitration Act, 9 U.S.C. § 3. Prospective Coinbase users are required to agree to the Coinbase User Agreement, including its arbitration provision, before using Coinbase's platform and services. As discussed below, courts have repeatedly enforced Coinbase's arbitration provision.[1]

But in an effort to circumvent arbitration, Plaintiff says that he opened a Coinbase account (the "First Account") when he was a minor "using his adult father's identification to bypass age restrictions" (Compl. ¶ 352), asserts that he has "disaffirmed" the User Agreement "through the filing of this Complaint" (*id.* ¶ 112), and seeks a declaration that the arbitration provision in User Agreement is therefore "unenforceable as to Plaintiff" (*id.* ¶¶ 484-493).

Critically, however, the complaint fails to mention that on his 18th birthday, Plaintiff opened an *additional* Coinbase account (the "Second Account")—this time in his own name. In the course of opening the Second Account, he agreed to the 2023 Coinbase User Agreement, including its arbitration provision. The 2023 User Agreement, like prior versions, further informed users that Coinbase could modify the terms of the agreement and that continued use of the

---

[1] Defendant Coinbase Global, Inc. is the parent company of wholly owned subsidiary Coinbase, Inc. Coinbase Global, Inc. has no independent business relationship with Plaintiff and is not a proper defendant in this case. Nevertheless, Plaintiff's claims against Coinbase Global, Inc. are subject to arbitration because "charges against a parent company and its subsidiary [that] are based on the same facts and are inherently inseparable" are arbitrable "even though the parent is not formally a party to the arbitration agreement." *Vitzethum v. Dominick & Dominick Inc.*, 1996 WL 19062, at *7 (S.D.N.Y. Jan. 18, 1996) (citation modified); *see also*, *e.g.*, *Heabeart v. Coinbase, Inc.*, 832 F. Supp. 3d 399, 406, 408-09 (S.D.N.Y. 2026) (compelling claims against both Coinbase, Inc. and Coinbase Global, Inc. to arbitration); *Pearl v. Coinbase Glob., Inc.*, 2023 WL 1769190 (N.D. Cal. Feb. 3, 2023) (granting Coinbase Global's motion to compel arbitration); *Donovan v. Coinbase Glob., Inc.*, 649 F. Supp. 3d 946 (N.D. Cal. 2023) (same); *Alfia v. Coinbase Glob., Inc.*, 2022 WL 3205036 (N.D. Cal. July 22, 2022) (same).

Coinbase platform would constitute acceptance of the updated terms. In April 2025, Coinbase sent users, including Plaintiff, an email providing notice that the User Agreement was being updated and providing a link to the updated terms. And Plaintiff continued to use Coinbase's platform after the updated agreement took effect, demonstrating his assent to the 2025 User Agreement (about two years after he reached the age of majority)—thereby mooting his assertion that he disaffirmed his earlier arbitration agreements.

But even if Plaintiff had not assented to the 2025 agreement and his earlier arbitration agreements were instead the relevant ones, he still is required to arbitrate. Both the 2022 User Agreement that Plaintiff accepted when he used the First Account and the 2023 User Agreement he accepted when opening the Second Account contain materially identical arbitration provisions. Most significantly, both of those provisions expressly delegate questions about the agreements' enforceability to an arbitrator to decide. Decl. of Charl Marais Exs. 3, 8 Appendix 5 § 1.6. The delegation provisions make compelling arbitration under these earlier agreements straightforward: Under both the laws of California (the governing law specified in the 2022, 2023, and 2025 User Agreements) and New York (where Plaintiff resides), purported disaffirmance by a minor is a defense to the *enforceability* of a contract, not its *formation*. And federal courts routinely hold that it is for the arbitrator to decide disaffirmance challenges when, as here, the parties have delegated enforceability issues to the arbitrator. *See, e.g.*, *Williams v. Moon Active Ltd.*, 811 F. Supp. 3d 1079, 1084 (N.D. Cal. 2025) (California law); *Ziboukh v. Whaleco, Inc.*, 795 F. Supp. 3d 349, 377-39 (E.D.N.Y. 2025) (New York law; collecting cases).

Finally, if this Court were to reach Plaintiff's disaffirmance arguments under the earlier arbitration agreements, it should reject them. Plaintiff continued to use the Coinbase account he created in his own name well after he turned 18, thereby ratifying the contract. And he did not

attempt to disaffirm any of the Coinbase User Agreements until filing this lawsuit, nearly three years after he turned 18 in April 2023. That is far too long to wait under either California or New York law, which require disaffirmance within a reasonable time after reaching the age of majority.

Accordingly, Plaintiff's claims against Coinbase must be resolved through arbitration.

## FACTUAL BACKGROUND

### A. Plaintiff Agrees To Coinbase's User Agreement In Connection With Two Accounts.

Defendant Coinbase, Inc. ("Coinbase") operates an online platform for buying, selling, and transferring cryptocurrencies like Bitcoin and Ethereum. *See* Marais Decl. ¶ 4. To access Coinbase's services, prospective users are required to create an account and accept the Coinbase User Agreement. *See id.* ¶ 7. Plaintiff did so in connection with both the First Account and Second Account.

#### 1. Plaintiff agrees to the Coinbase User Agreement using the First Account.

Coinbase's records show that in November 2016, Plaintiff created the First Account and accepted the Coinbase User Agreement using what he acknowledges is his father's information. Marais Decl. ¶ 12; *see also* Compl. ¶ 352.[2] The User Agreement Plaintiff accepted when creating the account contained a broad arbitration agreement, under which he agreed to resolve disputes arising under the User Agreement or related to Coinbase's services through binding arbitration on an individual basis. Marais Decl. ¶ 12 & Ex. 2 § 7.2 (2016 User Agreement). The User Agreement further provided that Coinbase "may amend or modify this Agreement." *Id.* Ex. 2 § 8.5.

[2] The Complaint alleges that Plaintiff opened the account in October 2018. Compl. ¶ 336. According to Coinbase's records, that is when Plaintiff used his father's driver's license to verify the previously-created account.

Coinbase periodically updates the terms of its User Agreement. Marais Decl. ¶¶ 13, 18, 21. Most relevant to the First Account, in 2022, Plaintiff affirmatively accepted an updated version of the Coinbase User Agreement dated January 31, 2022. *Id.* ¶¶ 13-17 & Exs. 3-6. Specifically, on January 26, 2022, before the Agreement went into effect, Coinbase emailed Plaintiff to inform him of the forthcoming update to the User Agreement. *Id.* ¶ 13 & Ex. 4. The email bore the subject line "Update to the Coinbase User Agreement" and contained a link to the "entire agreement" along with an outline of the updates to the User Agreement, including a bullet stating that "[w]e've revised our arbitration agreement to streamline the process for resolving problems you may experience." *Id.* Ex. 4.

When Plaintiff attempted to log into the First Account on February 13, 2022, he was routed to a landing page announcing that Coinbase was "updating our User Agreement" and prompting the user to "review and accept your updated terms and conditions to continue using your Coinbase account." *Id.* ¶¶ 14-15 & Exs. 5-6. Immediately beneath that prompt was a scroll box containing the full text of the updated 2022 User Agreement. *Id.* Ex. 5. At the bottom of the page was a large blue button that users could click to "Accept terms." *Id.*

Coinbase's records show that Plaintiff logged into the account and accepted the updated 2022 User Agreement by clicking the large blue "Accept terms" button on February 13, 2022. *Id.* ¶ 16 & Ex. 1.

**2. Plaintiff agrees to the Coinbase User Agreement in his own name.**

On April 26, 2023—his 18th birthday—Plaintiff completed the onboarding process for the Second Account using his own name and information. New prospective Coinbase users who created an account during that time period were required to sign up by entering their name, email address, and proposed password into a fillable form. *Id.* ¶ 20 & Ex. 9. Before they could complete their registration and account, prospective users like Plaintiff were also required to affirmatively

click a checkbox next to a sentence reading, "I certify that I am 18 years of age or older, and I agree to the User Agreement and Privacy Policy." *Id.* Ex. 9. The phrase "User Agreement" was blue and contained a hyperlink to the full terms of the User Agreement then in effect (the User Agreement dated April 13, 2023):




*Id.* Ex. 9.

Plaintiff began the account creation process the night before his 18th birthday; Coinbase's records show that Plaintiff accepted the 2023 User Agreement at 11:56 p.m. Eastern time on April 25, 2023—four minutes shy of his birthday. *Id.* ¶ 18 & Ex. 7. Coinbase's records further show, however, that Plaintiff did not complete the onboarding process and verify his identity until he had turned 18 years old on April 26, 2023. *Id.* ¶ 19.

The 2023 User Agreement informed Plaintiff that Coinbase could "amend or modify [the]

Agreement at any time by posting the revised agreement on the Coinbase Site and/or providing a copy to" Plaintiff, and that "continued use of [Coinbase's] Services after the posting of a Revised Agreement constitutes your acceptance of such Revised Agreement." *Id.* Ex. 8, Preamble, "Amendment of these Terms." Consistent with that provision, Coinbase emailed Plaintiff on April 8, 2025, to notify him of the update to the User Agreement. *Id.* ¶¶ 22-23 & Ex. 11.

The email specifically stated that Coinbase revised the arbitration provisions of the User Agreement, and that those terms would "apply only to disputes that you or we initiate after May 15, 2025." *Id.* Ex. 11. The email provided a hyperlink to the full terms of the updated User Agreement and encouraged users to "make sure [to] read the updated User Agreement." *Id.* The 2025 User Agreement also expressly states that continued use of Coinbase's services constitutes acceptance of the updated agreement. *Id.* Ex. 10, Preamble, "Amendment of these Terms."

Coinbase's records confirm that Plaintiff repeatedly logged into the Second Account after receiving the 2025 update and after that update went into effect. *Id.* ¶¶ 24-25. Plaintiff also continued to maintain the account until May 20, 2026—over a year after the 2025 update went into effect and over a month after filing this lawsuit—when Coinbase deleted the account. *Id.* ¶ 25.

**B. The Terms Of Plaintiffs' Arbitration Agreements.**

**1. 2025 Coinbase User Agreement.**

The 2025 User Agreement discloses arbitration in boldface at the outset, under the heading "**Dispute Resolution**":

> **PLEASE BE AWARE THAT SECTION 7 (CUSTOMER FEEDBACK, QUERIES, COMPLAINTS, AND DISPUTE RESOLUTION) AND APPENDIX 5 OF THIS AGREEMENT, CONTAIN PROVISIONS GOVERNING HOW TO RESOLVE DISPUTES BETWEEN YOU AND COINBASE. AMONG OTHER THINGS, APPENDIX 5 INCLUDES AN AGREEMENT TO ARBITRATE WHICH REQUIRES, WITH LIMITED EXCEPTIONS, THAT ALL DISPUTES BETWEEN YOU AND US SHALL**

> **BE RESOLVED BY BINDING AND FINAL ARBITRATION. APPENDIX 5 ALSO CONTAINS A CLASS ACTION AND JURY TRIAL WAIVER. PLEASE READ SECTION 7 AND APPENDIX 5 CAREFULLY.**

*Id.* Ex. 10, Preamble, "Dispute Resolution." Section 7.3 of the User Agreement requires arbitration and directs the user to the appendix laying out the terms of the arbitration agreement: "Arbitration. You agree to be bound by the Arbitration Agreement in Appendix 5 to this Agreement." *Id.* Ex. 10 § 7.3.

Appendix 5 of the 2025 User Agreement contains an arbitration agreement, which provides that "[y]ou and we agree to arbitrate all Disputes in binding arbitration." *Id.*, Ex. 10, Appendix 5, "Arbitration Agreement." With limited exceptions not relevant here, "'Disputes' are defined as any dispute, claim, or disagreement arising out of relating in any way to our relationship with you, the Services, the Coinbase Site, any Communications you receive, any products or services sold or distributed through the Coinbase Site, or the User Agreement. The term 'Disputes' is intended to be interpreted broadly." *Id.* Appendix 5, "Disputes Defined."

The 2025 User Agreement provides that "the laws of the State of California, without regard to principles of conflict of laws, will govern the Agreement and any Dispute, except to the extent governed by the Federal Arbitration Act or other applicable federal law." *Id.* Exs. 10 § 9.8. The arbitration agreement itself reiterates that it is governed by "the Federal Arbitration Act." *Id.* Ex. 10 Appendix 5, "Arbitration Procedure."

Finally, the 2025 User Agreement expressly "supersedes any and all prior discussions, agreements and understandings of any kind (including without limitation any prior versions of this Agreement), between you and Coinbase." *Id.* Ex. 10 § 9.1.

**2. 2022 and 2023 Coinbase User Agreements.**

The 2022 and 2023 User Agreements likewise both disclose arbitration in boldface at the outset and contain a sentence in Section 7.3 requiring arbitration. *See id.* Exs. 3, 8, Preamble, "Dispute Resolution," & § 7.3.

The arbitration provision itself is materially identical in the 2022 and 2023 User Agreements. With limited exceptions not relevant here, the arbitration provisions require, similar to the 2025 User Agreement, binding individual arbitration of any "Dispute," which the agreements define as "any dispute, claim, disagreements arising out of or relating in any way to your access to or use of the Services or of the Coinbase Site, any Communications you receive, any products sold or distributed through the Coinbase Site, the Services, or the User Agreement and prior versions of the User Agreement, including claims and disputes that arose between us before the effective date of these Terms." *Id.* Exs. 3, 8 Appendix 5 § 1.1.

Unlike in the 2025 User Agreement, however, these earlier arbitration provisions contain a delegation clause. The arbitration provisions specify that, with limited exceptions, that "[t]he arbitrator shall have *exclusive* authority to resolve any Dispute, including, without limitation, disputes arising out of or related to the interpretation or application of the Arbitration Agreement, including the *enforceability*, *revocability*, scope, or *validity* of the Arbitration Agreement or any portion of the Arbitration Agreement." *Id.* § 1.6 (emphases added). The only relevant exception here is that these agreements require a court, not an arbitrator, to decide "which version of the Arbitration Agreement applies." *Id.*

Finally, both the 2022 and 2023 User Agreements likewise provide that "the laws of the State of California, without regard to principles of conflict of laws, will govern this Agreement and any Dispute, except to the extent governed by federal law." *Id.* Exs. 3, 8 § 9.5. The arbitration

agreement itself again specifies that it is governed by "the Federal Arbitration Act." *Id.* Exs. 3, 8 Appendix 5 § 1.4.

### C. Plaintiff Files This Lawsuit Notwithstanding His Arbitration Agreements.

On April 10, 2026, Plaintiff filed this lawsuit in New York state court. Dkt. No. 1-2. He brings claims against a variety of defendants: Medium Rare N.V. d/b/a Stake.com, Sweepsteaks Ltd. d/b/a Stake.us, Easygo Group Holdings Pty Ltd., Easygo Entertainment Pty Ltd., Medium Rare Ltd., Slicemedia B.V., Bijan Tehrani, and Edward Craven (collectively, the "Stake Defendants"); Christopher Freeman (an individual alleged to be formerly involved with the Stake Defendants); and the two Coinbase defendants. *See id.*

Plaintiff alleges that he began gambling as a minor on the Stake Defendants' online platforms and "incurred substantial online gambling losses" as a result. Compl. ¶¶ 11-13. According to Plaintiff, he created a Coinbase account to "convert U.S. dollars into the cryptocurrency required to fund wagers on Stake.com." *Id.* ¶¶ 335-336.

Relying on those allegations, Plaintiff asserts claims for violations of New York General Business Law § 349 against all defendants (Count I); gross negligence and negligence against the Coinbase Defendants (Counts II and III); negligence per se against the Stake Defendants (Count IV); negligence against all Defendants except the Coinbase Defendants (Count V); and unjust enrichment against all defendants (Count VI). He also seeks a declaratory judgment against all defendants regarding the validity or enforceability of "Defendants' Terms of Service or User Agreements" (Count VII).

On July 15, 2026, the Stake Defendants removed the case to this Court under 9 U.S.C. §§ 203 and 205 and 28 U.S.C. § 1367. Dkt. 1. Coinbase filed a notice consenting to and joining in the removal. Dkt. 13.

In his response to Defendants' pre-motion letters, Plaintiff indicates that he intends to challenge supplemental jurisdiction over the claims against the Coinbase Defendants. Dkt. 25, at 3. But as the notice of removal points out, "28 U.S.C. § 1367 provides this Court with supplemental jurisdiction" over such claims because they form part of the same Article III case or controversy as the claims over which this Court has original jurisdiction. Dkt. 1, at 12 n.8 (citing 28 U.S.C. § 1367(a)). As Coinbase will discuss in more detail in opposing Plaintiff's cross-motion to remand, the claims—as alleged by Plaintiff—readily meet this standard. Plaintiff alleges that he used Coinbase to fund his wagers on the Stake Defendants' online platforms, and his claimed harm is tied to his use of those platforms. While Coinbase denies that the claims have any merit, these claims, "[f]or purposes of section 1367(a)," "form part of the same case or controversy" as the claims against the Stake Defendants because "they derive from a common nucleus of operative fact." *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011) (citation omitted).

## LEGAL STANDARD

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, applies to any written provision in a "contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract." *Frazier v. X Corp.*, 155 F.4th 87, 95-96 (2d Cir. 2025) (quoting 9 U.S.C. § 2). The use of internet technologies to purchase or transfer digital currencies satisfies the "interstate commerce" requirement. *See United States v. Cheng Le*, 902 F.3d 104, 112 (2d Cir. 2018) ("[T]he internet [is] routinely recognized by this court as an instrumentality of interstate commerce") (citations modified); *see also Sultan v. Coinbase, Inc.*, 354 F. Supp. 3d 156, 159-60 (E.D.N.Y. 2019) (applying FAA to Coinbase arbitration agreement). Accordingly, the FAA governs the enforceability of Plaintiff's arbitration agreements. *See also* Marais Decl. Ex. 10, Appendix 5, "Arbitration Procedure" ("You and we agree that the User Agreement evidences

a transaction involving interstate commerce and notwithstanding any other provision with respect to the applicable substantive law, the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* and federal arbitration law (not state arbitration law) will govern any proceedings regarding enforcement of this Arbitration Agreement.") (2025 User Agreement); *id.* Exs. 3, 8, Appendix 5 § 1.4 (same, 2022 and 2023 User Agreements).

The FAA provides that an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Supreme Court has emphasized that the FAA creates a strong, liberal federal policy that favors arbitration. *See, e.g.*, *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991). Any ambiguities relating to the scope of the arbitration clause must be resolved in favor of arbitration. *See Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 475-76 (1989).

On a motion to compel arbitration, the Court generally has authority to examine two gateway issues: (1) whether the parties have entered into a valid agreement to arbitrate, and (2) whether the dispute at issue comes within the scope of the arbitration agreement. *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73-74 (2d Cir. 2017).

If the 2022 and 2023 User Agreements govern, the parties expressly agreed in those agreements to delegate to the arbitrator questions related to the interpretation, scope, and enforceability of the arbitration agreement. *See* Marais Decl. Exs. 3, 8, Appendix 5 § 1.6. Such delegation clauses are separate, antecedent arbitration agreements. *See Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010). Accordingly, under those agreements, the Court's role is further limited to determining whether to enforce the delegation clause. *See*, *e.g.*, *id.* at 71; *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019); *Frazier*, 155 F.4th at 96.

## ARGUMENT

Coinbase's motion should be granted because Plaintiff accepted the arbitration agreement in the 2025 User Agreement (well after turning 18), that agreement covers his claims, and that agreement controls and supersedes Plaintiff's prior agreements.

But even if the 2025 User Agreement does not apply to Plaintiff, he is required to arbitrate under the arbitration provisions in the 2022 and 2023 User Agreements. Both of those earlier arbitration agreements expressly delegate gateway arbitration questions to the arbitrator—including questions about the enforceability, scope, and interpretation of the arbitration agreement itself and the User Agreement as a whole—so the Court need not evaluate for itself whether those arbitration agreements encompass Plaintiff's claims or whether Plaintiff has validly disaffirmed either agreement. Finally, even if the Court were to reach those questions, it should compel arbitration here.

### I. The FAA Requires Enforcement Of Plaintiff's Arbitration Agreements.

#### A. Plaintiff Repeatedly Agreed To Arbitrate.

"[A]rbitration is a matter of contract," *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (citations omitted), and courts apply state law to determine whether an agreement to arbitrate exists. *Meyer*, 868 F.3d at 73-74. Here, all three User Agreements (2022, 2023, and 2025) are governed by California law and Plaintiff resides in New York, but there is no need to decide whether California or New York law controls the contract formation issue because Plaintiff agreed to arbitrate under the law of either state. *See Reznik v. Coinbase, Inc.*, 2024 WL 1055002, at *3 & n.2 (S.D.N.Y. Mar. 11, 2014) (applying California law based on the choice-of-law provision in the 2022 User Agreement but noting that "the choice between New York and California law is not dispositive with respect to the issue of whether a valid arbitration agreement

was formed"); *see also Meyer*, 868 F.3d at 74 (applying California law but noting that "New York and California apply substantially similar rules" for determining contract formation).

Here, Plaintiff assented to both the 2022 User Agreement and the 2023 User Agreement by affirmatively clicking a prominent blue button (2022) and checkbox (2023) indicating his acceptance of the Agreement after being presented with the Agreement's terms. *See* Marais Decl. ¶¶ 16, 18. Courts routinely find contract formation, including in cases involving Coinbase, where "users . . . click an 'I agree' box after being presented with a list of terms and conditions of use." *Meyer*, 868 F.3d at 75; *see also*, *e.g.*, *Reznik*, 2024 WL 1055002, at *4 (S.D.N.Y. Mar. 11, 2024) (collecting cases enforcing Coinbase's 2022 arbitration agreement); *Cordero v. Coinbase*, 2025 WL 2223495, at *6 (N.D. Cal. Aug. 5, 2025) (same). Indeed, courts have repeatedly held that the process for agreeing to the 2022 Coinbase User Agreement validly formed an agreement to arbitrate. *Aggarwal v. Coinbase, Inc.*, 685 F. Supp. 3d 867, 873 (N.D. Cal. 2023); *see Pearl v. Coinbase Glob., Inc.*, 2023 WL 1769190, at *3 (N.D. Cal. Feb. 3, 2023) (enforcing 2022 arbitration agreement when there was "no dispute that plaintiffs agreed to the 2022 User Agreement"); *Donovan v. Coinbase Glob., Inc.*, 649 F. Supp. 3d 946, 951 (N.D. Cal. 2023) (same); *see also Alfia v. Coinbase Glob., Inc.*, 2022 WL 3205036, at *2 (N.D. Cal. July 22, 2022) (enforcing earlier version of Coinbase User Agreement where plaintiff checked a box to agree to hyperlinked terms).

Plaintiff also accepted the 2025 User Agreement on the Second Account he opened in his own name. The 2023 Agreement provided that Coinbase could update the Agreement's terms by giving notice to Coinbase users and that continued use of Coinbase's services would constitute acceptance of the updated terms. Marais Decl., Ex. 8, Preamble, "Amendment of these Terms." Plaintiff received an email expressly advising him that Coinbase was updating the Agreement and providing a link to the full text of the updated terms. *Id.* ¶¶ 22-23 & Ex. 11. He then continued to

use the Coinbase platform. *Id.* ¶¶ 24-25. As another court put it in the context of Coinbase's 2022 User Agreement update, "[t]he email and [Plaintiff's] continued use of Coinbase's services is enough to establish reasonably conspicuous notice and assent." *Kamath v. Coinbase, Inc.*, 2024 WL 950163, at *4 (N.D. Cal. Mar. 5, 2024). Judge Rakoff also recently enforced the 2025 User Agreement, concluding that "[e]ach of the plaintiffs did, in fact, agree to the operative User Agreement" through continued use of the platform after receiving the email notice. *Heabeart*, 832 F. Supp. 3d at 409; *see also, e.g.*, *Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 933-34 (N.D. Cal. 2024) ("Plaintiff's consent to the 2015 TOU, which contained a 'continuing use' provision, combined with Plaintiff's continued use of Coursera's services, is sufficient to demonstrate manifestation of consent to the [January 2021] updated terms sent directly to the email address Plaintiff had on file with Coursera") (citation modified); *In re Uber Techs., Inc.*, 2019 WL 6317770, at *4 (C.D. Cal. Aug. 19, 2019) ("Courts have found that when consumers receive [update] emails" that "continued use of the service or product constitutes assent to the updated terms.") (citation modified).

Finally, while Plaintiff protests in the complaint that he did not "open" or "read" any arbitration provision presented to him (Compl. ¶ 342), the assent requirement is met "whether [the user] clicked on the hyperlink or not." *Meyer*, 868 F.3d at 79-80; *accord Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825, 832 (S.D.N.Y. 2020).

In sum, Plaintiff repeatedly agreed to arbitrate.

### B. The Court Should Compel Arbitration Under The 2025 User Agreement, Which Encompasses Plaintiff's Claims.

The scope of the arbitration clause in the 2025 User Agreement is broad. Plaintiff and Coinbase agreed to arbitrate "any dispute, claim, disagreements arising out of or relating in any way to your access to or use of the Services or of the Coinbase Site, any Communications you

receive, . . ., the Services, or the User Agreement." Marais Decl. Ex. 10, Appendix 5, "Disputes Defined." Under Second Circuit precedent, an agreement that requires the parties to arbitrate any dispute "arising out of or in relation to a contract" is broad enough to reach all aspects of their relationship. *David L. Threlkeld & Co., Inc. v. Metallgesellschaft Ltd. (London)*, 923 F.2d 245, 251 (2d Cir. 1991) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 624 n.13 (1985)); *see also Hird v. iMergent, Inc.*, 2011 WL 43529, at *3 (S.D.N.Y. Jan. 6, 2011) (enforcing arbitration clause for "any and all disputes that arise between parties concerning this Agreement, or . . . any aspect of the [parties'] relationship.") (citation modified).

Plaintiff's claims against Coinbase fall squarely within the scope of the parties' arbitration agreements because they specifically arise out of or relate to Coinbase's provision of services to Plaintiff, Plaintiff's transactions using the Coinbase platform, the communications made by Coinbase about its services, and the enforceability of the Coinbase User Agreement itself. For example, Plaintiff alleges that Coinbase should have done more to prevent him from creating and using a Coinbase account to "convert U.S. dollars into the cryptocurrency required to fund wagers on Stake.com." Compl. ¶¶ 335-336. And he seeks to litigate the validity and enforceability of the Coinbase User Agreement (*id.* ¶¶ 392-402, 484-493)—although he plainly cannot seek to disaffirm the 2025 User Agreement, which he accepted about two years after reaching the age of majority.

Plaintiff asserts in his pre-motion response letter that the arbitration agreement in the 2025 User Agreement "is not retroactive to cover the conduct giving rise to this case." Dkt. 25, at 3. But that contention can't be squared with the text of the agreement, which broadly covers, *without* temporal limitation, all of Plaintiff's claims "arising out of relating in any way to" his use of Coinbase's "Services" and the communications made by Coinbase about those Services. Marais Decl. Ex. 10, Appendix 5, "Disputes Defined." Courts in this Circuit, as elsewhere, "regularly

decline to temporally limit otherwise expansive arbitration clauses." *Rubenstein v. Vivid Seats, Inc.*, 2025 WL 2773161, at *6 (E.D.N.Y. Sep. 29, 2025) (collecting cases and holding that arbitration agreement covered pre-agreement claims). Moreover, Plaintiff fails to account for the fact that the 2025 User Agreement expressly "supersedes any and all prior discussions, agreements and understandings of any kind (including without limitation *any prior versions of this Agreement*), between you and Coinbase." Marais Decl. Ex. 10 § 9.1 (emphasis added). Accordingly, the arbitration agreement in the 2025 User Agreement controls and covers *all* of Plaintiff's claims against Coinbase, regardless of when they arose. *See Heabeart*, 832 F. Supp. 3d at 407, 409 (applying 2025 Coinbase arbitration agreement to claims based on events from 2022); *cf. Meadows v. Cebridge Acquisition, LLC*, 132 F.4th 716, 727 (4th Cir. 2025) (holding that "later-in-time version" of an arbitration agreement controlled even absent an express statement that it superseded prior arbitration agreements).

Finally, Plaintiff asserts that the absence of express retroactivity language in the 2025 User Agreement creates an "ambiguit[y]" that should be construed against Coinbase because earlier versions of the User Agreement did contain retroactivity language. Dkt. 25, at 3. But as just discussed, there is no ambiguity because "no express temporal limitation" is required. *Rubinstein*, 2025 WL 2773161, at *6 (citation omitted). Moreover, the Supreme Court has "repeatedly held" that, as a matter of substantive *federal* law under the FAA, any "ambiguities about the scope of an arbitration agreement must be resolved in *favor* of arbitration." *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 189 (2019) (emphasis added). Binding Supreme Court precedent therefore forecloses Plaintiff's invitation for the Court to hold that state law would resolve any ambiguities against arbitration. *See id.*

In sum, each of the counts Plaintiff asserts against Coinbase are covered "Dispute[s]" under the arbitration agreement contained in the 2025 User Agreement and must be resolved through arbitration.

### C. Alternatively, The Court Should Compel Arbitration Under The 2022 Or 2023 User Agreements.

Even if the 2025 User Agreement did not apply here, Plaintiff is required to arbitrate under his two prior arbitration agreements, which are contained in the 2022 and 2023 User Agreements. Those agreements contain a delegation provision that calls for an arbitrator rather than courts to decide questions of enforceability. That said, if this Court were to reach the disaffirmance issue, it should reject Plaintiff's attempt to avoid his arbitration agreements for the reasons explained below.

#### 1. The 2022 and 2023 Arbitration Agreements clearly and unmistakably delegate questions of arbitrability to the arbitrator.

It is by now well settled under Supreme Court precedent that parties may delegate "gateway" questions about the existence and scope of an arbitration agreement to the arbitrator, as well as any questions of the arbitration agreement's enforceability. *See Rent-A-Ctr.*, 561 U.S. at 68-69, 72. Such clauses are "an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Id*. at 70. A delegation provision is enforceable so long as it is clear and unmistakable. *See, e.g.*, *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005).

Courts analyzing the arbitration provision in the 2022 User Agreement (and, by extension, the materially identical provision in the 2023 User Agreement) uniformly hold that the delegation clause in the 2022 User Agreement is clear and unmistakable, and requires questions regarding the scope and enforceability of the arbitration agreement to be decided by an arbitrator, not a court. *Cordero*, 2025 WL 2223495, at *8 ("The arbitration agreement [in the 2022 User Agreement]

requires the Court to refer all remaining disputes to an arbitrator."); *Kamath*, 2024 WL 950163, at *9 (delegation clause in 2022 User Agreement is "valid and enforceable"); *Aggarwal*, 685 F. Supp. 3d at 882 (delegation clause is "enforceable"); *Pearl*, 2023 WL 1769190, at *7 (Plaintiff "failed to show the Delegation Clause in the Arbitration Agreement is unenforceable as unconscionable"); *Donovan*, 649 F. Supp. 3d at 954 ("[T]he delegation provision is enforceable, and the Court finds that the Coinbase Plaintiffs' challenges to arbitrability have been delegated to the arbitrator.").

The delegation clause requires an arbitrator, not this Court, to resolve Plaintiff's disaffirmance defense. *See* page 2, *supra* (citing *Williams*, 811 F. Supp. 3d at 1084; *Ziboukh*, 795 F. Supp. 3d at 377-39); *see also, e.g., S.T.G. ex rel. Garcia v. Epic Games, Inc.*, 752 F. Supp. 3d 1200, 1206-11 (S.D. Cal. 2024); *N.A. v. Nintendo of Am.*, 2023 WL 8587628, at *5 (N.D. Cal. Dec. 11, 2023). Those cases follow from the straightforward principles, under both California and New York law, that (1) minors have the capacity to enter into contracts and (2) disaffirmance is a *defense* to the enforceability of a contract entered into by a minor, not a basis for denying the *existence* of the contract. *See* Cal. Fam. Code § 6700 ("a minor may make a contract in the same manner as an adult, subject to the power of disaffirmance"); *Doe #1 v. Coll. Bd.*, 440 F. Supp. 3d 349, 355 (S.D.N.Y. 2020) ("New York law offers minors the right to disaffirm a contract, not to find that no enforceable contract exists.").

The only two courts of appeals that have squarely addressed the question agree that a disaffirmance defense is for an arbitrator to decide when the arbitration agreement contains a delegation clause. *See K.F.C. v. Snap Inc.*, 29 F.4th 835, 837-38 (7th Cir. 2022) (California and Illinois law); *In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873, 883-86 (6th Cir. 2021) (Michigan law). Those courts too have reasoned that because contracts entered into by children are at most voidable rather than void at the outset, "youth must be a defense rather than an obstacle

to a contract's formation, and as a defense it goes to the arbitrator." *Snap*, 29 F.4th at 838; *see also In re StockX*, 19 F.4th at 883 ("plaintiffs' infancy argument does not concern the formation or existence of a contract").[3]

Accordingly, if it determines that the 2022 or 2023 User Agreement applies, the Court should compel arbitration and leave all disputes about the enforceability of the arbitration agreement for the arbitrator to decide.

**2. The 2022 and 2023 Arbitration Agreements encompass Plaintiff's claims and are valid and enforceable.**

The delegation clause in the 2022 and 2023 User Agreements is binding and enforceable. But even if the Court declines to enforce the parties' agreement to delegate validity and enforceability questions to an arbitrator, it should nevertheless compel arbitration. For the reasons discussed above in connection with the 2025 User Agreement (at 14-17), Plaintiff's claims fall squarely within the similarly broad scope of the arbitration agreements in the 2022 and 2023 User Agreements. *See* Marais Decl. Exs. 3, 8, Appendix 5 § 1.1.

In addition, Plaintiff cannot disaffirm either the 2022 or 2023 User Agreement, much less both. As discussed above (at 18), a minor has the capacity to contract under both California and New York law. And because disaffirmance presents a question of whether the Coinbase User

[3] One judge in this District, relying on the *dissent* in the Sixth Circuit, declined to enforce a delegation clause in the context of a disaffirmance defense. *See Melendez v. Ethical Culture Fieldston Sch.*, 789 F. Supp. 3d 316, 327-28 (S.D.N.Y. 2025). Coinbase respectfully submits that this outlier decision incorrectly treated disaffirmance as belonging to a "category of formation issues." *Id.* at 328 n.4; *see also Williams*, 811 F. Supp. 3d at 1085-86 (declining to follow *Melendez* for that reason); *Ziboukh*, 795 F. Supp. 3d at 377-39 (reaching a contrary conclusion a few months after *Melendez*). But in all events, Plaintiff is easily bound by the 2022 and 2023 User Agreements—including the 2023 User Agreement he agreed to when creating an account in his own name on his 18th birthday—even if the Court considers his disaffirmance defense. *See* pages 19-21, *infra*.

Agreement is enforceable, it should be governed by the User Agreements' California choice-of-law provision. *See* Marais Decl. Exs. 3, 8 § 9.5.

Under California law, "a minor can disaffirm a contract under two circumstances: (1) 'before majority' or (2) 'within a reasonable time afterwards.'" *Velazquez v. CEC Ent., LLC*, 2024 WL 4560169, at *3 (C.D. Cal. Oct. 23, 2024) (quoting Cal. Fam. Code § 6710). To the extent New York law is relevant, it similarly provides that a party must "disaffirm a contract entered into as a minor 'within a reasonable time after becoming of age.'" *Doe #1*, 440 F. Supp. 3d 349, 355 (quoting *I.C. ex rel. Solovsky v. Delta Galil USA*, 135 F. Supp. 3d 196, 208 (S.D.N.Y. 2015)). If he fails to do so, "his silence will be considered a ratification." *Career Placement of White Plains, Inc. v. Vaus*, 354 N.Y.S. 2d 764, 769 (N.Y. Sup. Ct., Westchester Cnty., 1974) (citation omitted).

These standards are not met here, for at least two independent reasons.

*First*, Plaintiff plainly ratified the 2023 User Agreement when he clicked a checkbox to accept four *minutes* before reaching the age of majority. He not only continued and completed the onboarding process for the Second Account *after* turning 18—including by submitting verification for the account on his 18th birthday—but he also continued to use and maintain the account long afterwards. Long-standing California law "is clear that if an infant, after arriving at adult age, ratifies a conveyance made by him during his infancy, he will have no power to revoke the ratification and disaffirm such conveyance thereafter." *Hastings v. Dollarhide*, 24 Cal. 195, 211-212 (1864); *see also id.* at 215 (ratification can occur through "performance of acts from which an affirmance might be reasonably implied"). Similarly, a New York court has suggested that a plaintiff's continued acceptance of the contractual relationship—there, an employment relationship—"for approximately ten months after attaining his majority" would demonstrate "as

a matter of law that the contract was ratified." *Career Placement*, 354 N.Y.S. 2d at 769 (ultimately rejecting the disaffirmance defense on other grounds).

*Second*, and in all events, Plaintiff concedes in his complaint that he has not attempted to disaffirm *any* User Agreement until filing this lawsuit in April 2026, nearly three years after turning 18. That is far too long; "courts across California generally agree that a 'reasonable' time is *within a year* after reaching majority." *Velazquez*, 2024 WL 4560169, at *3 (emphasis added) (surveying California cases). For that reason, the *Velazquez* court concluded that "Plaintiff did not timely disaffirm the Agreement" when he "initiat[ed] this action roughly four years after reaching the age of majority." *Id.*

The reasoning in *Velazquez* is on point here and warrants the same result. And New York courts would reach the same conclusion. For example, one court held that a plaintiff did not disaffirm a stock purchase contract within a reasonable time when he waited nearly three years after reaching the age of majority—the same amount of time as in this case. *Levenberg v. Ludington*, 274 N.Y.S. 193, 196 (N.Y. Cnty. Ct., Monroe Cnty., 1934).

In sum, Plaintiff did not timely disaffirm either the 2022 or 2023 User Agreement. He is required to arbitrate his claims against Coinbase.

## II. All Proceedings Against Coinbase Should Be Stayed Pending Completion Of Arbitration.

Under the FAA, if an issue referable to arbitration is brought in federal court, the court must enter a stay if one of the parties requests it. 9 U.S.C. § 3. Because the parties formed a valid arbitration agreement, the Court should compel arbitration and the claims against Coinbase should be stayed. *See Smith v. Spizzirri*, 601 U.S. 472, 476 (2024) ("When § 3 says that a court 'shall . . . stay' the proceeding, the court must do so.").

## CONCLUSION

For the foregoing reasons, Coinbase respectfully requests that the Court compel arbitration of Plaintiff's claims against Coinbase and stay the proceedings against Coinbase pending the outcome of arbitration.

Dated: September 8, 2026
New York, New York

Respectfully submitted,

*/s/ Michael W. McTigue Jr.*

Michael W. McTigue Jr.
Meredith C. Slawe
Lara A. Flath
Alexander C. Drylewski
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001-8602
Tel: (212) 735-3546
Fax: (212) 735-2000
Michael.McTigue@skadden.com
Meredith.Slawe@skadden.com
Lara.Flath@skadden.com
Alexander.Drylewski@skadden.com

Archis A. Parasharami
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7160
Fax: (202) 661-0160
Archis.Parasharami@skadden.com

*Counsel for Defendants Coinbase, Inc. and Coinbase Global, Inc.*

**CERTIFICATION OF WORD COUNT**

Pursuant to Rule 2.B of this Court's Individual Rules and Practices, the undersigned certifies that the foregoing Memorandum of Law contains 6,599 words, excluding the parts of the Memorandum exempted by Rule 2.B. The Memorandum therefore complies with the 8,750-word limit in Rule 2.B.

*/s/ Michael W. McTigue Jr.*
Michael W. McTigue Jr.